IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

TROY SMITH,

                Plaintiff,        Civil Action No.
                                      9:10-CV-1502 (DNH/DEP)

    v.

C. ROSATI, *et al.,*

                Defendants.

---

APPEARANCES:                OF COUNSEL:

FOR PLAINTIFF:

TROY SMITH, 02-A-6432, *Pro Se*
Elmira Correctional Facility
P.O. Box 500
Elmira, New York

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN     MICHAEL G. McCARTIN, ESQ.
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

*Pro se* plaintiff Troy Smith, a New York State prison inmate, has

commenced this action, pursuant to 42 U.S.C. § 1983, against the

Commissioner of the New York State Department of Corrections and

Community Supervision ("DOCCS") and several DOCCS employees, alleging deprivation of his civil rights. In general terms, plaintiff's amended complaint alleges that two defendants assaulted him at the instruction of other defendants, that one defendant failed to intervene and protect him from the assault, that two defendants failed to provide him with adequate medical care, that several defendants conspired to conceal the assault, and that he was deprived procedural due process at a disciplinary hearing arising from the event.

Currently pending before the court in connection with the action is defendants' motion for the entry of partial summary judgment. Specifically, defendants seek dismissal of all claims against all defendants with the exception of those asserted against defendants Rosati and St. John, who, plaintiff alleges, assaulted him. For the reasons set forth below, I recommend that defendants' motion be granted except as it relates to the failure to intervene claim asserted against defendant Fraser and the retaliation claim interposed against defendant Goodman.

## I.    <u>BACKGROUND</u>[1]

Plaintiff is a New York State prison inmate currently being held in the custody of the DOCCS.  *See generally* Am. Compl. (Dkt. No. 7).  Although he is currently confined elsewhere, at all times relevant to this action, Smith was confined in the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York.  *Id.* at 1.  Two series of events, separately discussed below, give rise to this action.

### A.    <u>Mattress Incident</u>

In January 2010, plaintiff attempted to trade in his old mattress to defendant B. Mars, the laundry supervisor at Great Meadow, in return for a new one.  Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 9.  According to plaintiff, defendant Mars improperly ordered plaintiff to pay the full price for the new mattress because she believed that plaintiff had purposely damaged his old one.  *Id.* at 9-10.  Defendant Mars issued a misbehavior to plaintiff, and plaintiff filed a grievance against defendant Mars with the Inmate Grievance Resolution Committee ("IGRC"), both as a result of the incident.  *Id.* at 10.  Defendant Craig Goodman, a corrections captain

---

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

employed by the DOCCS, presided over the disciplinary hearing that resulted from the misbehavior report issued by defendant Mars. *Id.* at 11; Goodman Decl. (Dkt. No. 79, Attach. 12) at ¶ 1. According to plaintiff, at that hearing, defendant Goodman acknowledged that plaintiff's old mattress was damaged as a result of normal wear-and-tear, promised to testify on plaintiff's behalf at the IGRC hearing, and dismissed the misbehavior report. Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 11. Plaintiff alleges, however, that defendant Goodman ultimately refused to testify on his behalf at the IGRC hearing, and denied that he told plaintiff his mattress was damaged as a result of normal wear-and-tear. *Id.* at 12. As a result, in January or February 2010, plaintiff filed a grievance with the IGRC alleging that defendant Goodman lied to him. *Id.* at 15, 17.

In May 2010, plaintiff tested positive for marijuana use, and was issued a misbehavior report. Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 13. Defendant Goodman presided over the ensuing disciplinary hearing and, after finding plaintiff guilty, sentenced him principally to twelve months of disciplinary confinement in the Special Housing Unit ("SHU"). *Id.* at 18, 21. Due to plaintiff's mental health status, however, this sentence was subsequently modified by the facility superintendent to six months in

keeplock confinement.  *Id.* at 23.  On or about June 11, 2010, plaintiff arrived in keeplock at Great Meadow.  *Id.*

B.    Assault

On June 18, 2010, defendant Paul Zarnetski, a corrections lieutenant employed by the DOCCS, instructed defendant Craig Rosati, a corrections officer also employed by the DOCCS, to escort plaintiff to his scheduled disciplinary hearing.  Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 87; Zarnetski Decl. (Dkt. No. 79, Attach. 14) at ¶¶ 1, 4. At approximately 12:45 p.m. on the same date, defendant Rosati retrieved plaintiff from his cell for the escort.  Am. Compl. (Dkt. No. 7) at 9; Goodman Decl. Exh. (Dkt. No. 79, Attach. 15) at 1.  As the two entered a nearby stairway, an altercation occurred between them, which resulted in both plaintiff and defendant Rosati falling down the stairs.  Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 31; Goodman Decl. Exh. (Dkt. No. 79, Attach. 15) at 1. Plaintiff alleges that defendant Rosati pushed him down the stairs and then jumped on him.  Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 31, 35. Defendant Rosati, on the other hand, reported that plaintiff turned toward him in a threatening manner, causing him to use force that consisted of a strike to plaintiff's forehead with a closed fist.  Goodman Decl. Exh. (Dkt.

5

No. 79, Attach. 13) at 1.  It is undisputed, however, that, after plaintiff and defendant Rosati fell down the stairs, defendant Chad St. John, another corrections officer, arrived at the scene.  Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 35-36; Goodman Decl. Exh. (Dkt. No. 79, Attach. 13) at 1. Plaintiff alleges that defendant St. John began kicking him while he was still on the ground.  Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 35-36. Defendants, however, maintain that defendant St. John used force that consisted only of applying mechanical hand restraints.  Goodman Decl. (Dkt. No. 79, Attach. 13) at 1.

Shortly after the arrival of defendant St. John, defendant C. Fraser, a corrections sergeant at Great Meadow, also arrived on the scene.  Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 37; Goodman Decl. Exh. (Dkt. No. 79, Attach. 13) at 1.  The parties dispute whether defendant Fraser witnessed a further use of force by defendant Rosati when defendant Rosati pushed plaintiff's face into a wall and threatened to kill him.  Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 38; Defs.' L.R. 7.1 Statement (Dkt. No. 79, Attach. 16) at ¶ 9.  It is undisputed, however, that defendant Fraser ordered that a video camera be brought to the scene; upon its arrival, a corrections officer began filming plaintiff's escort from the stairway to the Great

6

Meadow hospital.  Lindemann Decl. Exhs. (Dkt. No. 79, Attach. 10) (traditionally filed, not electronically filed).

Upon his arrival at the hospital, Smith was examined by defendant David Lindemann, a DOCCS registered nurse.  Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 40; Lindemann Decl. (Dkt. No. 79, Attach. 7) at ¶¶ 1, 4. As a result of his examination and interview of plaintiff, defendant Lindemann noted plaintiff's complaints of a sore left shoulder, pain to his left rib area, and facial area pain, but observed no decrease in plaintiff's range of motion in his shoulder and no visible injuries to his rib area. Lindemann Decl. (Dkt. No. 79, Attach. 7) at ¶ 5; Lindemann Decl. Exhs. (Dkt. No. 79, Attachs. 8, 9).  Defendant Lindemann observed a swollen area on plaintiff's head and a laceration of approximately one and one-half inches in length above plaintiff's left eye, for which he referred plaintiff to defendant Nesmith for stitches.  *Id.*  Defendant Ted Nesmith, a physicians assistant employed by the DOCCS, closed plaintiff's laceration above his left eye with eight stitches.  Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 79-80; Nesmith Decl. (Dkt. No. 79, Attach. 6) at ¶ 5.

As a result of the incident, plaintiff was issued a misbehavior report accusing him of engaging in violent conduct, attempted assault on staff,

7

and refusing a direct order. McCartin Decl. Exhs. (Dkt. No. 79, Attach. 5) at 2-3. A Tier III disciplinary hearing was subsequently convened by defendant Andrew Harvey, a commissioner's hearing officer, to address the charges.[2] *Id.* at 2. Plaintiff was assigned a corrections counselor, defendant Torres, to help him prepare his defense at the disciplinary hearing. Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 75-79. At the close of that hearing, plaintiff was found guilty on all three counts, and was sentenced to a six-month period of disciplinary SHU confinement, together with a loss of packages, commissary, and telephone privileges for a similar period. *Id.* at 21.

In the months that followed the incident involving defendants Rosati and St. John, both plaintiff and his mother, Linda Terry, wrote letters to defendant Fischer, the DOCCS Commissioner, complaining of the alleged assault. Plf.'s Resp. Exhs. (Dkt. No. 87, Attach. 2) at 5, 8-12. On September 15, 2010, defendant Lucien LeClaire, the Deputy DOCCS

---

[2] The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

Commissioner, responded by letter, advising plaintiff that defendant Fischer had referred plaintiff's complaint to him, and that he, in turn, had referred the matter to the Office of Special Housing/Inmate Disciplinary Programs. *Id.* at 6. The next day, defendant Albert Prack, the acting director of the Office of Special Housing/Inmate Disciplinary Programs, wrote a letter to plaintiff indicating that his letters to defendant Fischer, which he construed as a request for reconsideration of his appeal of the disciplinary conviction, was without merit, and advising plaintiff that "[n]o further administrative action will be taken." *Id.* at 7.

## II.   PROCEDURAL HISTORY

Plaintiff commenced this action on December 13, 2010, and on February 14, 2011, filed an amended complaint as a matter of right. Dkt. Nos. 1, 7. Those named as defendants in plaintiff's amended complaint include DOCCS Commissioner Brian Fischer; DOCCS Chief Counsel and Deputy Commissioner Anthony J. Annucci; DOCCS Deputy Commissioner Lucien LeClaire, Jr.; DOCCS Inspector General Richard Roy; Deputy Superintendent for Security at Great Meadow Charles Kelly; Deputy Superintendent for Administration at the Great Meadow D. Lindstrand;

Corrections Captains Joseph Carey and Craig Goodman;[3] Corrections Sergeants D. Bebee and C. Fraser; Corrections Lieutenants T. Pray and Paul Zarnetski;[4] Commissioner's Hearing Officer Andrew Harvey; Corrections Counselor Torres; Corrections Officers Craig P. Rosati and Chad W. St. John; Physicians Assistant Ted Nesmith;[5] Register Nurse David Lindemann;[6] Laundry Supervisor B. Mars; and Acting Director of the Office of Special Housing/Inmate Disciplinary Programs Albert Prack.[7]

Liberally construed, plaintiff's amended complaint asserts eight

---

[3]    Plaintiff's amended complaint identifies defendant Goodman as a lieutenant. Am. Compl. (Dkt. No. 7) at 5. In his affidavit submitted in support of defendants' pending motion, however, defendant Goodman states that he is a corrections captain. Goodman Decl. (Dkt. No. 79, Attach. 12) at ¶ 1.

[4]    Defendant Zarnetski's name has been spelled by plaintiff in various ways, and is listed on the court's records as Zaratski. The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as Zarnetski.

[5]    Defendant Nesmith was sued by plaintiff as "Nesmith (Ted) Fisher, III," Am. Compl. (Dkt. No. 7) at 6, and is listed on the court's records as "Nesmith Fisher." The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as Ted Nesmith.

[6]    Defendant Lindemann was sued by plaintiff as "D. Lindermann," Am. Compl. (Dkt. No. 7) at 6, and is listed on the court's records as "D. Lindermann." The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as David Lindemann.

[7]    The record reflects that defendant Prack's name has been spelled in a variety of ways, and is listed on the court's records as "Albert Prach." The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as Albert Prack.

causes of action, claiming (1) the use of excessive force by defendants Rosati and St. John; (2) conspiracy to conceal the alleged assault by defendants Rosati and St. John against defendants Rosati, St. John, Fraser, Bebee, Kelly, Lindemann, Nesmith, Lindstrand, Goodman, Torres, and Harvey; (3) deliberate indifference to plaintiff's serious medical needs against defendants Lindemann and Nesmith; (4) retaliation against defendants Goodman, Rosati, and St. John; (5) failure to enforce DOCCS regulations against defendants Fischer, Annucci, Roy, and LeClaire; (6) withholding personal property against defendant Mars and Goodman; (7) procedural due process against defendants Harvey, Torres and Prack; and (8) failure to train and supervise against defendants Fischer, Annucci, LeClaire, Roy, Kelly, and Lindstrand.[8]  Am. Compl. (Dkt. No. 7) at 19-20.

---

[8]     At several points in his complaint, as amended, plaintiff alleges that defendants violated various regulations regarding such matters as reporting the requirement of prison medical personnel to assess medical conditions, and the requirement that a disciplinary hearing be held within seven days.  It is well-established that the violation of a prison regulation is not redressable in a civil rights action brought pursuant to section 1983.  *See Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir. 1987) ("State procedural requirements do not establish federal constitutional rights."); *Barnes v. Henderson*, 628 F. Supp. 2d 407, 411 (W.D.N.Y. 2009) ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation.").  Plaintiff's complaint also references 18 U.S.C. § 1351, a criminal statute addressing fraud and foreign labor contracting, as well as the Torture Victim Protection Act of 1991, codified at 28 U.S.C. § 1350, and providing a private right of action by an alien for a tort committed in violation of international law or a United States treaty.  Those sections do not appear to have any applicability to the facts of this case.

Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive damages.

By decision and order dated June 23, 2011, following an initial review of plaintiff's amended complaint, pursuant to 28 U.S.C. §§ 1915(e) and 1915A, the court *sua sponte* dismissed all of plaintiff's claims against defendants Kelly, Lindstrand, Carey, Bebee, and Pray, without prejudice, as well as plaintiff's equal protection claims against defendants Mars and Goodman, also without prejudice, and otherwise authorized the action to go forward.  Dkt. No. 10.

On May 14, 2012, following the close of discovery, defendants moved for the entry of partial summary judgment dismissing the majority of the claims made in plaintiff's amended complaint.  Dkt. No. 79.  In their motion, defendants argue that (1) defendants Fischer, Annucci, LeClaire, Roy, and Prack are entitled to dismissal based upon the lack of their personal involvement in the alleged constitutional violations; (2) the record fails to support a claim of deliberate medical indifference against defendant Nesmith and Lindemann; (3) the record does not disclose a basis to hold defendant Fraser liable for failure to protect or intervene; (4) plaintiff's claims against defendant Zarnetski are subject to dismissal,

based upon his lack of prior knowledge of and involvement in the assault; (5) plaintiff's verbal harassment claim against defendant Goodman is not cognizable under section 1983; (6) plaintiff's procedural due process cause of action against defendant Harvey lacks merit; (7) plaintiff's claim based upon the payment of $65 for a new mattress does not state a cognizable constitutional claim; and (8) in any event, all defendants, except for defendants Rosati and St. John, are entitled to qualified immunity. Defs.' Memo. of Law (Dkt. No. 79, Attach. 17). Defendants' motion, to which plaintiff has since responded, Dkt. No. 87, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72(3)(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477

13

U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d

133, 137-38 (2d Cir. 1998).  The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party.  *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

     B.    <u>Personal Involvement</u>

In their motion, defendants seek dismissal of all claims against defendants Fischer, Annucci, LeClaire, Roy, and Prack based upon lack of personal involvement.  Plaintiff responds by arguing that, through his letters, those individuals were or should have been aware of plaintiff's circumstances, but were deliberately indifferent, and additionally were derelict in the performance of their duties and in supervising subordinates, permitting the alleged constitutional deprivations to occur.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977)).  In order to prevail on a

section 1983 cause of action against an individual, a plaintiff must show "a

tangible connection between the acts of a defendant and the injuries

suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). It is well

established that a supervisor cannot be liable for damages under section

1983 solely by virtue of being a supervisor because there is no

*respondeat superior* liability under section 1983.[9] *Richardson v. Goord*,

347 F.3d 431, 435 (2d Cir. 2003). A supervisor, however, may be held

responsible for a civil rights violation when it is established that he (1) has

directly participated in the challenged conduct; (2) after learning of the

violation through a report or appeal, failed to remedy the wrong; (3)

created or allowed to continue a policy or custom under which

unconstitutional practices occurred; (4) was grossly negligent in managing

subordinates who caused the unlawful event; or (5) failed to act on

information indicating that unconstitutional acts were occurring. *Iqbal v.*

*Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub*

*nom.*, *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *see also Richardson*, 347

_____

[9]    Here, the defendants implicated in this portion of the pending motion are
principally supervisory DOCCS employees.

F.3d at 435; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[10]

### 1. Defendant Fischer

At his deposition, plaintiff testified that he sued DOCCS Comissioner Fischer for two reasons: (1) he wrote defendant Fischer about the alleged assault by defendants Rosati and St. John, and defendant Fischer failed to respond; and (2) as the DOCCS Commissioner, defendant Fischer is responsible for the actions of his subordinate employees. Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 55-57. Neither of these reasons provides an adequate basis for suit under section 1983. *See*, *e.g.*, *Hernandez v. Keane*, 342 F.3d 137, 144 (2d Cir. 2003) ("[S]upervisor liability in a [section] 1983 action . . . cannot rest on *respondeat superior*."); *Parks v. Smith*, No. 08-CV-0586, 2011 WL 4055415, at *14 (N.D.N.Y. Mar. 29, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4055414 (N.D.N.Y. 2011) (McAvoy, J.) ("A prisoner's allegation that a supervisory official failed to

---

[10]     The Second Circuit has yet to address the impact of the Supreme Court's decision in *Iqbal* on the categories of supervisory liability under *Colon*. Lower courts have struggled with this issue – specifically in deciding whether *Iqbal* effectively calls into question certain categories of supervisor liability in *Colon*. *Sash v. United States*, 674 F. Supp. 2d 542-44 (S.D.N.Y. 2009); *see also Stewart v. Howard*, No. 09-CV-0069, 2010 WL 3907227, at *12 n.10 (N.D.N.Y. Apr. 26, 2010) (Lowe, M.J.) ("The Supreme Court's decision in [*Iqbal*] arguably casts in doubt the continued viability of some of the categories set forth in *Colon*." (citing *Sash*)). In this case, absent any controlling authority to the contrary, the court assumes that all of the *Colon* categories still apply.

respond to a grievance is insufficient to establish that official's personal involvement.").[11]  Except for this testimony by plaintiff, there is no other record evidence relating to defendant Fischer.  As a result, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Fischer was personally involved in any of the allegations giving rise to this action.

## 2.    Defendant Annucci

At his deposition, plaintiff testified that he sued DOCCS Chief Counsel and Deputy Commissioner Annucci in this action for four reasons: (1) he is at the top of the chain of command as Deputy Commissioner of DOCCS; (2) he failed to investigate the alleged assault on plaintiff; (3) he merely passed the letters from plaintiff and plaintiff's family down the chain of command; (4) he did not do his job.  Plf.'s Dep. Tr. (Dkt. No. 79, Attach 3) at 57-59.  Plaintiff's argument that defendant Annucci did not do his job by failing to investigate is based on plaintiff's unsupported assumption that defendant Fischer forwarded plaintiff's letter to defendant Annucci and instructed him to investigate.  *See id.* at 58 ("[Defendant Annucci] didn't do what I figured he was told to be done by

---

[11]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

investigating[.]").  Indeed, there is no record evidence, including any testimony from plaintiff, that plaintiff or any members of his family wrote a letter or complaint directly to defendant Annucci.  In any event, even assuming that defendant Annucci received plaintiff's letters, defendant Annucci's failure to respond to them is not sufficient to give rise to personal involvement under section 1983.  *Parks*, 2011 WL 4055415, at *14 ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement.").  For these reasons, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Annucci was personally involved in any of the allegations giving rise to this action.

### 3.    Defendant LeClaire

At his deposition, plaintiff testified that he sued Deputy DOCCS Commissioner LeClaire because defendant LeClaire forwarded plaintiff's letter addressed to defendant Fischer regarding the alleged assault to the Office of Special Housing/Inmate Disciplinary Programs.  Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 60; Plf.'s Resp. Exhs. (Dkt. No. 87, Attach. 2) at 6.  That allegation is insufficient to raise a dispute of material fact as to whether defendant LeClaire is personally involved in any of the allegations

giving rise to this action.  *See*, *e.g.*, *Ward v. LeClaire*, No. 07-CV-0026, 2010 WL 1189354, at *5 (N.D.N.Y. Mar. 24, 2010) (Suddaby, J.) ("[I]t is well settled that referring letters and grievances to staff for investigation is not sufficient to establish personal involvement." (internal quotation marks and alterations omitted)).  Because there is no other record evidence that relates to defendant LeClaire, I find that no reasonable factfinder could conclude that he was personally involved in any of the allegations giving rise to this action.

      4.   <u>Defendant Roy</u>

At his deposition, plaintiff stated that he sued defendant Roy because he has not received a response from the Inspector General's Office, where defendant Roy heads the Internal Affairs Department, regarding plaintiff's grievance.  Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 61.  Plaintiff testified that he gave a copy of his grievance regarding the alleged assault to an Internal Affairs employee while at Great Meadow, and was later interviewed regarding the incident, but has not yet received a result of the investigation.  *Id.* at 61-64.  Importantly, plaintiff testified that he has no personal knowledge that defendant Roy, as the head of Internal Affairs, was ever personally aware of the investigation.  *Id.*

Because there is no *respondeat superior* liability under section 1983, this evidence is not sufficient to support a claim against defendant Roy. *Hernandez*, 342 F.3d at 144. For that reason, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Roy was personally involved in any of the allegations giving rise to this action.

### 5. Defendant Prack

At his deposition, plaintiff testified that he sued defendant Prack because Prack cursorily reviewed plaintiff's appeal of his disciplinary conviction in his capacity as the acting director of the Office of Special Housing/Inmate Disciplinary Programs. Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 92; Plf.'s Resp. Exhs. (Dkt. No. 87, Attach. 2) at 7. A review of the record evidence reveals that defendant Prack did, in fact, respond to plaintiff's appeal of his disciplinary conviction, and that defendant Prack indicated in that response that plaintiff's appeal was meritless. Plf.'s Resp. Exhs. (Dkt. No. 87, Attach. 2) at 7.

Whether review of an inmate's disciplinary conviction by a person in defendant Prack's position is sufficient to establish personal involvement in section 1983 cases is the subject of debate in this circuit. Some courts

have determined that the review and response to an appeal of a

disciplinary conviction are sufficient to establish personal involvement

because that conduct implicates the second of the five potential grounds

for supervisor liability under *Colon*.[12]  *See Baez v. Harris,* No. 01-CV-0807,

2007 WL 446015, at *2 (N.D.N.Y. Feb. 7, 2007) (Mordue, C.J.) (finding

that the response of "the Director of the Special Housing/Inmate

Disciplinary Program" to the plaintiff's appeal is "sufficient to withstand

summary judgment on the issue of personal involvement"); *Ciaprazi v.

Goord*, No. 02-CV-0915, 2005 WL 3531464, at *16 (N.D.N.Y. Dec. 22,

2005) (Sharpe, J., *adopting report and recommendation by* Peebles, M.J.)

(recommending that [the director of Office of Special Housing/Inmate

Disciplinary Programs] not be dismissed for lack of personal involvement

because a "review of [the plaintiff's appeal from a disciplinary conviction]

sufficiently establishes his personal involvement based upon [the

defendant] being positioned to discern and remedy the ongoing effects of

any such violations"); *Johnson v. Coombe*, 156 F. Supp. 2d 273, 278

(S.D.N.Y. 2001) (finding that plaintiff's complaint sufficiently alleged

_____

[12]     *See Colon*, 58 F.3d at 873 ("The personal involvement of a supervisory
defendant may be shown by evidence that: . . . (2) the defendant, after being informed
of the violation through a report or appeal, failed to remedy the wrong[.]").

22

personal involvement of the superintendent and DOCCS commissioner to withstand motion to dismiss because the complaint alleged that both defendants had actual or constructive notice of the alleged constitutional violation that occurred at the disciplinary hearing); *Gilbert v. Selsky*, 867 F. Supp. 159, 166 (S.D.N.Y. 1994) ("If a supervisory official learns of a violation through . . . an appeal, but fails to remedy the wrong, that may constitute a sufficient basis for liability."); *Cepeda v. Coughlin*, 785 F. Supp. 385, 391 (S.D.N.Y. 1992) (holding that, on a motion to dismiss, the allegation that the DOCCS's commissioner "entertained" and "affirmed" the plaintiff's appeal is sufficient to state a claim against the commissioner because "the allegation that supervisory personnel learned of alleged misconduct on appeal yet failed to correct it constitutes an allegation of personal participation").

On the other hand, some courts have concluded otherwise, holding that the mere allegation that a defendant reviewed a disciplinary conviction appeal is insufficient to find that defendant personally involved. *See Tafari v. McCarthy*, 714 F. Supp. 2d 317 (N.D.N.Y. 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) ("The affirming of a disciplinary conviction does not constitute personal involvement in a

constitutional violation."); *Abdur-Raheem v. Selsky*, 598 F. Supp. 2d 367, 370 (W.D.N.Y. 2009) ("The only allegation concerning [the director of the Special Housing/Inmate Disciplinary Program] . . . is that he affirmed the disposition of plaintiff's administrative segregation hearing, pursuant to which plaintiff was confined to SHU.  That is not enough to establish [his] personal involvement." (internal citation omitted)); *Odom v. Calero*, No. 06-CV-15527, 2008 WL 2735868, at *7 (S.D.N.Y. Jul. 10, 2008) (holding that the allegation that the director of the Special Housing/Inmate Disciplinary Program was personally involved as a result his denial of the plaintiff's appeal of his disciplinary conviction was not sufficient to trigger the second category establishing personal involvement under *Colon* because, "[o]nce the [disciplinary] hearing was over and [the defendant's] decision was issued, the due process violation was completed"); *Ramsey v. Goord*, No. 05-CV-0047A, 2005 WL 2000144, at *6 (W.D.N.Y. Aug. 13, 2005) ("[T]he fact that [the DOCCS commissioner and SHU director], as officials in the DOC[C]S 'chain of command,' affirmed [a] determination on appeal is not enough to establish personal involvement of their part."); *Joyner v. Greiner,* 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002) ("The fact that Superintendent Greiner affirmed the denial of plaintiff's grievance –

which is all that is alleged against him – is insufficient to establish personal involvement or to shed any light on the critical issue of supervisory liability, and more particularly, knowledge on the part of the defendant." (internal quotation marks omitted)).

At this time, I am inclined to agree with those courts that have determined that a defendant's review and response to an appeal of a disciplinary conviction is sufficient under *Colon* to find that defendant personally involved. Mindful that on a motion for summary judgment I must view the facts, and draw all inferences, in the light most favorable to the non-movant, I find that a reasonable factfinder could conclude, if plaintiff's testimony is credited, that defendant Prack's review of plaintiff's disciplinary conviction revealed a due process violation, and by defendant Prack dismissing plaintiff's appeal, he failed to remedy that violation. Additionally, because it appears that plaintiff was still serving the sentence imposed at the disciplinary hearing where his alleged due process violation occurred, I find that any violation that may have occurred was ongoing, and defendant Prack was in a position to remedy that violation, at least in part, at the time plaintiff appealed his conviction. All of this is enough to find that there is a dispute of material fact as to whether

defendant Prack was personally involved in the allegations giving rise to plaintiff's due process claim by way of the second of the five potential grounds for supervisor liability under *Colon*. *Cf. Black v. Coughlin*, 76 F.3d 72, 75 (2d Cir. 1996) ("We disagree, however, with the district court's denial of leave to amend to add [the director of the Special Housing/Inmate Disciplinary Program], who [was] personally involved in [the plaintiff's] disciplinary proceedings[.]").[13]

In summary, I recommend that defendants' motion for summary judgment on the basis of personal involvement be granted with respect to defendants Fischer, Annucci, LeClaire, and Roy, but denied as it relates to defendant Prack.

C.    Deliberate Indifference Claims Against Defendants Nesmith and Lindemann

Defendants next seek dismissal of plaintiff's Eighth Amendment deliberate indifference claims against defendants Nesmith and Lindemann, arguing that the record lacks any evidence of their deliberate

---

[13]    Based on the record evidence now before the court, I find that defendant Prack could have been personally involved only in plaintiff's procedural due process claim. As discussed more completely below, however, I recommend dismissal of that claim. Therefore, the finding that a dispute of material fact exists as to whether defendant Prack was personally involved in the allegations giving rise to this action is largely academic.

indifference to plaintiff's serious medical needs.  In his amended complaint, plaintiff contends that defendants Nesmith and Lindemann failed to provide him with proper medical treatment for back pain, blurred vision, and hearing loss resulting from alleged assault by defendants Rosati and St. John on June 18, 2010.  Am. Compl. (Dkt. No. 7) at 12.

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or which 'involve the unnecessary and wanton infliction of pain[.]'" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (internal citations omitted)).  While the Eighth Amendment "'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)).

"These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103.  Failure to provide inmates with medical care, "[i]n the worst cases, . . . may actually produce physical torture or lingering death, [and] . . . [i]n less serious cases, . . . may result in pain and

suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care . . . . Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (internal citations omitted).

The second inquiry of the objective test requires a court to look at the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). "Factors relevant to the seriousness of a medical

condition include whether 'a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (internal quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith*, 316 F.3d at 185) (internal quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . ., the official's state of

mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837); *see also Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer*); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40).

Here, after carefully reviewing the record evidence, I find that no dispute of material fact exists as to whether defendants Nesmith and Lindemann were deliberately indifferent to plaintiff's medical needs as a result of the alleged assault by defendants Rosati and St. John. More specifically, although plaintiff testified at his deposition that defendant Nesmith did not follow "his procedure as being a physician" and failed to follow-up with plaintiff, plaintiff also testified that defendant Nesmith

cleaned plaintiff's laceration and closed it with eight stitches. Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 79-80. Importantly, plaintiff testified that, on the date of the alleged assault, defendant Nesmith did everything that plaintiff requested of him. *Id.* at 80, 81. The record also reflects that defendant Lindemann completed an examination of plaintiff upon his arrival at the Great Meadow hospital, and that he completed a two-page "Use of Force Report" and one-page "Alleged Fight Exam" report during his examination of plaintiff.[14] Lindemann Decl. (Dkt. No. 79, Attach. 7) at ¶ 4; Lindemann Decl. Exhs. (Dkt. No. 79, Attachs. 7, 8); Nesmith Decl. (Dkt. No. 79, Attach. 6) at ¶ 4. I have also reviewed the videotape submitted by defendants that recorded the treatment that defendants Nesmith and Lindemann provided plaintiff following the alleged assault by defendants Rosati and St. John. Lindemann Decl. Exhs. (Dkt. No. 79, Attach. 10) (traditionally filed, not electronically filed). This recording did not display anything unusual, and, although the recording did not include any sound, it appeared that defendants Lindemann and Nesmith asked plaintiff questions, responded to plaintiff's answers, and provided plaintiff with

---

[14] These reports do not include any complaints of hearing loss or blurred vision – complaints that plaintiff has alleged are ongoing and long-term effects of the alleged assault. *See generally* Lindemann Decl. Exhs. (Dkt. No. 79, Attachs. 7, 8).

thorough medical care for his reported injuries. *See generally id.* After carefully reviewing all of this evidence, including plaintiff's testimony, I conclude that no reasonable factfinder could find that the care defendants Nesmith and Lindemann provided plaintiff was inadequate, or that they acted with the requisite deliberate indifference when providing medical treatment to plaintiff.

As it relates to plaintiff's allegations that he received inadequate follow-up medical treatment, the record evidence does not support this allegation. Specifically, plaintiff testified that defendant Nesmith removed his stitches. Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 83. Additionally, a review of plaintiff's ambulatory health record reveals that plaintiff was subsequently treated by other medical staff members at Great Meadow on several occasions, including on June 20 and 25, 2010; July 1, 6, 20, 23, 27, and 29, 2010; and August 3, 2010. Lindemann Decl. Exhs. (Dkt. No. 79, Attach 11). While some of those visits reference symptoms that plaintiff now attributes to the alleged assault on June 18, 2010, including a notation that plaintiff was scheduled to see an eye doctor (June 25, 2010), others involved matters unrelated to the alleged assault, including missing dentures (July 20, 2010), bug bites (July 23, 2010) and a request for

toenail clippers (July 29, 2010). *Id.* Even considered in the light most favorable to plaintiff, the cumulation of this evidence leads me to find that a reasonable factfinder could not conclude that plaintiff received inadequate follow-up medical care by any of the named-defendants, including defendants Nesmith and Lindemann, or that any of the named-defendants acted with the requisite deliberate indifference.

In summary, I find that there is no record evidence to support a reasonable factfinder's determination that, objectively, defendants Nesmith and Lindemann provided plaintiff with inadequate treatment for a serious medical need, or that, subjectively, they knew of but disregarded an excessive risk to plaintiff's health or safety. I therefore recommend dismissal of plaintiff's deliberate medical indifference claim against those two defendants.

### D.    Plaintiff's Claims Against Defendant Fraser

Defendants next seek dismissal of all claims asserted in plaintiff's amended complaint against defendant Fraser. A careful review of plaintiff's amended complaint reveals that it asserts three causes of action against defendant Fraser, including (1) conspiracy to cover-up the alleged assault on June 18, 2010; (2) the issuance of a false misbehavior report;

and (3) failure to intervene.  In their motion, defendants only specifically seek dismissal of a perceived excessive force claim, and the issuance of a false misbehavior report claim against defendant Fraser.  For the sake of completeness, I will nonetheless address all of the claims asserted against defendant Fraser.

To the extent that plaintiff's amended complaint may be construed as asserting an excessive force claim against defendant Fraser, I recommend dismissal of that claim because there is no record evidence that defendant Fraser used any force against plaintiff.  Specifically, a review of both plaintiff's amended complaint and his deposition transcript do not reveal an allegation that defendant Fraser used any force against him.  Plaintiff only alleges that defendants Rosati and St. John used force, which is not sufficient to support an excessive force claim against defendant Fraser.

The remaining claims asserted against defendant Fraser, except for plaintiff's failure to intervene cause of action, are also easily discounted. Plaintiff's conspiracy claim fails against defendant Fraser, as well as defendants Rosati, St. John, Harvey and Torres, Am. Compl. (Dkt. No. 7) at 19, because there is no record evidence that these defendants agreed

to violate any of plaintiff's constitutional rights.  *See Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) ("To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.").  Specifically, plaintiff did not testify at his deposition to the existence of any agreement among those defendants, and the only mention of such an agreement is a conclusory allegation in plaintiff's amended complaint.  *See* Am. Compl. (Dkt. No. 7) at 19 ("Defendant[]s Fraser, Rosati, St. John, Harvey, and Torres conspired to use Tier III hearing to deflect official misconduct for exercising a protected right[.]").  Mere conclusory allegations that are unsupported by any record evidence are insufficient to give rise to a genuine dispute of material fact.  *See*, *e.g.*, *Hilson v. Maltese*, No. 09-CV-1373, 2012 WL 6965105, at *6 n.10 (N.D.N.Y. Dec. 14, 2012) (Baxter, M.J.), *adopted by* 2013 WL 375489 (N.D.N.Y. Jan. 30, 2013) (Mordue, J.) ("Plaintiff's conclusory assertion . . . is not sufficient to establish a material issue of fact[.]" (listing cases)).

Plaintiff's claim that defendant Fraser issued a false misbehavior

report against him is not cognizable under section 1983.  *See Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) ("[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report.").

The allegations in plaintiff's amended complaint related to defendant Fraser's failure to adhere to DOCCS's regulations or policies, do not give rise to a cognizable claim under section 1983.  *See Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir. 1987) ("State procedural requirements do not establish federal constitutional rights."); *Barnes v. Henderson*, 628 F. Supp. 2d 407, 411 (W.D.N.Y. 2009) ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation.").

Plaintiff's failure to intervene claim against defendant Fraser, however, cannot be dismissed at this juncture.  "[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."  *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994), *accord*, *Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001); *see also Mowry v. Noone,* No. 02-CV-6257, 2004 WL 2202645, at *4

(W.D.N.Y. Sept. 30, 2004) ("Failure to intercede results in liability where an officer observes the use of excessive force or has reason to know that it will be used."). To establish liability on the part of a defendant under this theory, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle*, No. 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008)).

Here, a review of the record evidence reveals the existence of a genuine dispute of material fact as to whether defendant Rosati's continued use of force against plaintiff triggered defendant Fraser's duty to intervene. Although defendants cite plaintiff's deposition testimony for the proposition that "no further assault occurred after Defendant Fraser's arrival on the scene," Defs.' L.R. 7.1 Statement (Dkt. No. 79, Attach. 16) at ¶ 9, the record does not support this fact. Instead, during two separate lines of questioning, plaintiff testified at his deposition that, after defendant Fraser arrived to the scene, defendant Rosati "pushed" or "mushed"

37

plaintiff's face into the wall and threatened to kill him. Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 38, 65. Because this testimony clearly indicates that defendant Fraser was present for this alleged use of force by defendant Rosati, and because the record evidence does not conclusively support a finding that defendant Rosati's additional use of force was unconstitutional,[15] I find that a reasonable factfinder could conclude, based on the record evidence now before the court, that defendant Fraser's duty to intervene was triggered by defendant Rosati's conduct.

In summary, I recommend that all claims against defendant Fraser be dismissed, with the exception of the failure to intervene claim.

E.     Plaintiff's Claims Against Defendant Zarnetski

Defendants next seek dismissal of all claims against defendant Zarnetski. Plaintiff's amended complaint alleges that defendant Zarnetski is liable for the force used by defendant Rosati because he should have predicted that, when he instructed defendant Rosati to escort plaintiff to the disciplinary hearing, defendant Rosati would assault him. Although

---

[15]     In their motion, defendants have expressly represented that they do not move for summary judgment on the excessive force claim asserted against defendants Rosati and St. John because "[t]hat claim. . . necessarily involves a credibility determination . . . [and] remain[s] for trial." Defs.' Memo of Law (Dkt. No. 79, Attach. 17) at 3.

such an allegation, if properly supported by the record, may give rise to a failure to intervene or conspiracy to use excessive force claim, the evidence in this case does not support either claim.

In his verified amended complaint, plaintiff avers that defendant Zarnetski sent defendant Rosati to escort him to his disciplinary hearing, and on the way to the hearing, defendant Rosati assaulted him. Am. Compl. (Dkt. No. 7) at 17. During his deposition, plaintiff elaborated on this allegation only to the extent of testifying that it is "known" at Great Meadow that defendant Rosati "is a hothead," and, as a result of this common prison knowledge, defendant Zarnetski should have predicted that defendant Rosati would assault plaintiff. Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 88-89. Plaintiff also admitted, however, that, in order to attend his disciplinary hearing, he was required to be escorted by a corrections officer. *Id.* at 88. In his affidavit, defendant Zarnetski avers that he "had absolutely no foreknowledge that C.O. Rosati and plaintiff would be involved in a use of force on June 18, 2010." Zarnetski Decl. (Dkt. No. 79, Attach. 14) at ¶ 4. Because, in the face of defendant Zarnetski's denial, plaintiff's allegations amount to nothing more than his rank speculation that defendant Zarnetski knew or should have known that

defendant Rosati would assault plaintiff, I find that no reasonable factfinder could conclude that defendant Zarnetski had a duty to intervene. *See Henry*, 2011 WL 5975027, at *4 (finding that, to establish liability on the part of a defendant for failure to intervene, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene."). In addition, because none of this evidence raises a genuine dispute of material fact as to whether defendants Zarnetski and Rosati agreed to use force against plaintiff, I find that no reasonable factfinder could conclude that defendant Zarnetski conspired to violate plaintiff's constitutional rights. *See Pangburn*, 200 F.3d at 72 ("To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."). For all of these reasons, I recommend dismissing all of plaintiff's claims against defendant Zarnetski.

F.    Plaintiff's Claims Against Defendant Lieutenant Goodman

In his amended complaint, plaintiff alleges that defendant Goodman conspired with defendants Rosati and St. John to effectuate the alleged assault on plaintiff because plaintiff successfully modified a disciplinary sentence imposed by defendant Goodman.  Am. Compl. (Dkt. No. 7) at 8. Plaintiff supports this contention with a further allegation that, three days after the alleged assault by defendants Rosati and St. John, defendant Goodman said to plaintiff, "'That is what you get for getting my sentence modified[.]'"  *Id.* at 14.  Defendants properly construe these allegations as plaintiff's assertion of a First Amendment retaliation claim, and seek its dismissal.  Defendants also seek dismissal of plaintiff's verbal harassment claim asserted against defendant Goodman.

1.    First Amendment Retaliation

A cognizable section 1983 retaliation claim lies when prison officials take adverse action against an inmate, which is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment.  *See Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of

rights guaranteed by the Constitution or federal laws.").  To state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

Here, it is well settled that plaintiff's appeal of defendant Goodman's disciplinary sentence is constitutionally protected conduct, satisfying the first prong of a retaliation claim.  *See*, *e.g.*, *Santiago v. Holden*, No. 11-CV-0567, 2011 WL 7431068, at *5 (N.D.N.Y. Nov. 29, 2011) (Homer, M.J.), *adopted by* 2012 WL 651871 (N.D.N.Y. Feb. 28, 2012) (Suddaby, J.) ("There is no question that [the plaintiff's] conduct in filing grievances and appeals was conduct protected by the First Amendment."); *Brown v. Bascomb*, No. 05-CV-1466, 2008 WL 4283367, at *6 (N.D.N.Y. Sept. 16,

2008) (Mordue, C.J.).  In addition, being assaulted plainly constitutes an adverse action sufficient to satisfy the second prong of a retaliation claim. *See Cole v. N.Y.S. Dep't of Corrs. Svcs.*, 2012 WL 4491825, at *13 (N.D.N.Y. Aug. 31, 2012) (Dancks, M.J.), *adopted by* 2012 WL 4506010 (N.D.N.Y. Sept. 28, 2012) (Mordue, J.) ("An assault by corrections officers is sufficient to chill a person of ordinary firmness from continuing to engage in his First Amendment activity." (internal quotation marks omitted)).  Turning to the third requirement for a retaliation claim, requiring that a plaintiff to establish a casual connection between the protected conduct and adverse action, drawing all inferences in favor of plaintiff, I find that both plaintiff's amended complaint and his deposition testimony, if credited by a factfinder, may serve to support the allegation that defendant Goodman did, in fact, conspire with defendants Rosati and St. John to assault plaintiff.  More specifically, if plaintiff's testimony regarding defendant Goodman's statements three days after the assault is credited, a reasonable factfinder could conclude that this statement was an admission by defendant Goodman that he orchestrated, in some way, the assault on plaintiff.  However, because defendant Goodman explicitly denied conspiring with defendants Rosati and St. John to assault plaintiff,

Goodman Decl. (Dkt. No. 79, Attach. 12) at ¶¶ 3, 4, I find that a genuine dispute of fact exists as to whether defendant Goodman conspired with defendants Rosati and St. John to retaliate against plaintiff for having exercised his First Amendment rights. For this reason, I recommend that defendants' motion for summary judgment be denied as it relates to plaintiff's retaliation claim against defendant Goodman.

### 2. Verbal Harassment

To the extent that plaintiff's amended complaint may be construed as asserting a verbal harassment claim against defendant Goodman for allegedly stating to plaintiff, "'That is what you get for getting my sentence modified,'" Am. Compl. (Dkt. No. 7) at 14, that claim is not cognizable under section 1983. *See*, *e.g.*, *Moncrieffe v. Witbeck*, No. 97-CV-0253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) ("A claim for verbal harassment is not actionable under 42 U.S.C. § 1983."). For this reason, I recommend that plaintiff's verbal harassment claim asserted against defendant Goodman be dismissed.[16]

---

[16] In the court's initial order, plaintiff's equal protection cause of action was dismissed against defendants Goodman and Mars. Dkt. No. 10 at 16.

G.  Plaintiff's Claims Against Defendants Harvey, Torres, and Prack

Defendants next seek dismissal of plaintiff's procedural due process claims asserted against defendants Harvey, Torres, and Prack. Defendant Harvey served as the hearing officer who presided at plaintiff's Tier III disciplinary hearing arising from the incident on June 18, 2010. Defendant Torres was assigned to assist Smith in his defense at that disciplinary hearing. Plaintiff's amended complaint also alleges that defendants Harvey and Torres conspired with others to use the Tier III hearing to conceal official misconduct. Additionally, as was briefly noted above, plaintiff's amended complaint asserts a due process claim against defendant Prack.

1.  Due Process Claims

To establish a procedural due process claim under section 1983, a plaintiff must show that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes*, 143 F.3d at 658; *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are

well established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell*, 418 U.S. 539, 564-67 (1974).  Under *Wolff*, the constitutionally mandated due process requirements, include (1) advanced written notice of the charges, (2) a hearing in which the inmate is provided the opportunity to appear at a disciplinary hearing and present witnesses and evidence, (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken, and, in some circumstances, (4) the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-70; *see also Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1988).  In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner at least "some eviden[tiary]" support.  *Superintendent, MA Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985).

Here, as it relates to defendant Harvey, plaintiff's amended complaint alleges that defendant Harvey failed to provide plaintiff with a timely hearing.  Am. Compl. (Dkt. No. 7) at 13.  To the extent that plaintiff bases this claim on an allegation that defendant Harvey violated a state agency's regulation, that claim fails as a matter of law.  *See Bolden*, 810 F.2d at 358 ("State procedural requirements do not establish federal

constitutional rights."); *Barnes*, 628 F. Supp. 2d at 411 ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation.").

As it relates to defendant Torres, plaintiff's allegation that she failed to call or interview witnesses on his behalf is unsupported by the record evidence. Specifically, plaintiff admitted at his deposition that he has no basis to believe that defendant Torres failed to interview the people identified by plaintiff as potential witnesses to the alleged assault. Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 75-76. In addition, plaintiff admitted that defendant Torres returned to plaintiff with a list of witnesses that would or would not testify on his behalf. *Id.* at 77. Finally, plaintiff admitted that he did, in fact, call as witnesses those people that agreed to testify on his behalf. *Id.* at 78. From this record evidence, I find that no reasonable factfinder could conclude that defendant Torres denied plaintiff due process based on a failure to assist plaintiff in identifying and calling witnesses on his behalf.

As it relates to defendant Prack, plaintiff's amended complaint alleges that defendant Prack "failed to stop the torture in SHU." Am. Compl. (Dkt. No. 7) at 19. The court construes this allegation to suggest

that, because defendant Prack denied plaintiff's appeal of his disciplinary conviction, he contributed to whatever procedural due process violations occurred during the disciplinary hearing below. The record evidence, however, does not support this conclusion because, as discussed above, defendant was provided the opportunity to investigate and present witnesses on his behalf, and he was appointed a corrections counselor to assist in the preparation of his defense. Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 75, 77-78. Moreover, a careful review of the Tier III hearing transcript, submitted by defendants in support of their motion, reveals that plaintiff was provided adequate due process during the disciplinary hearing from which plaintiff appealed to defendant Prack. McCartin Decl. Exhs. (Dkt. No. 79, Attach. 5). All of this evidence leads the court to conclude that no reasonable factfinder could find that defendant Prack's determination that plaintiff's appeal contributed to a due process violation.

For all of these reasons, I recommend that plaintiff's procedural due process claim asserted against defendant Harvey, Torres, and Prack be dismissed.

## 2. Conspiracy Claim

To the extent it is alleged that defendants Harvey and Torres conspired to conceal the June 18, 2010 assault, such claims are not cognizable under section 1983. *De Ponceau v. Bruner*, No. 09-CV-0605, at *7 (N.D.N.Y. Feb. 21, 2012) (Peebles, M.J.), *adopted by* 2012 WL 1014821 (N.D.N.Y. Mar. 23, 2012) (Suddaby, J.). In any event, as was discussed above in determining that plaintiff's conspiracy claim asserted against defendant Fraser, there is no record evidence that defendants Harvey and Torres engaged in an agreement to violate any of plaintiff's constitutional rights. For these reasons, I recommend that plaintiff's conspiracy claim asserted against defendants Harvey and Torres be dismissed.

## H. Plaintiff's Claims Against Defendant Mars

Defendants next seek dismissal of all claims against defendant Mars, including plaintiff's claim that she violated his Fourteenth Amendment rights by making him pay $65 to replace a damaged mattress. The Fourteenth Amendment, however, does not give rise to a claim that a defendant deprived a plaintiff of private property; it only protects a plaintiff's right to due process as a result of a deprivation of

private property.  *See*, *e.g.*, *Edwards v. Bezio*, No. 08-CV-0256, 2010 WL 681369, at *5 (N.D.N.Y. Feb. 24, 2010) (Kahn, J., *adopting report and recommendation by* Treece, M.J.) ("The lynchpin of a due process claim based on a state actor's unauthorized deprivation of private property is the availability of post-deprivation remedies provided by the state, not the deprivation itself . . . . Plaintiff does not allege that New York State has failed to provide a meaningful post-deprivation remedy, and, in fact, New York provides a venue for challenging such appropriations in the New York State Court of Claims.").  For this reason, I recommend that any claim asserted by plaintiff against defendant Mars based on an allegation that she charged him too much money for his new mattress be dismissed.

Defendants also seek dismissal of plaintiff's claim against defendant Mars relating to the issuance of a false misbehavior report.  The mere allegation of the issuance of a false misbehavior report against an inmate, however, is not cognizable under section 1983.  *See Boddie*, 105 F.3d at 862 ("[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report.").  Moreover, even assuming that defendant Mars did issue a false misbehavior report, whatever wrong arose out of that conduct is rectified by the court's finding that plaintiff

received adequate due process at the ensuing disciplinary hearing. *See*, *e.g.*, Plf.'s Dep. Tr. (Dkt. No. 79, Attach. 3) at 12-13. *See Jones v. Coughlin*, 45 F.3d 677, 679 (2d Cir. 1995) (finding that, where an alleged false misbehavior report is filed against a prisoner, his "due process rights are protected if he is granted a hearing on the charges and given an opportunity to rebut them").

Finally, defendants seek dismissal of plaintiff's equal protection claim asserted against defendant Mars based on plaintiff's admission that defendant Mars did not single him out or treat him differently than other inmates based on his race. Plaintiff's equal protection claim against defendant Mars, however, was previously dismissed by the court, and it has not been revived by plaintiff's amended complaint. Dkt. No. 10 at 16.

For all of these reasons, I recommend that all of plaintiff's claims asserted against defendant Mars be dismissed.

I.    Qualified Immunity

Because I recommend that one claim against each defendant Fraser and defendant Goodman survive defendants' pending motion for summary judgment, I will only address defendants' defense of qualified immunity as it relates to those two defendants.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of New York*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). The inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a constitutional right, and if so, whether that right is clearly established at

the relevant time. *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2080 (2011); *Nagle v. Marron*, 663 F.3d 100, 114 (2d Cir. 2011); *Doninger*, 642 F.3d at 345 (citing cases). To be clearly established, a right must be sufficiently clear "that every reasonable official would have understood that what he is doing violates that right." *Ashcroft*, 131 S.Ct. at 2083 (internal quotation marks omitted). Until recently, courts were required to analyze qualified immunity by considering the two factors in order. *Doninger*, 642 F.3d at 345 (citing *Saucier*, 533 U.S. at 201). Following the Supreme Court's decision in *Pearson*, however, courts are no longer wedded to the *Saucier* "two step," and instead retain the discretion to decide the order in which the two relevant factors are to be considered.[17] *Id.*; *see also Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 429 n.9 (2d Cir. 2009).

To prevail on a qualified immunity defense, a defendant must establish that "(1) the officers' actions did not violate clearly established law, or (2) it was objectively reasonable for the officers to believe that their

---

[17]     Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson*, 555 U.S. at 231 (internal quotation marks omitted).

actions did not violate such law."  *Green v. Montgomery*, 219 F.3d 52, at 59 (2d Cir. 2000).

### 1.    Defendant Fraser

Because the right to be free from excessive force is a clearly established right, the relevant qualified immunity inquiry turns on whether a reasonable officer in defendant Fraser's position would have known that defendant Rosati's conduct amounted to excessive force.  *See Green*, 219 F.3d at 59 ("It is beyond dispute that the right to be free from excessive force has long been clearly established.").  Defendants have already acknowledged that whether defendant Rosati's use of force against plaintiff constitutes excessive force is a question for the jury, and I agree.  As a result, I cannot conclude that defendant Fraser is entitled to qualified immunity as it relates to plaintiff's failure to intervene claim.

### 2.    Defendant Goodman

As noted earlier, an inmate's right to appeal a disciplinary sentence is protected by the First Amendment.  *Santiago*, 2011 WL 7431068, at *5. Therefore, the relevant inquiry is whether a reasonable officer in defendant Goodman's position would have known that conspiring with other corrections officers to have plaintiff assaulted in retaliation for

plaintiff appealing the sentence violated his clearly established First Amendment right. Because that answer is clearly, "yes," I cannot conclude that defendant Goodman is entitled to qualified immunity as it relates to plaintiff's retaliation claim.

In summary, I recommend that defendants' motion for summary judgment be denied as it relates to defendants' qualified immunity defense.

## IV.     SUMMARY AND RECOMMENDATION

At the center of plaintiff's amended complaint in this action is his claim that he was assaulted by defendants Rosati and St. John, two corrections officers stationed at Great Meadow, during an escort from his cell to a disciplinary hearing. While defendants have moved for summary judgment dismissing many of plaintiff's other claims, they do not challenge that cause of action at this juncture, acknowledging that its resolution will undoubtedly turn upon credibility determinations, which are not properly made on a motion for summary judgment.

After carefully reviewing the record evidence in this case, I recommend that all of plaintiff's claims against all of the remaining defendants be dismissed, with the exception of plaintiff's failure to

intervene claim against defendant Fraser, and plaintiff's retaliation claim against defendant Goodman. As it relates to those two remaining claims, I conclude that a reasonable factfinder could determine, if plaintiff's testimony is credited, that defendant Fraser's duty to intervene was triggered, and that defendant Goodman conspired with defendants Rosati and St. John to retaliate against plaintiff. Additionally, at this juncture, the record evidence does not establish a basis to find that defendants Fraser or Goodman are entitled to qualified immunity.

Addressing plaintiff's remaining claims, I find that the record before the court fails to establish a proper basis to conclude that defendants Fischer, Annucci, LeClaire, and Roy were personally involved in any of the allegations giving rise to this action. The record also reflects that no reasonable factfinder could conclude that defendant Nesmith and Lindermann are liable for deliberate medical indifference to plaintiff's serious medical needs. Similarly, plaintiff has stated no claim against defendant Zarnetski associated with the assault or otherwise, nor has he stated a cognizable due process claim against defendants Harvey, Torres or Prack. Finally plaintiff's claims against defendant Mars, related to the requirement that he pay $65 to replace a damaged mattress, and the

issuance of a false misbehavior report, lack merit.  Based upon the foregoing, it is hereby respectfully,

RECOMMENDED that defendants' summary judgment motion (Dkt. No. 79) be GRANTED, in part, as it relates to all of plaintiff's claims against all defendants, with the exception of (1) plaintiff's claims against defendants Rosati and St. John, (2) plaintiff's failure to intervene claim against defendant Fraser, and (3) plaintiff's First Amendment retaliation claim against defendant Goodman.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules; and it is further

ORDERED that the clerk is respectfully directed to amend court records to reflect the correct name spellings of defendants Zarnetski, Nesmith, Lindemann, and Prack.

Dated:      February 20, 2013
              Syracuse, New York

_____
David E. Peebles
U.S. Magistrate Judge

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jesse L. STEWART, Jr., Plaintiff,
v.
Gary HOWARD, D. Monell, N. Marsh, D.
Spangenburg, D. Swarts, E. Hollenbeck, J. Edwards, D.
Russell, Defendants.
No. 9:09–CV–0069 (GLS/GHL).

April 26, 2010.
Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael
J. Livolsi, Esq., of Counsel, East Syracuse, NY, for
Defendants.

### REPORT–RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action,
commenced pursuant to 42 U.S.C. § 1983, has been
referred to me for Report and Recommendation by the
Honorable Gary L. Sharpe, United States District Judge,
pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).
Plaintiff Jesse L. Stewart alleges that Defendants, all
employees of the Tioga County Jail, violated his
constitutional rights by limiting his ability to send legal
mail, depriving him of his mattress and bedding during
daytime hours, subjecting him to excessive force, denying
him medical care after the alleged use of excessive force,
and conducting biased disciplinary hearings. Currently
pending before the Court is Defendants' motion for
summary judgment pursuant to Federal Rule of Civil
Procedure 56. (Dkt. No. 30.) Plaintiff has opposed the
motion. (Dkt. No. 32.) For the reasons that follow, I
recommend that Defendants' motion be granted.

### I. FACTUAL AND PROCEDURAL SUMMARY

This action involves Plaintiff's experiences at Tioga
County Jail, where he was incarcerated from August 19,
2008, to January 13, 2009. (Dkt. No. 30–4 at 14:2–11.)
The complaint consists almost entirely of copies of
grievances and letters that Plaintiff submitted to other
individuals and organizations. The "facts" section of the
civil complaint form merely directs the reader to "see
attached." As such, the precise contours of Plaintiff's
claims are difficult to discern. The documents attached to
the complaint show that:

On September 22, 2008, Plaintiff requested a
grievance form so that he could complain about the
facility's legal mail procedures. (Dkt. No. 1 at 41.) A
grievance form was issued. *Id.*

On October 27, 2008, Plaintiff requested a grievance
form so he could complain about being denied access
to the courts. (Dkt. No. 1 at 44.) Sgt. William "spoke with
[Plaintiff] but he refuses to sign off. He states he needs
these letters to go out to these courts because he's fighting
extradition." *Id.*

On October 30, 2008, Defendant Officer Earl
Hollenbeck issued an Inmate Rule Infraction Notice to
Plaintiff accusing him of sending mail using another
inmate's account. (Dkt. No. 1 at 31.)

In a "notice of intention" dated November 30 2008,
Plaintiff alleged that, pending disciplinary action against
him, staff at the Tioga County Jail deprived him of his
mattress, sheets, and blanket when temperatures were as
low as fifteen degrees at night and forced him to sit
directly on his steel bed for periods up to seventeen hours.
(Dkt. No. 1 at 8.) In support of Defendants' summary
judgment motion, Defendant Lt. David Monell declares
that when inmates are accused of violating a disciplinary
rule, they are placed in administrative segregation pending
a hearing. During that time, the inmate's bedding is
removed during the day. If this was not done, "inmates
may intentionally violate rules in order to be assigned to
administrative segregation so they could sleep in the cell
all day instead of having to adhere to the normal inmate
routine." (Dkt. No. 30–11 at 6 ¶ 12.) The parties agree that
inmates' mattresses and bedding are returned at night.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

(Dkt. No. 1 at 10; Dkt. No. 30–11 at 6 ¶¶ 13–15.)

**\*2** In his "notice of intention," Plaintiff alleged that on November 3, 2008, he asked for a grievance form. (Dkt. No. 1 at 8.) Defendant Officer Douglas Swarts told him "if you don't shut the fuck up I'll have a few people shut you up." *Id.* Two or three minutes later, several other officers, including Defendant Sergeant Dennis Spangenburg, arrived and stood in front of Plaintiff's locked cell. *Id.* Plaintiff asked Defendant Spangenburg why he was denying Plaintiff the right to file a grievance. *Id.* at 8–9. Defendant Spangenburg replied "I can deny you anything I want." *Id.* at 9. Defendant Officers Jonathan Edwards and David Russell then entered Plaintiff's cell and handcuffed Plaintiff so tightly that the handcuffs "stopp[ed] the flow of blood to [Plaintiff's] hands." *Id.* Defendants Edwards and Russell then escorted Plaintiff to the intake area of the facility. Along the way, they used Plaintiff's "head and body as a ram to open the electronically control[l]ed doors," which cut Plaintiff's lip and caused his nose to bleed. *Id.* Attached to Plaintiff's complaint are affidavits from inmates who state that they witnessed this incident. *Id.* at 14–15.

Plaintiff alleged in his "notice of intention" that upon arrival at the intake area, he was placed in a strip isolation cell. (Dkt. No. 1 at 9.) Several officers "entered in behind me, at what time I was hit with closed fist[s] and what felt like kicks from all directions to my head, back, ribs, and groin area several times." *Id.* Plaintiff was punched in the right eye. *Id.* After that, Plaintiff's handcuffs were removed and Defendant Sergeant Nathaniel Marsh entered the cell, grasped Plaintiff around the neck with one hand, held his mace an arm's length away from Plaintiff's face, and repeated "get the fuck up you little asshole" over and over. *Id.*

Defendants Marsh, Spangenburg, Swarts, Edwards, and Russell have submitted notarized affidavits in support of Defendants' motion for summary judgment stating that they did not assault Plaintiff. (Dkt. No. 30–11 at 10, 12, 18, 22, 24.)

At 10:50 a.m., Defendant Swarts issued two Inmate Rule Infraction Notices. The first stated that Plaintiff "refused to lock in his cell after numerous orders to do so.

Duress alarm was activated." (Dkt. No. 1 at 32.) The second stated that Plaintiff "disrupted the pod by yelling threats to jail personnel." *Id.* at 33.

In his "notice of intention," Plaintiff alleged that he needed medical attention but was locked in the cell alone without such attention for approximately fourteen hours. (Dkt. No. 1 at 9.) At 11:30 p.m., Plaintiff was escorted back to his usual cell. *Id.* All of his personal property had been removed and he was given only a mattress and a blanket. *Id.* The next morning, officers removed the mattress. *Id.* Plaintiff was told that he could only shower if he remained handcuffed and shackled. *Id.* He was given only two sheets of toilet paper. *Id.* at 9–10. This pattern of being given a mattress at night and having it removed in the morning continued for ten days. *Id.* at 10.

**\*3** On November 6, 2008, Plaintiff submitted an Inmate Request Form asking to "be released from ... restraint and receive my property back today." (Dkt. No. 1 at 45.) His request was denied. *Id.*

In his "notice of intention," Plaintiff alleged that when his property was finally returned to him, he "became submissive" and "did not file any more grievances as I was told not to or the next time it may be worse." *Id.* at 10.

In his "notice of intention," Plaintiff alleged that Defendant Marsh conducted a biased disciplinary hearing and found him guilty "on all of the infractions." (Dkt. No. 1 at 10.) Another attachment to the complaint shows that on November 12, 2008, Defendant Marsh found Plaintiff guilty and sentenced him to twenty-eight days of keeplock with no programs, no commissary, twenty minute hygiene, and legal phone calls only. *Id.* at 34.

In his "notice of intention," Plaintiff alleged that there is no "inhouse mail, or legal outgoing mail system" at Tioga County Jail and that Defendants refused to mail any item that would cost more than eighty-four cents. (Dkt. No. 1 at 10.)

On December 1, 2008, Officer Sean Shollenberger issued an Inmate Rule Infraction Notice stating that Plaintiff used stamps from another inmate to send personal mail. (Dkt. No. 1 at 35.) A hearing was scheduled for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

December 17, 2008. Plaintiff filed a written request stating that he had been informed of the hearing and requesting "that any decision to be determined may be done so without my participation or presence ... I do not wish to participate in such hearing." (Dkt. No. 1 at 36.) Plaintiff's request was approved. *Id.* At the hearing, Defendant Marsh found Plaintiff guilty and sentenced him to fourteen days of keeplock, no programs, no commissary, twenty minute hygiene, and legal calls only. *Id.* at 37. Defendant Marsh noted that "this is not the first infraction hearing due to [Plaintiff's] abusing the U.S. Postal Service." *Id.* On December 18, 2008, Plaintiff appealed the decision. *Id.* at 38. Plaintiff stated that he had refused to attend the hearing because of Defendant Marsh's previous use of force against him and because the hearing was not recorded. *Id.* at 39. The Chief Administrative Officer denied the appeal on December 23, 2008, because the "sanctions imposed are appropriate." *Id.* at 38.

On December 17, 2008, Plaintiff requested two grievance forms so that he could complain about the lack of bedding and facility disciplinary and hearing procedures. Grievance forms were issued. (Dkt. No. 1 at 46–47.)

On December 18, 2008, Plaintiff submitted a grievance complaining about the lack of bedding, visits, food, medical care, access to courts, and water. (Dkt. No. 1 at 20.) The grievance coordinator denied the grievance because "[d]iscipline is not grievable. There is an appeal process which the inmate can follow." *Id.* at 22. Plaintiff appealed to the Chief Administrative Officer. *Id.*

**\*4** On December 18, 2008, Plaintiff submitted a grievance complaining about Defendant Marsh's conduct during the disciplinary hearing <u>FN1</u> and requesting that disciplinary hearings be recorded or monitored by another hearing officer. (Dkt. No. 1 at 23–24.) The Grievance Coordinator denied the grievance because "NYS Minimum Standards requires that records be kept of infraction hearings. Records are kept of the infraction hearing. The TCJ does not have more than one officer available to do infraction hearings." *Id.* at 25. Plaintiff appealed to the Chief Administrative Officer. *Id* . On December 22, 2008, Defendant Marsh completed a Grievance Investigation Form stating that he interviewed

Plaintiff. Defendant Marsh found that "this facility keeps all hearing records as well as provide a copy of the hearing record to the inmate. This facility has more than one hearing officer available." *Id.* at 26.

> **FN1.** Although it is not clear, Plaintiff was presumably referring to the November 12, 2008, hearing, which he attended, rather than the December 17, 2008, hearing that he refused to attend.

On December 18, 2008, Plaintiff submitted an Inmate Request Form asking to speak with the Undersheriff or Captain. (Dkt. No. 1 at 48 .)

On December 22, 2008, Plaintiff wrote a letter to the Chairman of the New York Commission of Corrections; the Hon. Thomas J. McAvoy, Senior United States District Judge, and the New York State Attorney General regarding conditions at Tioga County Jail. (Dkt. No. 1 at 16–17.) Specifically, Plaintiff complained about the bedding issue, the grievance and appeal system, and the legal mail system. *Id.*

On December 28, 2008, Plaintiff submitted a grievance complaining about the facility's legal mail procedure. (Dkt. No. 1 at 27.) The Grievance Coordinator denied the grievance because "[t]his facility is not denying you access to the courts. Minimum standards ha[ve] been and will be controlled by the State of NY, therefore this issue is not grievable. NYSCOC was contacted regarding your reference to a 'new' state directive regarding legal mail. No such directive exists." *Id.* at 28. Plaintiff checked the box indicating that he wanted to appeal to the Chief Administrative Officer and wrote a note that he "was told that Lt. D. Monell is the Chief Officer and that I could not appeal this decision any higher." *Id.*

In his "notice of intention," Plaintiff alleged that on December 31, 2008, he was summoned to the front of the jail for an interview with Defendant Lt. D. Monell. (Dkt. No. 1 at 11.) Defendant Monell questioned Plaintiff about his December 22, 2008, letter to the Commission of Corrections. *Id.* Defendant Monell said that he did not give a damn about federal standards regarding bedding. *Id.* Defendant Monell told Plaintiff he should save his weekly

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

postage allowance until he had enough to send a large document and did not respond when Plaintiff informed him that he was not allowed to do. *Id.* Regarding Plaintiff's complaint that he had received only two sheets of toilet paper, Defendant Monell replied that this was facility policy. (Dkt. No. 1 at 12.) Defendant Monell stated that he had reviewed the videotape of the alleged excessive force incident and did not see anything. *Id.* Defendant Monell asked "in a sarcastic manner" whether Plaintiff wanted protective custody because he felt threatened by the facility's officers. Plaintiff said no. *Id.*

**\*5** On January 1, 2009, Plaintiff filed an Inmate Request Form stating that he had not received responses to his appeals regarding disciplinary hearings. (Dkt. No. 1 at 49.) Defendant Russell responded that "Grievance # 36 was upheld so there is no appeal. Grievance # 35 was not a grievable issue because it regarded disciplinary sanctions." (Dkt. No. 1 at 50.)

On January 1, 2009, Plaintiff wrote to the Commission of Corrections informing them of his conversation with Defendant Monell and requesting an outside investigation. (Dkt. No. 1 at 18.)

On January 5, 2009, Plaintiff filed an Inmate Request Form asking for a grievance form. He stated that "the taking of bedding is not a disciplinary sanction but in fact an illegal practice." (Dkt. No. 1 at 42.) Defendant Monell replied that "removal of bedding is a disciplinary sanction and as such is not a grievable issue. Do not put in any more requests on this matter." *Id.*

On January 5, 2009, Plaintiff filed an Inmate Request Form stating that "the grievant has the right to appeal any decision by the grievance committee to the highest level for confirmation of such determination." (Dkt. No. 1 at 43.) Defendant Monell replied that Plaintiff should "read minimum standards—once the action requested has been met-there is no grounds for appeal. Request for grievance is denied. Do not put in any more requests on this matter ." *Id.*

On January 5, 2009, Plaintiff wrote to the Commission of Corrections again. He stated that he was being illegally denied the right to file grievances and that

Defendant Monell "attempted to intimidate me." (Dkt. No. 1 at 19.) In a separate letter, he stated that his "grievance is not in regards to any disciplinary sanctions, but in fact an illegal local procedural practice at Tioga County Jail." (Dkt. No. 1 at 29.) He stated that he had been deprived of bedding, food, medical care, visits, and mail without due process. *Id.* at 29–30.

On January 8, 2009, Plaintiff filed an Inmate Request Form stating that he wanted to file a grievance about "the issue of periodicals and the donation/reading of them." (Dkt. No. 1 at 51.) A sergeant (signature illegible) responded that "this is not a grievable issue-this is a requestable issue which will be denied due to security problems encountered in the D-pod housing unit involving the newspaper. Donations of books and magazines are allowed-you also are allowed to release property to persons outside of the jail." *Id.* at 52.

Plaintiff filed this action on January 21, 2009. (Dkt. No. 1.) Defendants now move for summary judgment. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) Defendants have filed a reply. (Dkt. No. 36.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

**\*6** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim

for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

Defendants argue that they are entitled to summary judgment because (A) Plaintiff refused to cooperate with his deposition; (B) Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") regarding the November 3 excessive force incident "and other claims such as lack of toilet paper"; (C) Plaintiff has failed to state an Eighth Amendment conditions of confinement claim; (D) Plaintiff's allegations regarding the lack of bedding do not state a due process claim; (E) Plaintiff has failed to state a claim that he was denied access to the courts; and (F) Plaintiff has not alleged that Defendants Howard or Hollenbeck were personally involved in any alleged constitutional violation.

**A. Deposition**

**\*7** Defendants move, pursuant to Federal Rule of Civil Procedure 37, to dismiss this action because Plaintiff unilaterally ended his deposition before answering any substantive questions. (Dkt. No. 30–12 at 10–11.) In the alternative, Defendants request an order precluding Plaintiff from offering sworn testimony in opposition to any motion brought by Defendants or at trial. *Id.* at 11. I

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

find that Defendants' motion is untimely.

This Court's Mandatory Pretrial Discovery and Scheduling Order, issued on March 31, 2009, granted Defendants permission to depose Plaintiff. The order stated that "[t]he failure of the plaintiff to attend, be sworn, and answer appropriate questions may result in sanctions, including dismissal of the action pursuant to [Rule] 37." (Dkt. No. 21 at 3 ¶ D.) The order also noted that "any motion to compel discovery in the case must be filed not later than ten (10) days after the deadline for completing discovery." [FN3] *Id.* at 4 n. 5. The order set July 29, 2009, as the deadline for completing discovery. *Id.* at 4 ¶ A.

> **FN3.** Effective January 1, 2010, the deadlines in the local rules were amended. The local rule now requires that discovery motions be filed no later than fourteen days after the discovery cut-off date. Local Rule 7.1(d)(8).

On July 2, 2009, Defendants requested permission to depose Plaintiff. (Dkt. No. 22.) The Court denied the motion as moot, noting that permission had already been granted. (Dkt. No. 23.) On July 31, 2009, Defendants requested an extension of the discovery cut-off date to allow them time to take Plaintiff's deposition. (Dkt. No. 24.) The Court granted Defendants' request and extended the discovery deadline to September 19, 2009. (Dkt. No. 27.)

On September 14, 2009, Defendants conducted Plaintiff's deposition. (Dkt. No. 30–4 at 9–17.) When defense counsel began asking Plaintiff about his criminal history, Plaintiff stated "[y]ou're browbeating me here, and I'll write to the judge and tell him why I didn't cooperate." *Id.* at 15:14–15. Plaintiff then ended the deposition. *Id.* at 15:20–22. No questions were asked or answered about the events at issue in this action.

Discovery in this case closed on September 19, 2009. Defendants did not file a motion to compel Plaintiff's deposition or for sanctions until they filed the pending motion on October 27, 2009. Because Defendants did not file their motion within ten days of the discovery cut-off date or request an extension of time in which to file a discovery motion, I recommend that their motion to

dismiss the case as a sanction for Plaintiff's refusal to cooperate with his deposition be denied.

**B. Exhaustion of Administrative Remedies**

Defendants argue that Plaintiff's claims regarding the November 3, 2008, alleged use of excessive force and the alleged failure to provide medical care after the incident must be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 30–12 at 2–3.) Defendants are correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218 (2007).

***8** Tioga County Jail has an inmate grievance procedure. (Dkt. No. 30–10 at 8–11.) Under the procedure, the Corrections Officer assigned to the inmate's housing unit initially receives complaints either verbally or in writing and attempts to resolve the complaint informally. *Id.* at ¶ 1.2(A)(1–2). If the complaint cannot be resolved informally, the inmate files a written complaint form, which is forwarded to the Shift Supervisor. *Id.* at ¶ 1.2(A) (3–4). If the Shift Supervisor cannot resolve the complaint, the complaint is forwarded to the Grievance Coordinator, who provides the inmate with a grievance form. *Id.* at ¶ 1.2(A)(5–8). The Grievance Coordinator is responsible for investigating and making a determination on the grievance and must give a written copy of his or her decision to the inmate. *Id.* at ¶ 1.2(A)(9). This written decision must be issued within five business days of receipt of the grievance. *Id.* at 1.3(C). If the inmate does not accept the Grievance Coordinator's determination, "an appeal will be forwarded to the Jail Chief Administrative

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

Officer." *Id.* at ¶ 1.2(A)(11). The inmate must appeal within two business days of receipt of the Grievance Coordinator's determination. *Id.* at ¶ 1.3(D). At the request of the inmate, a copy of the appeal will be mailed by the Jail Administrator to the Commission of Corrections. *Id.* at ¶ 1.2(A)(13). The Jail Administrator must make a determination within two working days. *Id.* at ¶ 1.3(E). The inmate may appeal within three business days of receipt of the decision to the Commission of Corrections. *Id.* at ¶ 1.3(F).

Here, Plaintiff did not file a grievance regarding the alleged use of excessive force on November 3, 2008. (Dkt. No. 30–11 ¶ 6.) Therefore, he did not exhaust his administrative remedies.

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN4]

> FN4. The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81 (2006), in which the Supreme Court held that each step of an available grievance procedure must be "properly" completed before a plaintiff may proceed in federal court. *Chavis v. Goord,* No. 07–4787–pr, 2009 U.S.App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did

not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

**\*9** Here, as discussed above, administrative remedies were available to Plaintiff. Defendants preserved the exhaustion defense by raising it in their answer. (Dkt. No. 19 at ¶¶ 8–10.) Plaintiff appears to argue that Defendants are estopped from asserting the defense or that special circumstances exist justifying the failure to exhaust. Specifically, Plaintiff states that exhausting his administrative remedies would have been futile and "may have caused more harm to the plaintiff" because the officers who allegedly assaulted him "are the persons that operate and give the decisions" regarding grievances. (Dkt. No. 32 at 1.)

Plaintiff's explanation is belied by his actual conduct. Plaintiff alleges that Defendant Marsh was involved in the use of excessive force. (Dkt. No. 1 at 9.) Despite this fact, Plaintiff filed a grievance three weeks after the incident complaining about Defendant Marsh's conduct during a disciplinary hearing. (Dkt. No. 1 at 23–24.) This indicates that Plaintiff was not, in fact, afraid to file grievances against the Defendants who allegedly assaulted him and denied him medical care. Thus, Plaintiff has not plausibly alleged that special circumstances prevented him from exhausting his administrative remedies. Therefore, I find that Plaintiff failed to exhaust his administrative remedies regarding the alleged use of excessive force and I recommend that the Court dismiss that claim.

**C. Eighth Amendment Conditions of Confinement**

Plaintiff alleges that Defendants violated his Eighth Amendment rights by removing his personal property, taking away his bedding and mattress during the day, allowing him to shower only if he remained handcuffed and shackled, and providing him with only two sheets of toilet paper. (Dkt. No. 1 at 9–10.) Defendants move for summary judgment of this claim. (Dkt. No. 30–12 at 5.)

The Eighth Amendment to the United States Constitution imposes on jail officials the duty to "provide

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). Specifically, an inmate must show that he was deprived of a "single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). Here, Plaintiff does not allege that he was deprived of any human need. He was provided with a mattress and blankets at night, had the opportunity to shower, and received toilet paper. Although his conditions may not have been pleasant, the Eighth Amendment "does not mandate comfortable prisons." *Farmer,* 511 U.S. at 932 (citing *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's conditions of confinement claim.

**D. Due Process**

1. *Bedding*

**\*10** Defendants construe Plaintiff's complaint as asserting a claim that the removal of his bedding during the day violated his right to due process. Defendants argue that this claim should be dismissed. (Dkt. No. 30–12 at 5–6.) Defendants are correct.

An individual claiming that he was deprived of an interest in property "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Plaintiff had not legitimate claim of entitlement to possessing bedding during the day. Therefore, I recommend that the Court dismiss this claim.

2. *Disciplinary Hearing*

Plaintiff appears to allege that Defendant Marsh deprived him of due process by conducting a biased disciplinary hearing. (Dkt. No. 1 at 10.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Assuming *arguendo* that the state has granted inmates in county jails an interest in remaining free from keeplock confinement, the issue is whether Plaintiff's confinement imposed an "atypical and significant hardship" on him in relation to the ordinary incidents of prison life. Courts in the Second Circuit have routinely declined to find a liberty interest where an inmate's keeplock confinement is an "exceedingly short" period, less than thirty days, and there is no indication that the inmate suffered any "unusual conditions" during the confinement. *Anderson v. Banks,* No. 06–Cv–0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) ("Confinements in ... keeplock of less than thirty days will not suffice to demonstrate a protected liberty interest absent other extraordinary circumstances of the confinement demonstrating that it was atypical or significant for other reasons.") (Sharpe, J.) (Homer, M.J.).[FN5]

FN5. The Court will provide Plaintiff with a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Here, Defendant Marsh sentenced Plaintiff to twenty-eight days of keeplock after the November 12, 2008, hearing that followed the alleged excessive force incident. (Dkt. No. 1 at 34.) Defendant Marsh sentenced Plaintiff to fourteen days of keeplock after the December 17, 2008, hearing regarding Plaintiff's alleged use of another inmate's stamps. (Dkt. No. 1 at 37.) There is no indication that Plaintiff suffered any unusual conditions during these keeplock confinements. Notably, Plaintiff's allegations regarding the removal of his bedding occurred not during these keeplock sentences, but rather during earlier administrative segregation periods in October and November. (Dkt. No. 1 at 8–10.) Thus, Plaintiff has not alleged facts plausibly suggesting, or raised a triable issue of fact, that he was deprived of a liberty interest. Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant Marsh *sua sponte.*

**E. Access to the Courts**

**\*11** Defendants argue that Plaintiff's claims regarding Tioga County Jail's legal mail procedures must be dismissed because (1) Plaintiff has not alleged the personal involvement of any Defendant; and (2) Plaintiff has not alleged any actual harm resulting from the procedures. (Dkt. No. 36–3 at 1.) Defendants did not raise this argument in their moving papers. Normally, due process would thus require that I disregard the argument or give Plaintiff an opportunity to file a sur-reply. Here, however, Plaintiff addressed this issue in his opposition despite Defendants' failure to raise it initially. (Dkt. No. 32 at 1.) Moreover, even if he had not, I would recommend that the Court dismiss the claim *sua sponte.*

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986)

(citing *Bounds v. Smith,* 430 U.S. 817, 821–23 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). A claim for reasonable access to the courts under § 1983 requires that an inmate demonstrate that the alleged act of deprivation "actually interfered with his access to the courts or prejudiced an existing action." *Id.* (citations omitted). Courts have not found an inmate's rights to be violated when the deprivation merely delays work on his legal action or communication with the court. *Id.* To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, Plaintiff has not raised a triable issue of fact that he suffered any actual injury. In his "notice of intention," he stated that the facility's mail policies "*could* cause a great effect" and "*could* cause irreparable harm" to two pending *habeas corpus* cases. (Dkt. No. 1 at 10, emphasis added.) In his opposition to the motion for summary judgment, Plaintiff states that he "suffered the loss of one of the court actions" because he could not mail a brief. (Dkt. No. 32 at 1.) However, I note that this statement is not "evidence" because Plaintiff's opposition was not signed under penalty of perjury and does not contain any other language bringing it into substantial compliance with 28 U.S.C. § 1746. *See, LeBoeuf, Lamb, Greene & MacCrae, L.L.P. v. Worsham,* 185 F.3d 61, 65–66 (2d Cir.1999). Therefore, I recommend that Plaintiff's claim regarding legal mail be dismissed.

**F. Personal Involvement**

**\*12** Defendants argue that Plaintiff has failed to allege personal involvement by Defendants Howard or Hollenbeck. (Dkt. No. 30–12 at 11–12.) Defendants are correct.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,*

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

950 F.2d 880, 885 (2d Cir.1991)).[FN6] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.[FN7] If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN8] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN9] Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [FN10]

FN6. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN7. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN8. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN9. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN10. The Supreme Court's decision in *Ashcroft v. Iqbal,* ——U.S. ——, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* —— F.Supp.2d ——, No. 08–CV–116580, 2009 U.S. Dist. LEXIS 116580, at *32–39, 2009 WL 4824669, at*10–11 (S.D.N.Y. Dec. 15, 2009). Here, the Court will

assume *arguendo* that all of the *Colon* categories apply.

The only allegation in the complaint regarding Defendant Hollenbeck is that he issued an Inmate Rule Infraction Notice to Plaintiff on October 30, 2008. (Dkt. No. 1 at 31.) Plaintiff has not alleged any facts plausibly suggesting, or raised a triable issue of fact, that Defendant Hollenbeck's conduct violated Plaintiff's constitutional rights. Therefore, I recommend that any claims against Defendant Hollenbeck be dismissed.

The complaint's only reference to Defendant Howard is in the caption of the "notice of intention." (Dkt. No. 1 at 7.) Plaintiff could, perhaps, have argued that, as Sheriff, Defendant Howard was responsible for creating or allowing to continue unconstitutional policies. However, Plaintiff did not allege any facts plausibly suggesting, or raise a triable issue of fact, that Defendant Howard was responsible for the policies about which Plaintiff complains. Even if he had, as discussed above, Plaintiff has not provided sufficient evidence for any of his claims regarding those policies to survive summary judgment. Therefore, I recommend that any claims against Defendant Howard be dismissed.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 30) be **GRANTED;** and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Anderson v. Banks,* No. 06–Cv–0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*13** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989));

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Stewart v. Howard
Not Reported in F.Supp.2d, 2010 WL 3907227
(N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

(Cite as: 2010 WL 3907137 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jesse L. STEWART, Jr., Plaintiff,
v.
Gary HOWARD; D. Monell; N. Marsh; D.
Spangenburg; D. Swarts; E. Hollenbeck; J. Edwards;
and D. Russell, Defendants.
No. 9:09–CV–69 (GLS/GHL).

Sept. 30, 2010.
Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael J. Livolsi, Esq., of Counsel, East Syracuse, NY, for the Defendants.

### MEMORANDUM–DECISION AND ORDER

GARY L. SHARPE, District Judge.

#### I. Introduction

*1 Plaintiff Jesse L. Stewart, an inmate at Forest State Correctional Institution, Forest County, Pennsylvania, brings this action under 42 U.S.C. § 1983, alleging that defendants Tioga County Jail employees violated his Eighth and Fourteenth Amendment rights during his incarceration at Tioga County Jail. (See Compl., Dkt. No. 1.) Defendants moved for summary judgment and for dismissal based on, among other things, Stewart's refusal to cooperate at his deposition. (Dkt. No. 30.) On April 26, 2010, Magistrate Judge George H. Lowe issued a Report and Recommendation Order (R & R) recommending that defendants' motion for dismissal as a discovery sanction be denied but that defendants' motion for summary judgment be granted. (Dkt. No. 38.) Pending are Stewart's objections to the R & R. (Dkt. No. 39.) For the reasons that follow, the court adopts the R & R in its entirety.

#### II. Standard of Review

Before entering final judgment, this court routinely reviews all report-recommendations in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations de novo. See Almonte v. N.Y. State Div. of Parole, No. 04–cv–484, 2006 WL 149049, at *6–7 (N.D.N.Y. Jan.18, 2006). In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the findings and recommendations of a magistrate judge for clear error. See id.

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing FED. R. CIV. P. 56(c)); see also Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 170 (2d Cir.2006). In considering a motion for summary judgment, the court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor ...." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir.1995) (citation omitted). The initial burden is on the moving party to inform the court of the basis for its motion, and identify those portions of the pleadings, affidavits, and discovery and disclosure materials on file that it believes "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); see also SEC v. Kern, 425 F.3d 143, 147 (2d Cir.2005). "A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1114 (2d Cir.1988) (citation omitted). And while the court remains obliged to read a pro se movant's supporting papers liberally and "interpret them to raise the strongest arguments that they suggest," Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994), "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact," Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998). Moreover, pro se status "does not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

(Cite as: 2010 WL 3907137 (N.D.N.Y.))

exempt a party from compliance with relevant rules of procedural and substantive law" and courts cannot read into pro se submissions inconsistent claims or claims not suggested by those submissions. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (citations and internal quotation marks omitted).

### III. *Discussion*

**\*2** Construed liberally, Stewart's objections specifically challenge Judge Lowe's conclusions that: (1) Stewart failed to exhaust his administrative remedies regarding his excessive force and failure to provide medical care claims; (2) Stewart's claims regarding the amount of toilet paper, conditions of showering, and removal of bedding during the day failed to make out a viable Eighth Amendment claim; (3) Stewart had no protected liberty interest entitling him to additional process prior to the imposition of disciplinary sanctions; and (4) Stewart failed to raise any triable issue of fact as to his claim for denial of access to the courts. Consequently, the court will review those conclusions de novo.

### A. *Failure to Exhaust Administrative Remedies*

Stewart objects to Judge Lowe's conclusion that his Eighth Amendment excessive force and denial of medical care claims are barred by his failure to exhaust his administrative remedies under the Prisoner Litigation Reform Act of 1995 (PLRA). Read liberally, Stewart's argument is threefold. First, Stewart argues that the grievance process at Tioga County Jail was such that any appeal he filed would be futile and accordingly that administrative remedies were not "available" to him under the meaning of 42 U.S.C. § 1997(e). (*See* Pl. Objections at 2, Dkt. No. 39.) This argument is without merit. Even if the court were to accept the allegation that following the grievance procedures would ultimately have lead to an unfair denial of Stewart's claims at the institutional level, perceived futility of the process "does not render the grievance system 'unavailable.' " *Yeldon v. Ekpe,* 159 Fed. Appx. 314, 316 (2d Cir.2005) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

Second, Stewart argues that he was not required to use the prison system to exhaust his remedies because the prison grievance system cannot award monetary damages. (*See* Pl. Objections at 3, Dkt. No. 39.) However, "[e]ven

when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (citing *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). Accordingly, this argument also fails.

Finally, Stewart claims that he was threatened and did not file grievances at the institutional level for fear of being retaliated against. (*See* Pl. Objections at 2, Dkt. No. 39; *see also* Compl. at 10, Dkt. No. 1; Pl. Resp. at 1, Dkt. No. 32.) The Second Circuit has held that threats by prison officials may estop those officials from raising the affirmative defense of failure to exhaust administrative remedies. *See, e.g., Macias v. Zenk,* 495 F.3d 37, 44–45 (2d Cir.2007). The estoppel argument can take two forms: either that the actions of a prison official made all administrative remedies unavailable, or that those actions made only some remedies unavailable. *See Hemphill,* 380 F.3d at 687. Stewart can only be arguing the latter. His objections state that he did complain of the use of excessive force and the failure to provide medical care in his letters to the Sheriff, Under Sheriff, and Commissioner. (*See* Pl. Objections at 2, Dkt. No. 39.) However, a review of those letters reveals that they are entirely bereft of any mention of the excessive force or failure to provide medical treatment claims, excepting two mentions—without any detail or request for action—of a civil claim for excessive force Stewart was pursuing against defendant Marsh. (*See* Compl. at 16–30, Dkt. No. 1.) As a consequence, even if the court were to presume Stewart's remedies at the prison level were unavailable, there is no question of fact as to whether Stewart failed to exhaust all his available remedies. Stewart could have raised those issues outside the local grievance process but failed to do so. Thus, defendants are entitled to judgment as a matter of law on those claims.

### B. *Eighth Amendment Conditions of Confinement Claims*

**\*3** Stewart further argues that, contrary to Judge Lowe's conclusions, his conditions of confinement "shock the mind" and that he was subject to "barbaric," "draconian," and "extreme treatment" sufficient to make out cruel and unusual punishment under the Eighth Amendment. (Pl. Objections at 2–3, Dkt. No. 39.) Stewart

Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

(Cite as: 2010 WL 3907137 (N.D.N.Y.))

alleged in his complaint that for ten days he was denied bedding between the hours of 6:30 am and 11:00 pm, denied his personal property, allowed to shower only while in restraints, and provided only two sheets of toilet paper per defecation. (*See* Compl. at 8–9, Dkt. No. 1.) Judge Lowe was correct to find that these deprivations are not sufficiently serious to support an Eighth Amendment claim. (*See* R & R at 17–18, Dkt. No. 38.) The Supreme Court has held that

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Stewart's complaint and response fail to allege either the presence of an excessive risk to his health or safety or that any prison official was aware of such a risk. Accordingly, Judge Lowe's finding is adopted and Stewart's conditions of confinement claims are dismissed .[FN1]

> FN1. Stewart now claims via his objections that he was denied blankets at night (in contradiction of his complaint), that he had unspecified "medical life threatening ailments" which could have caused him to die in the cold without blankets, and that there was a risk he would slip and fall while wearing restraints in the shower. (*See* Pl. Objections at 4, Dkt. No. 39.) The court declines to consider these new claims at this late stage. *See Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir.1999).

**C. Due Process**

Stewart's objections reassert the claim that his due process rights were violated due to a biased disciplinary hearing and generally flawed grievance system at Tioga County Jail. (*See* Pl. Objections at 2, Dkt. No. 39.) As the R & R observed, to establish a procedural due process claim, an inmate must show that he possessed a state granted interest in remaining free from the alleged

deprivation and that the deprivation imposed " 'an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " (*See* R & R at 19, Dkt. No. 38 (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)).) Here, the conditions of Stewart's heightened confinement are not disputed by the parties and there is no evidence or allegation that the conditions of confinement were atypical in relation to other administrative confinements imposed in the ordinary course of prison administration. Thus, summary judgment is appropriate. *See Davis v. Barrett,* 576 F.3d 129, 134 (2d Cir.2009). In the absence of unusually harsh conditions, "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection." *Id.* at 133 (citation omitted). Given that Stewart's confinement was substantially shorter than 101 days, the court agrees with Judge Lowe's conclusion that Stewart possessed no protected liberty interest sufficient to support a procedural due process claim and adopts the recommendation that Stewart's due process claims be dismissed.

**D. Access to the Courts**

*\*4* Lastly, Stewart argues that Judge Lowe erred in finding that Stewart failed to raise any triable issue of fact as to an injury suffered by his restricted use of the mail system. (*See* Pl. Objections at 4, Dkt. No. 39.) Stewart claims that his limited use of the mail prevented him from being heard in support of a habeas corpus petition, which resulted in an unfavorable outcome. (*See id.; see also* Pl. Resp. at 1, Dkt. No. 32.) Other than those two places, no allegation of any actual injury stemming from the mail restrictions has been made in Stewart's submissions. Judge Lowe was correct in observing that Stewart's response is unsworn and it cannot be treated as an affidavit for summary judgment purposes. (*See* R & R at 21, Dkt. No. 38.) Accordingly, the response's contents cannot constitute "evidence" sufficient to create a triable issue of fact. (*See* Pl. Resp. at 1, Dkt. No. 32.) The court is mindful of Stewart's pro se status and observes that even if his response could be construed as an affidavit, the statement therein is too conclusory to create a triable issue of fact regardless of his non-compliance with 28 U.S.C. § 1746. Stewart references no specific facts regarding the case he allegedly lost as a consequence of the denial of sufficient postage. Mere assertions unsupported by any specifics,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

(Cite as: 2010 WL 3907137 (N.D.N.Y.))

even when contained in an affidavit, are insufficient to create the material dispute necessary to defeat a motion for summary judgment. *See Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 310 (2d Cir.2008). Therefore, the court adopts Judge Lowe's recommendation that Stewart's denial of access to the courts claim be dismissed.[FN2]

> [FN2.] The court observes in passing that even if it were willing to consider new evidence in Stewart's sworn objections, Stewart's statement therein regarding his lost legal case is no more helpful in identifying what case he lost or providing substantiation to the claim that he lost the case as a consequence of limited postage. (*See* Pl. Objections at 4, Dkt. No. 39.)

**E. *Remaining Recommendations***

Because Stewart has not objected to the remaining recommendations, the court has reviewed those recommendations for clear error and finds none. Accordingly, the remainder of the R & R is adopted.

**IV. *Conclusion***

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge George H. Lowe's April 26, 2010 Report and Recommendation Order (Dkt. No. 38) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion to dismiss based on Stewart's refusal to cooperate with his deposition (Dkt. No. 30) is **DENIED;** and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 30) is **GRANTED** and Stewart's claims are **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide copies of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Stewart v. Howard
Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Joseph PARKS, Plaintiff,
v.
Joseph T. SMITH, et al., Defendants.
No. 9:08–CV–0586 (TJM/GHL).

March 29, 2011.
Joseph Parks, Wallkill, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Aaron M. Baldwin, Esq., of Counsel, Albany, NY, for Defendants.

### REPORT–RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Joseph Parks alleges that Defendants violated his right to exercise his religion when they disciplined him for attempting to mail a photograph of himself with his hands in what he characterizes as a prayer pose and Defendants characterize as a gang sign. Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 51.) For the reasons that follow, I recommend that Defendants' motion be granted.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, who is now and was at all relevant times an inmate at Shawangunk Correctional Facility ("Shawangunk"), was raised as a Jehovah's Witness, but did not fully accept the religion until 2000 or 2001. (Dkt. No. 51–8 at 6:6–11.[FN1]) Thereafter, Plaintiff prayed five or six times per day. *Id.* at 22:6–11. Each time he prayed, Plaintiff placed his hands in a meditative hand position. *Id.*

at 17:17–18:5.) He assumed this hand position so that he could "make sure [he] went before [his] Father clean. Not just physically but mentally." *Id.* at 22:16–21. The hand position is not mandated for all Jehovah's Witnesses, but Plaintiff's own research and study led him to believe that he, personally, is required to use the hand position "[b]ecause where I am spiritually and what I know pertaining to the Bible as well as research. What you know holds you accountable." *Id.* at 24:11–17; 25:7–26:6. Plaintiff believes that he cannot pray without using the hand position. *Id.* at 12:13–13:13, 31:3–18.

> FN1. Page numbers refer to the page number assigned by the Court's electronic filing system.

On February 27, 2007, Plaintiff attempted to mail a letter and photograph to a personal ad service. (Dkt. No. 51–4 at 2 ¶ 6.) The photograph depicted Plaintiff, clad in a shirt and red pants, sitting on a chair. (Dkt. No. 51–6; Dkt. No. 51–8 at 16:14–18.) Plaintiff's feet were placed wide apart and his elbows were resting on his thighs. (Dkt. No. 51–6.) His hands were pressed together with his fingertips pointed downward and his thumbs meeting at the top to form a heart or diamond shape. *Id.* At his deposition, Plaintiff testified that he was not praying or meditating when the picture was taken. (Dkt. No. 51–8 at 28:14–16.) Rather, he "was just trying to relax and in the course of just trying to relax," he made the hand sign. *Id.* at 28:14–23. In the letter that accompanied the photograph, Plaintiff indicated that he wanted "to begin a good friendship" with "someone special" and hoped to "find my ideal woman who can complete me ... as I complete her." (Dkt. No. 51–5 at 7.) In the letter, Plaintiff referred to himself several times as a "spiritual" person, but did not mention that he is a Jehovah's Witness. (*Id.;* Dkt. No. 51–8 at 36:3–7.) At his deposition, Plaintiff testified that he included the photograph with the letter to "have a resemblance of me.... [t]o show what I looked like." (Dkt. No. 51–8 at 16:19–23.) In a declaration submitted in opposition to Defendants' motion for summary judgment, Plaintiff states that he "included the photo, not only to show what I look like but to attract someone who practices the same religion I do." (Dkt. No. 55 at 36.)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

**\*2** The photograph was taken in the gym at Shawangunk, and DOCS personnel screened it before allowing Plaintiff to leave the gym with it. (Dkt. No. 51–8 at 15:4–23.) However, when Defendant Corrections Officer Kim Skwera, who was assigned to review outgoing inmate mail on February 27, 2007, saw the photograph, she "suspected that the photograph depicted [Plaintiff] making a gang sign with both his hands." (Dkt. No. 51–4 at 2 ¶¶ 6–7.) Based on this suspicion, Defendant Skwera "consulted with [Defendant] Senior Counselor Luis Franco, who had training in these matters and was one of the staff members who regularly reviewed incoming media and other materials to ensure that they do not contain any unauthorized gang material." *Id.* ¶ 8.

There is no written DOCS policy, procedure, or directive governing specifically how to identify gang insignia or materials. (Dkt. No. 51–3 at 3 ¶ 12.) Rather, staff members such as Defendant Franco receive training from the DOCS Central Intelligence/Special Investigations Unit. *Id.* ¶ 13. During this training, staff hear oral instruction and see examples of gang signs and symbols. *Id.* ¶ 15. The training includes "information on particular groups, such as 'The United Bloods Nation,' also known as 'The Bloods,' which is an unauthorized organization that is active and making an adverse impact within DOCS ." *Id.* at 4 ¶ 16. Staff learn that "The Bloods original color is RED ... Members' display of hand signs varies depending on the Set they belong to. The most common hand sign is indicated by making a circle with the thumb and index finger, touching at the finger's tip and extending the remainder of the fingers." *Id.* ¶ 17 (emphasis in original).

Based on this training, Defendant Franco concluded that the photograph depicted Plaintiff making a Bloods hand sign. *Id.* at 5 ¶ 22. He reached that conclusion because of the "manner in which the plaintiff is holding his hands together, facing downwards, in a heart or triangular shaped fashion with the fingers and thumbs touching" and because Plaintiff was wearing red pants in the picture. *Id.* at ¶¶ 23–24.

Accordingly, Defendant Skwera wrote a misbehavior report charging Plaintiff with, *inter alia,* violating DOCS

Rule 105.12. (Dkt. No. 51–4 at 2 ¶ 10.) That rule, which has since been repealed, stated that "an inmate shall not engage in or encourage others to engage in unauthorized organizational activities or meetings, or display, wear, possess, distribute or use unauthorized organizational insignia or materials." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2 (2004).

The disciplinary hearing regarding the misbehavior report was held on March 2 and 7, 2007. (Dkt. No. 51–5 at 3, 13.) Defendant Lt. G. Gardner served as the hearing officer. *Id.* at 3. Plaintiff alleges that Defendant Gardner "created a hostile environment, using intimidation tactics of taunting and facial gestures." (Dkt. No. 1 at 8 ¶ 16.)

**\*3** Plaintiff called Defendants Skwera and Franco as witnesses. (Dkt. No. 51–5 at 3.) Defendant Skwera testified that she did not speak to anyone other than Defendant Franco about the hand sign. *Id.* at 6. Defendant Franco testified that, based on his experience, Plaintiff's hand position was "clearly ... an unauthorized hand sign." *Id.* at 9. Plaintiff showed Defendant Franco pictures of several meditation hand signs and asked if he was familiar with them. *Id.* at 9–10. Defendant Franco testified that the "only religious ... group that comes close to that type of hand sign ... would be the Rastafarians.... [T]hat's the only one I'm familiar with. I am not familiar with ... meditation ... at all." *Id.* at 12.

Plaintiff told Defendant Gardner that he is a religious man, that there is a religious justification for the hand gesture, and that because he had "been trained for a period of time within my meditation ... I reacted when trying to get calm for the picture ." *Id.* at 12, 14.

Defendant Gardner found Plaintiff guilty of the unauthorized organizations and activities charge. *Id.* at 16. He stated that he relied on Defendant Skwera's report, Plaintiff's testimony that the hand sign was a form of meditation, Defendant Franco's testimony "verifying that the hand sign is that of an unauthorized organization known as the Bloods," and the photograph itself in reaching his decision. *Id.* at 17. He imposed a penalty of fifteen days' keeplock, thirty days' loss of packages and events, and fifteen days' loss of commissary and phone privileges. *Id.* He stated that the reason for his decision

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

was "to impress upon the inmate that unauthorized organizations or displays with the hand signs are prohibited." *Id.*

Plaintiff appealed Defendant Gardner's decision. (Dkt. No. 51–5 at 18.) In his appeal, he stated that the hand sign he made in the photograph was "an unconscious gesture that is relevant to my religious beliefs ... so to find me guilty is to infringe on my Constitutional rights that guarantee[ ] me freedom of religion, and freedom of speech and equal protection under the law." *Id.* at 40. Defendant John Maly, acting as Defendant Superintendent Joseph T. Smith's designee, affirmed the disposition on March 21, 2007. *Id.* at 18.

On March 12, 2007, Plaintiff filed a grievance with Defendant J. Krom, the facility's inmate grievance supervisor, alleging that Defendant Gardner was biased, had deprived Plaintiff of due process, and had deprived Plaintiff of the free exercise of his religion. (Dkt. No 1 at 9 ¶ 21.) Plaintiff also alleged that Defendant Smith allowed "a pattern of unchecked, unconstitutional conduct to take place at the hearings ... due to an unwritten Shawangunk policy promoting, encouraging and/or condoning such." *Id.* When Krom did not reply within three weeks, Plaintiff filed an appeal of his grievance with Defendant Smith. *Id.* ¶ 22. When Plaintiff did not receive a reply within four weeks, he appealed to Defendant Thomas G. Egan, the facility's inmate grievance director. *Id.* at 9–10 ¶ 23. Plaintiff did not receive a response. *Id.* at 10 ¶ 24.)

**\*4** Plaintiff filed the complaint in this action on June 4, 2008. (Dkt. No. 1.) Plaintiff's complaint asserted eight causes of action: (1) a First Amendment free exercise claim or, in the alternative, a claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"); (2) a claim that Defendants "retaliated against Plaintiff due to him exercising his right to express his religious views"; (3) a claim under the Equal Protection Clause, claiming that Defendants deprived "Plaintiff[ ] of free exercise of religion, while allowing other religious groups free exercise of religion"; (4) a First Amendment freedom of expression claim; (5) a claim that Defendants violated the Due Process Clause by "refusing to provide [Plaintiff] with a tier hearing consistent with his

constitutionally protected rights"; (6) a claim that Defendants violated the Due Process Clause by failing to respond to his grievance; (7) a claim of racial discrimination; and (8) a claim that Defendants conspired to violate his constitutional rights. (Dkt. No. 1 at 11–12.) Plaintiff requests $1,000.00 for each day he was deprived of his right to practice his religion, the reversal of his disciplinary sentence, and costs. *Id.* at 13.

Defendants moved for judgment on the pleadings. (Dkt. No. 20.) As a result of that motion, the Court dismissed six of Plaintiff's claims. (Dkt. No. 30.) Plaintiff's sole remaining claims are that Defendants violated his religious rights under the First Amendment and RLUIPA and retaliated against him for exercising his religious rights. Defendants now move for summary judgment of those claims. (Dkt. No. 51.) Plaintiff has opposed the motion. (Dkt. No. 55.) Defendants have filed a reply. (Dkt. No. 56–2.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 272–73 (2d Cir.2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* The nonmoving party must do more than "rest upon the mere allegations ... of his pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

**\*5** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Schwartz v. Compagnise Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968) (citations omitted). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Id.; accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* –––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

**A. RLUIPA**

Plaintiff claims that Defendants violated his rights under RLUIPA. (Dkt. No. 1 at 11.) RLUIPA provides that

**\*6** [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution FN3 ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

> FN3. An "institution" is, *inter alia,* "a jail, prison, or other correctional facility." 42 U.S.C. § 1997(1)(B)(ii) (2003).

42 U.S.C. § 2000cc–1(a).

Defendants argue that Plaintiff's RLUIPA claim should be dismissed because (1) Plaintiff was not disciplined for engaging in a "religious exercise"; (2) even if Plaintiff was engaged in a religious exercise, it was not substantially burdened by the misbehavior report and disciplinary sentence; (3) Defendants acted in furtherance of a compelling governmental interest and used the least

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

restrictive means of furthering that interest; and (4) RLUIPA does not authorize money damages. (Dkt. No. 51–10 at 6–13.)

1. *Whether Plaintiff Was Engaged in a Religious Exercise*

Defendants argue that they are entitled to judgment because Plaintiff has not raised a triable issue of fact that he was disciplined for engaging in a "religious exercise." (Dkt. No. 51–10 at 8–9.) I find that Plaintiff has raised a triable issue of fact on this issue.

Under RLUIPA, a "religious exercise" is "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). Defendants argue that Plaintiff was not engaged in an "exercise" because "[P]laintiff admits that he was neither praying nor meditating in the photograph that gave rise to the misbehavior report." (Dkt. No. 51–10 at 8.)

The evidence shows that while Plaintiff was not actively praying or meditating in the photograph, he has maintained since the incident occurred that his hand gesture in the photograph was the result of his prayer practice. At his disciplinary hearing, he told Defendant Gardner that because he had "been trained for a period of time within my meditation," he "reacted" with the hand sign "when trying to get calm for the picture." (Dkt. No. 51–5 at 12, 14.) Plaintiff testified at his deposition that he "fell into [his] meditation gesture unconsciously" as he was "trying to relax for the picture." (Dkt. No. 51–8 at 29:7–11.) Defendants have not cited, nor can I find, any case law discussing whether such an unconscious manifestation of one's faith (which seems akin to the practice of some Catholics to reflexively cross themselves in moments of stress) is an "exercise" within the meaning of RLUIPA. Because the burden on a motion for summary judgment is on the moving party, and because I must view the facts in the light most favorable to Plaintiff, I therefore find that Defendants have not established as a matter of law that Plaintiff was not engaged in an "exercise" of religion.

Defendants argue that even if Plaintiff was engaged in an "exercise," it was not "religious" because (1) the Jehovah's Witness religion does not require adherents to

assume any special position when praying; and (2) the way Plaintiff is holding his hands in the photograph is different than the hand poses depicted in the book from which Plaintiff says he adopted the prayer practice. (Dkt. No. 51–10 at 8–9.)

**\*7** Courts analyzing RLUIPA claims use the First Amendment "sincerely held religious beliefs" standard to determine whether a plaintiff was engaged in a "religious" exercise. *See, e.g., Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Singh v. Goord,* 520 F.Supp.2d 487, 498 (S.D.N.Y.2007). Under that standard, a religious belief is "sincerely held" when the plaintiff subjectively and sincerely holds a particular belief that is religious in nature. *Ford v. McGinnis,* 352 F.3d 582, 590 (2d Cir.2003).

Courts have routinely expressed reticence about deciding, on summary judgment, whether or not an individual's beliefs are sincere. As the Second Circuit has noted, "the judiciary is singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs" because the "[s]incerity analysis is exceedingly amorphous, requiring the factfinder to delve into the claimant's most veiled motivations...." *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984).

The fact that the prayer gesture employed by Plaintiff is not mandated by any central authority of the Jehovah's Witness faith is immaterial to the sincerity analysis. As the Supreme Court has noted:

Intrafaith differences ... are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses.... [T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether [a party or another member of his faith] more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation.

*Thomas v. Review Bd. of the Indiana Empl. Sec. Div.,* 450 U.S. 707, 715–16, 101 S.Ct. 1425, 67 L.Ed.2d

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

624 (1981) (holding that one Jehovah's Witness's belief that his religion prevented him from working in area of factory that produced tank turrets was sincere, despite fact that another Jehovah's Witness believed that such work did not violate the faith).

Similarly, I cannot conclude as a matter of law that Plaintiff's conduct was not sincere because his hand position in the photograph did not perfectly match the pictures in the book from which he adopted the pose. As a matter of fact, of course, a reasonable juror could consider this issue and conclude that the imperfection of the hand pose is evidence that Plaintiff's assertion is insincere and that he was, in fact, making a gang sign. But a reasonable juror could also conclude that the imperfection of the hand pose supports Plaintiff's claim that he unconsciously assumed the position, honed from years of using it to pray five or six times per day, in order to relax. But as a matter of law, I cannot credit one interpretation over the other. The Supreme Court has cautioned that the "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit ... protection." *Thomas,* 450 U.S. at 714. Further, "[c]ourts should not undertake to dissect religious beliefs because the ... [plaintiff's] beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Id.* at 715.

**\*8** Finally, I note that *Farid v. Smith,* 850 F.2d 917 (2d Cir.1988), cited by Defendants, is distinguishable. In that case the plaintiff "neither alleged nor submitted any proof that he sincerely h[eld] to any religious belief that mandates the use of Tarot cards ..." *Farid,* 850 F.2d at 926. Here, Plaintiff has maintained since before filing this lawsuit that the hand gesture in the photograph was religious in nature and has submitted voluminous declarations to that effect.

Therefore, I find that Plaintiff has raised a triable issue of fact that he was engaged in a "religious exercise."

2. *Substantial burden*

RLUIPA prohibits only government action that places a "substantial burden" on religious exercise. 42 U.S.C. § 2000cc–1(a). Defendants argue that even if Plaintiff was

disciplined for engaging in a religious exercise, that punishment did not place a "substantial burden" on Plaintiff. (Dkt. No. 51–10 at 9–11.) I find that Plaintiff has raised a triable issue of fact on this issue.

A prisoner's sincerely held religious belief is substantially burdened "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996) (punctuation omitted).

Defendants argue that Plaintiff's religious exercise has not been substantially burdened because Plaintiff can still pray in the privacy of his living quarters or "in designated religious areas whenever feasible as determined by the Superintendent" and because "Plaintiff is allowed to use ... meditation poses ... while praying ...." (Dkt. No. 51–10 at 10.) Defendants cite Defendant Franco's declaration as support for the latter assertion. In the cited paragraph, Defendant Franco declares that "Plaintiff would be allowed to use those 'meditation poses' depicted in his Complaint while praying ..., *which poses are different from that unauthorized group symbol made by the plaintiff in the photograph* ...." (Dkt. No. 51–3 at 6 ¶ 33, emphasis added.) In other words, Defendants argue that Plaintiff's religious exercise has not been substantially burdened because he can still pray, but only if he does it in designated areas and only so long as he does not use the prayer gesture he unconsciously assumed on February 27, 2007. I cannot find as a matter of law that such restrictions do not place substantial pressure on Plaintiff to modify his behavior and to violate his beliefs. A reasonable juror could conclude that this pressure was substantial, and another reasonable juror could conclude that this pressure was not substantial. Therefore, Plaintiff has raised a triable issue of fact that Defendants substantially burdened his religious exercise.

3. *Least Restrictive Means of Furthering a Compelling Governmental Interest*

Under RLUIPA, government officials may substantially burden an inmate's religious exercise if they are motivated by a compelling governmental interest and use the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc–1(a). The burden of proving this element is on Defendants. *Redd v. Wright,* 597 F.3d 532,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

536 (2d Cir.2010) ("[T]he state may overcome a RLUIPA claim by demonstrating that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest.").

**\*9** Defendants argue that they were motivated by the compelling governmental interest of preventing gang activity and that their "zero tolerance" policy is the least restrictive means of furthering that interest. (Dkt. No. 51–10 at 11.) Defendant Franco's declaration discusses, at length, the security problems posed by gang activity within the DOCS system. Defendant Franco declares that "DOCS has seen an increase" in gang activity "in recent years that has compelled the Department to take steps to slow the growth of these groups and monitor them closely." (Dkt. No. 51–3 at 2 ¶ 5.) Defendant Franco declares that gangs:

> often use seemingly innocuous but covert means of identifying themselves and communicating with other members both within and outside correctional facilities. These include the use of code words, slang, hidden messages (sometimes contained in letters or newspaper classified advertisements), and signs, symbols, and insignia which can range from anything [from] wearing certain color clothing or jewelry, to tattoos, and the use of hand signs, symbols and gestures, whether in person or in photographs.

> *Id.* ¶ 6.

"Prison security and penological institutional safety goals are indeed a most compelling governmental interest ..." *Campos v. Coughlin,* 854 F.Supp. 194, 207 (S.D.N.Y.1994) (Sotomayor, J.); *see also Orafan v. Goord,* 411 F.Supp.2d 153, 160 (N.D.N.Y.2006), *rev'd on other grounds, Orafan v. Rashid,* 249 Fed. App'x 217 (2d Cir.2007). Courts must be sensitive to these interests and apply RLUIPA's "compelling interest" standard "with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with consideration of costs and limited resources.' " *Cutter v. Wilkinson,* 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). This, however, does not end the inquiry.

In *Jova v. Smith,* 582 F.3d 410, 415 (2d Cir.2009), the Second Circuit noted with approval that "[o]ther circuits have ... recognized that the state may not merely reference an interest in security ... in order to justify its actions...." Indeed, "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet [RLUIPA's] requirements." *Id.* at 416 (quoting 146 Cong. Rec. S7775 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy on RLUIPA)). The Second Circuit also noted with approval that "[o]ther circuits ... have required that, for a state to demonstrate that its practice is the least restrictive means, it must show that it 'actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice.' " *Id.* (quoting *Warsoldier v. Woodford,* 418 F.3d 989, 999 (9th Cir.2005)). As another district court has noted, *Jova* thus suggests that Defendants are required to present evidence of having considered less restrictive practices. *Forde v. Baird,* 720 F.Supp.2d 170, 180 (D.Conn.2010).

**\*10** Defendant Franco declares that an "absolute ban or 'zero tolerance policy' enforceable through the disciplinary system when rule violations occur for displaying, wearing, possessing, distributing or using unauthorized organizational insignia or materials is the only way that DOCS can meaningfully attempt to prevent and curtail unauthorized group activity in this regard in correctional facilities." (Dkt. No. 51–3 at 3 ¶ 9.) Otherwise, he states:

> it would be unduly burdensome on facility staff, if not impossible, to prevent the unlimited dissemination or use of unauthorized organizational insignia or materials throughout the correctional systems which would be highly dangerous. Without a zero tolerance policy, the prohibitions could also be applied ... inconsistently from one situation to another.

> *Id.* ¶ 10.

Although this is a close question, I find that Defendant Franco's declaration adequately meets Defendants' burden of showing, as a matter of law, that they had a compelling interest and used the least

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

restrictive means to further that interest when they disciplined Plaintiff for attempting to mail a photograph of himself wearing red pants and making a hand gesture that resembled one used by the Bloods. If Plaintiff had been punished simply for making the hand sign, particularly in his cell or in some other area designated for inmate prayer, I would likely recommend that the Court deny Defendants' motion for summary judgment. However, Plaintiff was attempting to disseminate the photograph and, in DOCS' experience, gang members sometimes use hidden messages in newspaper classified advertisements to communicate. (Dkt. No. 51–3 at 2 ¶ 6.) Accordingly, applying the due deference I must give to prison administrators in establishing necessary procedures to maintain security, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's RLUIPA claim.

### 5. *Availability of Money Damages*

Defendants argue that even if Plaintiff had raised a triable issue of fact and could proceed to trial on his RLUIPA claim, he would be entitled only to injunctive relief. (Dkt. No. 51–10 at 13.) Defendants are correct.

RLUIPA allows prevailing plaintiffs to recover "appropriate relief against a government." 42 U.S.C. § 2000cc–2(a). The United States Courts of Appeals are divided on the issue of whether "appropriate relief" includes money damages. *Compare Madison v. Commonwealth of Virginia,* 474 F.3d 118, 131–32 (4th Cir.2006) (money damages not available) *with Smith v. Allen,* 502 F.3d 1255, 1265 (11th Cir.2007) (money damages available). The Second Circuit has not resolved the issue. The consensus of opinion among district courts in the Second Circuit is that RLUIPA does not authorize suits for money damages. *See Pugh v. Goord,* 571 F.Supp.2d 477, 506–09 (S.D.N.Y.2008). The issue is currently pending before the Supreme Court in *Sossamon v. Texas,* 560 F.3d 316 (5th Cir.2009), *cert. granted ––– U.S. ––––, 130 S.Ct. 3319, 176 L.Ed.2d 1218 (2010)* (argued Nov. 2, 2010). In the event that the District Court concludes that Plaintiff has raised a triable issue of fact as to his RLUIPA claim and, at that time, the Supreme Court has not yet issued a decision in *Sossamon,* I would recommend that the Court allow only Plaintiff's RLUIPA claim for injunctive relief to proceed.

### B. Free Exercise Clause Claim

**\*11** Plaintiff claims that Defendants violated his First Amendment right to freely exercise his religion. (Dkt. No. 1 at 11.) Defendants argue that they are entitled to summary judgment dismissing Plaintiff's claim, for the same reasons that they asserted regarding the RLUIPA claim. (Dkt. No. 51–10 at 6–13.) Defendants are correct.

Under the Free Exercise Clause of the First Amendment, a prison regulation or individualized decision to deny a prisoner the ability to engage in a religious exercise "is judged under a reasonableness test less restrictive than that ordinarily applied [to burdens on fundamental rights]: a regulation that burdens a [prisoner's] protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (punctuation omitted).

To establish a free exercise claim, a prisoner "must show at the threshold that the disputed conduct substantially burdens [FN4] his sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274–75 (citing *Ford,* 352 F.3d at 591). Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened,"[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin,* 467 F.3d at 275 (quoting *Ford,* 352 F.3d at 595) (punctuation omitted). When determining whether the burden imposed by the defendants is reasonable rather than irrational, a court evaluates four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether the prisoner has an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Salahuddin,* 467 F.3d at 274.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

FN4. Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. "The *Ford* court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied. Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008) (citations and some punctuation omitted).

Here, as discussed above, Defendants have established that they are entitled to judgment under the strict RLUIPA compelling interest standard. Accordingly, they are also entitled to judgment under the less stringent First Amendment standard. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's claim under the Free Exercise Clause.

**C. Retaliation**

Plaintiff claims that Defendants retaliated against him for exercising his right to freely exercise his religion. (Dkt. No. 1 at 11.)

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381–383. Because of the relative ease with which claims

of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

**\*12** [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a retaliation claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d. Cir.2001)).

Defendants argue that Plaintiff's conduct was not protected because Plaintiff "was not praying or meditating in the photograph which led to the misbehavior report." (Dkt. No. 51–10 at 11–12.) As discussed above, Plaintiff has raised a triable issue of fact that he was engaged in a religious exercise in the photograph. Therefore, I find Defendants' argument regarding the first prong to be without merit.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

Regarding the second prong, Defendants concede that "the misbehavior report constitutes adverse action ..." (Dkt. No. 51–10 at 11.)

Regarding the third prong:

[t]o satisfy the causal-connection prong of a retaliation claim, an inmate must show that the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff. The court may consider a number of factors when determining whether a causal connection exists, including (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation.

*Vega v. Artus,* 610 F.Supp.2d 185, 207 (N.D.N.Y.2009) (citations and punctuation omitted) (Suddaby, J.).

Here, there is simply no evidence in the record from which a reasonable juror could conclude that Defendants were substantially motivated by Plaintiff's religion. Defendants Franco and Skwera have both filed declarations stating that they were not aware of Plaintiff's religion until they heard him testify at the disciplinary hearing. (Dkt. No. 51–3 at 5–6 ¶¶ 27–30; Dkt. No. 51–4 at 4–5 ¶¶ 21–25.) Although Defendant Gardner was aware of Plaintiff's faith when he found Plaintiff guilty of the disciplinary charge, there is no evidence in the record that he was substantially motivated by Plaintiff's religion to punish Plaintiff. Although the complaint characterizes Defendant Gardener's conduct at the hearing as "hostile" and "intimidating" (Dkt. No. 1 at 8 ¶ 16), nothing in the transcript indicates that Defendant Gardener said anything derogatory about Jehovah's Witnesses or people who use hand poses to pray. As for the other defendants, Plaintiff asserts that they must have known about his religion because, when he became a Jehovah's Witness, he filled out a form designating Jehovah's Witness as his religion. (Dkt. No. 51–8 at 6:2–20.) However, there is no evidence that any of the named defendants were aware of that form. Accordingly, I find that Plaintiff has not raised a triable

issue of fact that there was a causal connection between his protected conduct and the adverse action. Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's retaliation claim.

**D. Personal Involvement**

*13 Defendants argue that, even if Plaintiff had raised a triable issue as to any of his substantive claims, the claims against several Defendants should be dismissed for lack of personal involvement. (Dkt. No. 51–10 at 18–22.) Defendants are correct.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[FN5]

FN5. In *Ashcroft v. Iqbal,* ––– U.S. –––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. *See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). I will assume for the purposes of this motion that *Colon* remains good law.

1. *Claims Against Defendant Smith*

Plaintiff claims that Defendant Smith violated his constitutional rights by (1) designating Plaintiff's appeal of the disciplinary decision to Defendant Maly, who then affirmed the decision (Dkt. No. 1 at 9 ¶¶ 19–20); (2) ignoring Plaintiff's grievance (Dkt. No. 1 at 9–10 ¶¶ 22–23); and (3) allowing "a pattern of unchecked, unconstitutional conduct to take place at the hearings ... due to an unwritten Shawangunk policy promoting, encouraging and/or condoning such." (Dkt. No 1 at 9 ¶ 21.) Even if Plaintiff had raised a triable issue of fact as to his substantive claims, he has not raised a triable issue of fact that Defendant Smith was personally involved.

Regarding the appeal, the evidence shows that Defendant Smith personally took no action at all. Even if he had handled Plaintiff's appeal personally rather than designating the task to Defendant Maly, courts have held that "merely affirming the hearing determination is not a sufficient basis to impose liability." *Woodward v. Mullah,* No. 08–CV–463A, 2009 WL 4730309, at *2–3 (W.D.N.Y. Dec.7, 2009).[FN6] Although the Second Circuit once held that allegations that a superintendent affirmed a prisoner's conviction on administrative appeal were sufficient to allow the case to survive summary judgment [FN7], district courts in this Circuit have often distinguished that case by noting that liability only attaches if the supervisory official "proactively participated in reviewing the administrative appeals as opposed to merely rubber-stamping the results." *Woodward,* 2009 WL 4730309, at *2–3. Here, there is no evidence that

Defendant Smith proactively participated in the review.

FN6. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

FN7. *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986).

*14 A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement. *Rivera v. Goord,* 119 F.Supp.2d 327, 344–45 (S.D.N.Y.2000). *See also Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). Thus, Defendant Smith's alleged failure to respond to Plaintiff's grievance does not constitute personal involvement.

Finally, Plaintiff has not produced any evidence of "a pattern of unchecked, unconstitutional conduct" at hearings, much less any that occurred "due to an unwritten Shawangunk policy promoting, encouraging and/or condoning such." (Dkt. No 1 at 9 ¶ 21.) Therefore, Plaintiff has not raised a triable issue of fact that Defendant Smith was personally involved in any alleged constitutional violations.

2. *Claims Against Defendant Maly*

Plaintiff's only claim against Defendant Maly is that he affirmed the disciplinary conviction. (Dkt. No 1 at 9 ¶¶ 19–20.) As discussed above, such a claim is insufficient to establish personal involvement unless there is evidence that the defendant was proactively involved in the appeal. Here, there is no such evidence regarding Defendant Maly. Therefore, Plaintiff has not raised a triable issue of fact that Defendant Maly was personally involved in any alleged constitutional violations.

3. *Claims Against Defendants Krom and Egan*

Plaintiff's only claim against Defendants Krom and Egan is that they ignored his grievance. (Dkt. No. 1 at 9–10 ¶¶ 22–24.) As discussed above regarding Defendant

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

Smith, this is insufficient to establish personal involvement. Therefore, Plaintiff has not raised a triable issue of fact that Defendants Krom and Egan were personally involved in any alleged constitutional violations.

**ACCORDINGLY,** it is

**ORDERED** that the Clerk provide Plaintiff with a copy of *Woodward v. Mullah,* No. 08–CV–463A, 2009 WL 4730309 (W.D.N.Y. Dec.7, 2009) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009); and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 51) be ***GRANTED.***

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2011.

Parks v. Smith
Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1189354 (N.D.N.Y.)

(Cite as: 2010 WL 1189354 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Kenneth WARD, Plaintiff,
v.
Lucien LeCLAIRE, Jr., Acting Commissioner;
Lawrence Sears, Superintendent, Franklin Correctional
Facility; J.D. Demars, Deputy Superintendent of
Programs; Glenn Goord, Docs Commissioner; M. Dutil,
Correctional Officer; Brian Fischer, Commissioner; K.
Habeck, Deputy Superintendent of Administration; T.
Dumas, Registered Nurse; D.A. Rock, Deputy
Superintendent of Security, Defendants.
No. 907–CV–0026 (GTS/RFT).

March 24, 2010.
Kenneth Ward, Rochester, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Christina L. Roberts–Ryla, Esq., David L.
Cochran, Esq., Assistant Attorneys General, of Counsel,
Albany, NY, for Defendants.

### DECISION and ORDER

Hon. GLENN T. SUDDABY, District Judge.
   *1 Currently before the Court in this *pro se* prisoner
civil rights action filed by Kenneth Ward ("Plaintiff")
against nine employees of the New York State Department
of Correctional Services ("Defendants") pursuant to 42
U.S.C. § 1983 are (1) Defendants' motion for summary
judgment (Dkt. No. 85), (2) United States Magistrate
Judge Randolph F. Treece's Report–Recommendation
recommending that Defendants' motion be granted in part
and denied in part (Dkt. No. 97), and (3) Plaintiff's
Objections to the Report–Recommendation (Dkt. No. 99).
For the reasons set forth below, the
Report–Recommendation is accepted and adopted in its
entirety, and Defendants' motion for summary judgment is
granted in part and denied in part.

## I. BACKGROUND

### A. Plaintiff's Amended Complaint

   On January 28, 2008, Plaintiff filed his Amended
Complaint. (Dkt. No. 64.) Construed with the utmost of
liberality, Plaintiff's Amended Complaint alleges that,
between approximately May 2006 and January 2008,
while he was incarcerated at Franklin Correctional Facility
in Malone, New York ("Franklin C.F."), his civil rights
were violated in the following manner: (1) Defendants
Dutil, Sears, Demars, Habeck, Rock, Goord, Fischer, and
LeClaire were deliberately indifferent to the conditions of
his confinement in violation of the Eighth Amendment; (2)
Defendants Dumas, Rock, and the medical staff of
Franklin C.F.[FN1] were deliberately indifferent to his
medical needs in violation of the Eighth Amendment; (3)
Defendant Dumas and the medical staff retaliated against
him in violation of the First Amendment; (4) Defendant
Demars denied him due process by failing to address his
request for a reasonable accommodation pursuant to the
Americans with Disabilities Act ("ADA"), in violation of
the Fourteenth Amendment; (5) the Franklin medical staff
conspired to violate his constitutional rights; and (6) all of
the named Defendants violated various articles of the New
York State Constitution and other New York statutes. (*See
generally,* Dkt. No. 64 [Plf.'s Am. Compl.].)

      FN1. In his Amended Complaint, Plaintiff asserts
      claims against twelve (12) Defendants. (Dkt. No.
      64.) However, Plaintiff only identifies nine (9)
      Defendants by name, and fails to identify the
      three (3) unnamed Defendants as John Doe
      Defendants. However, liberally construed, the
      Court finds that Plaintiff has attempted to assert
      claims against members of the medical staff who
      are subordinates (and/or co-workers) of
      Defendant Dumas.

   More specifically, Plaintiff alleges as follows: (1)
Defendants failed to enforce the New York State
Department of Correctional Services' ("DOCS") smoking
policy at Franklin C.F., thereby exposing him to high

Not Reported in F.Supp.2d, 2010 WL 1189354 (N.D.N.Y.)

(Cite as: 2010 WL 1189354 (N.D.N.Y.))

levels of environmental tobacco smoke ("ETS") that caused his asthma condition to deteriorate and placed him at risk for more serious diseases, such as cancer; (2) Defendants conspired to "cover up" their failure to enforce the smoking rules; (3) Defendant Dumas and the medical staff at Franklin C.F. improperly took and tracked his vital signs when he received medical treatment, made him wait for up to an hour before receiving treatment for his asthma, and he did not allow him to see a doctor from July 17 through September 4, 2007; (4) the medical staff delayed providing him with medical treatment and failed to document his medical records because he filed grievances and complaints; and (5) Defendant J.D. Demars denied his request for a reasonable accommodation to participate in services, including showering, which he was not able to participate in because of the environment. (*Id* .)

**\*2** For a more detailed recitation of the factual allegations giving rise to Plaintiff's claims, the Court refers the reader to the Amended Complaint in its entirety, and Magistrate Judge Treece's Report–Recommendation in its entirety. (Dkt.Nos.64, 97.)

**B. Defendants' Motion for Summary Judgment and Plaintiff's Response**

On September 15, 2008, Defendants filed a motion for summary judgment seeking dismissal of all of Plaintiff's claims. (Dkt. No. 85.) In their motion, Defendants argue as follows: (1) Plaintiff has failed to state a claim under the Fourth and Fifth Amendments for unreasonable search and seizure, or a compulsion to give self-incriminating evidence, because he has failed to allege facts plausibly suggesting such a violation; (2) Plaintiff's claims under New York law should be dismissed for failure to state a claim because a violation of state law does not give rise to claim under 42 U.S.C. § 1983; (3) Plaintiff has failed to state a claim against Defendants Fischer, LeClaire, Rock, Sears, and Habeck because he has failed to allege facts plausibly suggesting, and/or adduce admissible record evidence establishing, that those supervisors were personally involved in the constitutional violations he alleges; (4) Plaintiff has failed to establish an Eighth Amendment claim for deliberate indifference to serious medical needs because he has failed to adduce admissible record evidence establishing that he

experienced a serious medical need during the time in question, and/or that Defendants acted with criminal recklessness in disregard of any such need; (5) Plaintiff has failed to establish an Eighth Amendment claim for inadequate prison conditions based on his exposure to ETS, because he has failed to adduce admissible record evidence establishing a causal connection between his filing of grievances and the adverse action that he allegedly experienced; (7) Plaintiff has failed to establish a Fourteenth Amendment claim for violation of his procedural due process rights because he has failed to adduce admissible record evidence establishing that he suffered an atypical and significant hardship in relation to the ordinary incidents of prison life; (8) Plaintiff's claim under the ADA should be dismissed because he has failed to adduce admissible record evidence establishing that he suffered from a "disability" under the ADA; (9) Plaintiff has failed to state a claim for conspiracy because he has failed to allege facts plausibly suggesting that there was a meeting of the minds between Defendants to act together to inflict an unconstitutional injury on Plaintiff, and that they took an act in furtherance of such an agreement; and (10) based on the current record, Defendants are entitled to qualified immunity as a matter of law. (Dkt. No. 85, Attach. 14, at 11–24.)

On February 17, 2009, after a three-and-one-half-month deadline extension was granted to Plaintiff by the Court, Plaintiff submitted his response in opposition to Defendants' motion for summary judgment. In his response, Plaintiff argues as follows: (1) supervisory officials Fischer, Goord, LeClaire, Sears, Rock and Habeck should not be dismissed as Defendants from this action because the record contains evidence that they were personally involved in the alleged constitutional violations; (2) the record contains evidence in support Plaintiff's Eighth Amendment claim for deliberate indifference to his serious medical needs; (3) the record contains evidence in support Plaintiff's Defendants retaliated against him in violation of the First Amendment; (4) Defendant Demars violated Plaintiff's due process rights, because Demars failed to follow the procedure created by the State of New York through its implementation of DOCS Directive 2614; and (5) based on the current record, Defendants are not entitled to qualified immunity as a matter of law. (Dkt. No. 94, at 2–10.)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1189354 (N.D.N.Y.)

(Cite as: 2010 WL 1189354 (N.D.N.Y.))

## C. Magistrate Judge Treece's Report–Recommendation

*3 On September 16, 2009, Magistrate Judge Treece issued a Report–Recommendation recommending as follows: (1) that Plaintiff's Eighth Amendment conditions-of-confinement claim against Defendants Sears, Demars, Habeck, Rock, Goord, Fischer, and LeClaire be dismissed; (2) that Plaintiff's Eighth Amendment deliberate-indifference claim against Defendants Dumas, Rock, and the medical staff of Franklin C.F. be dismissed; (3) that Plaintiff's First Amendment retaliation claim against Defendant Dumas and the medical staff be dismissed; (4) that Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Demars be dismissed; (5) that Plaintiff's conspiracy claim against the Franklin medical staff be dismissed; (6) that Plaintiff's claims under the New York State Constitution and other New York statutes against all Defendants be dismissed; and (7) that Plaintiff's Eighth Amendment conditions of confinement claim against Defendant Dutil *not* be dismissed pursuant to Fed.R.Civ.P. 56 due to the existence of genuine issues of material fact regarding this claim. (Dkt. No. 97, at 9–29.)

### D. Plaintiff's Objections

On November 5, 2009, after an extension of time was granted by the Court, Plaintiff filed his Objections to the Report–Recommendation, arguing, *inter alia,* that Magistrate Judge Treece improperly recommended the dismissal of Defendants LeClaire, Jr., Sears, Demars, Goord, Fischer, and Dumas. (Dkt. No. 99.) More specifically, Plaintiff argues, *inter alia,* as follows: (1) there is no right to privacy in the correctional facility, which makes it difficult for corrections officers to enforce a smoking ban; (2) Defendants failed to consider and implement any of Plaintiff's proposed solutions to the smoking problem; (3) the smoking violation reports provided by Defendants, which the Court relied on, in part, in making its determinations, are incomplete; (4) because Defendants Fischer, LeClaire received and acted on his grievances and complaints, they were personally involved in the constitutional violations; (5) as a result of his complaints, Defendants' subordinates repeatedly delayed his receipt of medical treatment and failed to properly document his medical records, which resulted in his suffering an acute asthmatic attack; and (6) Defendant Demars violated DOCS policy by not forwarding Plaintiff's accommodation request to the medical unit and the ADA/CORC. (*See generally* Dkt. No. 99 [Plf.'s Objections].)

For a more detailed recitation of Plaintiff's Objections, the Court refers the reader to the Objections.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review Governing a Report–Recommendation

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C).[FN2] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See* Brown v. Peters, 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).[FN3] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See* Batista v. Walker, 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

> FN2. On de novo review, "[t]he judge may ... receive further evidence ...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g.,* Paddington Partners v. Bouchard, 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no

Not Reported in F.Supp.2d, 2010 WL 1189354 (N.D.N.Y.)

(Cite as: 2010 WL 1189354 (N.D.N.Y.))

justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

FN3. *See also Vargas v. Keane,* 93–CV–7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec.12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), aff'd, 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

**B. Standard Governing a Motion for Summary Judgment**

**\*4** Magistrate Judge Treece correctly recited the legal standard governing a motion for summary judgment. (Dkt. No. 97, at 3–5.) As a result, this standard is incorporated by reference in this Decision and Order.

**III. ANALYSIS**

After carefully reviewing all of the papers herein, including Magistrate Judge Treece's thorough Report–Recommendation, the Court can find no error (clear or otherwise) in the Report–Recommendation.[FN4] Magistrate Judge Treece employed the proper standards to Plaintiff's claims, accurately recited the facts surrounding these claims, and reasonably applied the law to those facts. As a result, Magistrate Judge Treece's Report–Recommendation is accepted and adopted in its entirety. The Court would add only two points.

FN4. Although the Court finds Plaintiff's Objections to be general in nature, the Court notes that Magistrate Judge Treece's Report–Recommendation would survive even a *de novo* review.

First, with regard to Plaintiff's continued insistence that Defendants violated his constitutional rights by failing to follow DOCS Directive 2614, section 1983 provides, in pertinent part, "Every person who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by *the Constitution and laws,* shall be liable to the party injured ...." 42 U.S.C. § 1983 [emphasis added]. The term "the Constitution and laws" refers to United States Constitution and *federal* laws.[FN5] A violation of a state law or regulation, *in and of itself,* does not give rise to liability under 42 U.S.C. § 1983.[FN6] Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation;[FN7] this is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive.[FN8]

FN5. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' *of the United States.*" ) (emphasis added); *Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985) ("Recovery under 42 U.S.C. § 1983 ... is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or *federal* statutory right ....") (citation omitted; emphasis added); *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994) ("The initial inquiry in a § 1983 action is whether the Plaintiff has been deprived of a right 'secured by the Constitution and laws' *of the United States.*" ) [emphasis added].

FN6. *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson, 761 F.2d at 891* ("[A] state

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1189354 (N.D.N.Y.)

(Cite as: 2010 WL 1189354 (N.D.N.Y.))

employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983 ....") (citation omitted); *Murray v. Michael,* 03–CV–1434, 2005 WL 2204985, at *10 (N.D.N.Y. Sept.7, 2005) (DiBianco, M.J.) ("[A]ny violations of state regulations governing the procedures for disciplinary hearings ... do not rise to the level of constitutional violations.") (citation omitted); *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ( "[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") (citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 [2d Cir.1990] ).

FN7. *See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citation omitted); *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997).

FN8. *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

Having said that, it is true that a state may, *under certain circumstances,* create a liberty interest protected by the Fourteenth Amendment's Due Process Clause through its enactment of certain statutory or regulatory measures. At one point, the Supreme Court held that a state created such a liberty interest if it repeatedly used explicit language of an unmistakably mandatory character in connection with requiring specific substantive predicates. *Hewitt v. Helms,* 459 U.S. 460, 466–472, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). However, that rule created a perverse incentive (1) for inmates to "comb" state regulations for mandatory language upon which to base claims of entitlements, (2) for courts to draw negative inferences from mandatory language in state regulations, and to involve themselves in the day-to-day management of prisons, and (3) for states to not codify prison management procedures, or to confer on correctional personnel "standardless discretion." *Sandin v. Connor,* 515 U.S. 472, 477–484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). As a result, the Supreme Court changed the rule,

shifting the courts' focus from the language of a particular state law or regulation to the nature of the deprivation. *Sandin,* 515 U.S. at 483–484.[FN9] Specifically, in 1995, the Supreme Court held that, while states may still under certain circumstances create a liberty interest protected by the Fourteenth Amendment's Due Process Clause, the interest "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483–84.

FN9. *See also Blouin v. Spitzer,* 356 F.3d 348, 362–363 (2d Cir.2004) (recognizing abrogation or modification of prior rule which focused on language of state regulation), *accord, Anderson v. Recore,* 317 F.3d 194, 198–200 (2d Cir.2003), *accord, Watson v. City of N.Y.,* 92 F.3d 31, 37–38 (2d Cir.1996), *accord, Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

**\*5** Second, with regard to Plaintiff's argument that Defendants Fischer, and LeClaire were personally involved in the constitutional violation because these individuals "received, acted and reviewed Plaintiff's grievances and complaints," (Dkt. No. 99, at 4), the record reflects that Defendants Fischer and LeClaire "routinely received several thousand letters per year" from inmates, which were screened by secretarial staff members and sent to the "appropriate Deputy Commissioner who oversaw the area that encompassed the issue raised by the inmate." (Dkt. No. 85, Attach. 9, at ¶¶ 6, 13 [LeClaire Decl.]; Dkt. No. 85, Attach. 11, at ¶¶ 6–7, 12–16 [Fischer Decl.].) Although Plaintiff argues that forwarding a letter to "the appropriate Deputy Commissioner" constitutes acting on the complaint, it is well settled that "referring ... letters [and grievances] to staff for investigation is not sufficient to establish personal involvement." *Vega v. Artus,* 610 F.Supp.2d 185, 199, n. 13 (N.D.N.Y.2009) (Suddaby, J.) ("Prison supervisors are entitled to refer letters of complaint to subordinates, and rely on those subordinates to conduct an appropriate investigation and response, without rendering the supervisors personally involved in the constitutional violations alleged in the letters of complaint.") (citing cases); *see also Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1189354 (N.D.N.Y.)

(Cite as: 2010 WL 1189354 (N.D.N.Y.))

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Treece's Report–Recommendation (Dkt. No. 97) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 85) is ***DENIED*** with regard to Plaintiff's Eighth Amendment conditions-of-confinement claim against Defendant Dutil; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 85) is ***GRANTED*** with regard to all of Plaintiff's other claims. The clerk is directed to terminate this action as against Defendants LeClaire, Sears, Demars, Boyea, Goord, Fischer, Habeck, Dumas and Rock.

N.D.N.Y.,2010.

Ward v. LeClaire
Not Reported in F.Supp.2d, 2010 WL 1189354 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Candido BAEZ, Plaintiff,
v.
J. HARRIS, Deputy Superintendent, Shawangunk
Correctional Facility; Donald Selsky, Director Special
Housing Unit Program; and Quartarone, Nurse,
Shawangunk Correctional Facility, Defendants.
No. 9:01-CV-807.

Feb. 7, 2007.
Candido Baez, Ossining, NY, Plaintiff Pro Se.

Andrew M. Cuomo, Attorney General for the State of New
York, Maria Moran, Esq., Assistant Attorney General,
Syracuse, NY, Attorney for Defendants.

**MEMORANDUM-DECISION AND ORDER**

NORMAN A. MORDUE, Chief U.S. District Judge.
**INTRODUCTION**

*1 Plaintiff, an inmate in the custody of the New York
State Department of Correctional Services, brought this
action under 42 U.S.C. § 1983. The amended complaint
(Dkt. No. 49) claims that defendants violated his
constitutional rights under the Eighth and Fourteenth
Amendments.

Defendants' motion for summary judgment (Dkt. No.
75) was referred to United States Magistrate Judge David
R. Homer for a report and recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). Magistrate
Judge Homer's Report and Recommendation (Dkt. No. 81)
recommends that defendants' motion be granted in part
and denied in part.

Plaintiff has submitted an objection (Dkt. No. 82) to
the Report and Recommendation. Pursuant to 28 U.S.C. §
636(b)(1)(C), this Court conducts a *de novo* review of
those parts of a magistrate judge's report and

recommendation to which a party specifically objects.
Where only general objections are filed, the Court reviews
for clear error. *See* Brown v. Peters, 1997 WL
599355,*2-*3 (N.D .N.Y.), *af'd without op.,* 175 F.3d
1007 (2d Cir.1999). Failure to object to any portion of a
report and recommendation waives further judicial review
of the matters therein. *See* Roldan v. Racette, 984 F.2d 85,
89 (2d Cir.1993).

**DISCUSSION**

Plaintiff objects to Magistrate Judge Homer's Report
and Recommendation insofar as it recommends: (1) that
all claims against Selsky be dismissed; and (2) that all
Eighth Amendment claims be dismissed.
**(1) Claims against Selsky**

Plaintiff asserts Eighth and Fourteenth Amendment
claims against Selsky. Plaintiff objects to Magistrate Judge
Homer's recommendation that they be dismissed.

The Court first addresses plaintiff's Eighth
Amendment claims against Selsky. Plaintiff's amended
complaint may be read to assert a claim against Selsky
based on the allegedly premature removal of plaintiff's
bandages after hernia surgery. In a Memorandum-Decision
and Order entered on September 29, 2003 (Dkt. No. 29)
the Court adopted Magistrate Judge Homer's
recommendation (Dkt. No. 27) to dismiss without
prejudice plaintiff's claims based on premature removal of
the bandages because plaintiff had failed to exhaust this
claim. Plaintiff then filed a grievance raising this issue.
The grievance was rejected as untimely, and that rejection
was affirmed on administrative appeal. Accordingly, the
claim remains unexhausted. Plaintiff objects to dismissal
of this claim, arguing that he attempted to exhaust it. The
fact that plaintiff was foreclosed from exhausting the claim
due to the passage of time does not, without more, excuse
him from the administrative exhaustion requirement. *See*
Williams v. Comstock, 425 F.3d 175, 176 (2d Cir .2005);
Baez v. Kahanowicz, 2007 WL 102871, *7 (S.D.N.Y.).
Thus, the Court agrees with Magistrate Judge Homer that
plaintiff's Eighth Amendment claim based on removal of
his bandages must be dismissed for failure to exhaust his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

administrative remedies. Further, the Court agrees with Magistrate Judge Homer that, in any event, the claim lacks merit. Accordingly, to the extent that plaintiff asserts an Eighth Amendment claim against Selsky based on this allegation, it is dismissed.

**\*2** Plaintiff also appears to assert an Eighth Amendment claim against Selsky stemming from plaintiff's allegedly premature removal from the hospital and subjection to a lengthy bus trip when he needed immediate medical attention. However, there is no basis to find that Selsky was personally involved in these events. To the extent that plaintiff asserts an Eighth Amendment claim against Selsky based on this allegation, it is dismissed.

To the extent that plaintiff bases an Eighth Amendment claim on the conditions he experienced in SHU, this Court agrees with Magistrate Judge Homer that as a matter of law plaintiff's allegations fail to state such a claim. *See generally Branch v. Goord,* 2006 WL 2807168, *5 (S.D.N.Y.).* Thus, all Eighth Amendment claims against Selsky are dismissed.

With respect to plaintiff's Fourteenth Amendment claims against Selsky, plaintiff's objections state: "Defendant Selsky could have release[d] plaintiff sooner from SHU, but instead waited until I submitted a C.P.L.R. Article 78 [petition] to change his decision and release me. Defendant Selsky was put on notice sooner with my administration *[sic]* appeal to release me from SHU but chose not to." Essentially, plaintiff asserts Fourteenth Amendment liability against Selsky stemming from the disciplinary hearing conducted by defendant Harris and Selsky's handling of plaintiff's appeal from Harris' determination. <sup>FN1</sup>

FN1. In his objection, plaintiff also states: "My father addressed a letter to Mr. Selsky documenting the violations of my rights. Therefore, [Selsky] is personally involve[d] because he was aware of the violation and never release[d] me from SHU[.]" The receipt of a letter does not, however, constitute sufficient personal involvement to generate supervisory liability. *See Sealey v. Giltner,* 116 F.3d 47, 51

(2d Cir.1997); *Garvin v. Goord,* 212 F .Supp.2d 123, 126 (S.D.N.Y.2002).

Selsky's affidavit in support of summary judgment states that he is the Director of the Special Housing/Inmate Disciplinary Program, and that he personally responds, as the Commissioner's authorized designee, to all Tier III appeals taken by inmates. Under the circumstances of this case, the record is sufficient to withstand summary judgment on the issue of personal involvement. *See, e.g., Gilbert v. Selsky,* 867 F.Supp. 159, 166 (S.D.N.Y.1994) ("If a supervisory official learns of a violation through a report or an appeal, but fails to remedy the wrong, that may constitute a sufficient basis for liability."). Likewise, defendants are not entitled to dismissal of plaintiff's claim against Selsky based on plaintiff's confinement in SHU for one year. *See generally Sandin v. Connor,* 515 U.S. 472, 483-84 (1995).

**(2) Claims against Quartarone**

Plaintiff objects to Magistrate Judge Homer's recommendation that the Court dismiss plaintiff's Eighth Amendment claim against defendant Quartarone. Insofar as this claim is based on Quartarone's allegedly premature removal of plaintiff's bandages after his hernia repair surgery, it is unexhausted as discussed above.

Plaintiff's other Eighth Amendment claims, based on his allegedly premature removal from the hospital and bus transfer, do not allege any involvement on the part of Quartarone. The sole named defendant allegedly involved in these events is Forte; however, all claims against him have been dismissed (Dkt. No. 79). Accordingly, all claims against Quartarone are dismissed.

**CONCLUSION**

**\*3** It is therefore

ORDERED the Court accepts and adopts the Report and Recommendation (Dkt. No. 81) of United States Magistrate Judge David R. Homer, except insofar as it recommends dismissal of the Fourteenth Amendment claims as against Selsky; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 75) is granted in part and denied in part; and it is further

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

ORDERED that dismissal of all claims against defendant Quartarone is granted; and it is further

ORDERED that dismissal of plaintiff's Eighth Amendment claims against defendant Donald Selsky is granted; and it is further

ORDERED that dismissal of plaintiff's Fourteenth Amendment claims against Donald Selsky is denied; and it is further

ORDERED that dismissal of plaintiff's claims against J. Harris is denied.

IT IS SO ORDERED.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Candido Baez ("Baez"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants,[FN2] three DOCS employees, violated his constitutional rights under the Eighth and Fourteenth Amendments. Am. Compl. (Docket No. 49) at ¶¶ 50-53. Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Docket No. 75. Baez opposes the motion. Docket No. 76. For the reasons which follow, it is recommended that defendants' motion be granted in part and denied in part.

> FN2. Harris, Selsky, and Quartarone. Defs. Mem. of Law (Docket No. 75) at 2. The remaining defendant, Doctor Forte, was dismissed following his death in 2004. Docket No. 79.

**I. Background**

The facts are set forth in the light most favorable to Baez as the non-movant. See Section II(A) *infra*.

**A. Disciplinary Hearing**

At all relevant times, Baez was incarcerated at Shawangunk Correctional Facility ("Shawangunk"). Am. Compl. at ¶ 1. On November 8, 1999, while in the A yard, Baez swung a five-pound weight and hit inmate Garbez on the left side of his head. Moran Aff. (Docket No. 75), Ex. A at 1. Another inmate, Valdez, began to fight with Baez and both ignored orders from corrections officer Riopelle to stop. *Id.* A response team was able to separate Valdez and Baez, removed them from the yard, and brought both inmates to the infirmary. *Id.* Baez was issued a misbehavior report for assault on an inmate, fighting, refusing a direct order, and having a weapon. *Id.* On the same day, corrections officers searched Baez's cell and confiscated a bottle of expired medication, a broken ruler, and a hard plastic plate. *Id.* at 2. Baez received another misbehavior report for possessing unauthorized medication, contraband, property in unauthorized area, and an altered item. *Id.*

On November 10, 1999, the commencement of Baez's Tier III disciplinary hearing [FN3] was adjourned to November 16, 1999 because the hearing officer, Deputy Superintendent of Programs J. Harris, was unavailable. Docket No. 24, Ex. C; Hrg. Tr. at 1. Baez's assistant for the hearing, Boyham,[FN4] first met with Baez on November 10, 1999 and completed his assistance on November 12, 1999. Hrg. Tr. at 2. On November 16, 1999, Baez's disciplinary hearing commenced. Hrg. Tr. at 1. On November 23, 1999, Harris found Baez guilty of assault, fighting, possessing a weapon, refusing a direct order, and having an altered item and found him not guilty of unauthorized medication, having property in an unauthorized area, and possessing contraband. Moran Aff., Ex. A at 3-4. Baez was sentenced to twenty-four months in the Special Housing Unit ("SHU"),[FN5] loss of packages, commissary, and telephone privileges, and the recommended loss of twenty-four months of good time credit. *Id.* Additionally, Baez lost his inmate grade-pay and program assignment. Compl. (Docket No. 1) at ¶ 17.

> FN3. DOCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged. A Tier III hearing, or superintendents' hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed. N.Y. Comp.Codes R. &

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

Regs. tit. 7, §§ 253.7(iii), 270.3(a) (2006).

FN4. Boyham, an original defendant in this matter, was dismissed from the case on a motion for summary judgment on September 29, 2003. Docket No. 29.

FN5. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2006). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

**\*4** Baez appealed Harris's determination. Docket No. 24, Ex. H. On March 21, 2000, Baez filed a petition pursuant to N.Y. C.P.L.R. Art. 78.FN6 Moran Aff., Ex. C. The defendants received three extensions of time to answer Baez's petition. Am. Compl. at ¶ 10. On May 17, 2000, Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, modified Baez's punishment from twenty-four months to twelve months. Moran Aff., Ex. B at 1-2. On October 26, 2000, Baez's petition was transferred from Ulster County Supreme Court to the Appellate Division, Third Department. Moran Aff., Ex. C at 3. On March 12, 2001, Selsky administratively reversed the disciplinary determination because the hearing officer considered medical evidence not on the record. Moran Aff., Ex. B at 4. On June 14, 2001, Baez's Article 78 petition was denied as moot. Moran Aff., Ex. C at 3-4.

FN6. N.Y. C.P.L.R. Art. 78 (McKinney 1994 & Supp.2006) establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

**B. Medical Treatment**

On December 14, 1999, Baez had hernia repair surgery at Albany Medical Center. Am. Compl. at ¶ 33. Baez was to remain on bed rest in the hospital for three days. Id. On December 16, 1999, Baez was discharged from the hospital. Id. Baez was instructed to keep the dressing dry and intact for two days and then remove the outer dressing and resume showering. Davidson Decl. (Docket No. 75), Ex. 1. Baez was not allowed to engage in lifting, strenuous work, straining or reaching for six weeks and was allowed to return to work or school. Id. A follow-up examination at the prison clinic was also required. Id. Quartarone removed Baez's bandages and padding from the incision area against doctor's orders. Am. Compl. at ¶ 33.

On the day of Baez's discharge, he was ordered to board a bus for transfer to Downstate Correctional Facility. Id. Baez was taken on a bus trip which included stops at Shawangunk and Wallkill Correctional Facility where Baez began to vomit and experience severe pain. Am. Compl. at ¶ 34. Baez's requests to be taken to the infirmary were ignored. Id. This action followed.

**C. Procedural History**

Baez commenced this action by filing a complaint on May 25, 2001. See Compl. Defendants filed a motion for summary judgment on December 13, 2002. Docket Nos. 21-23. As a result of that motion, several claims and defendants were dismissed. Docket No. 27. That decision was modified on November 18, 2004 and required Baez to file an amended complaint within thirty days of the order. Docket No. 47. Baez complied and filed his amended complaint on December 17, 2004. Docket No. 49. This motion for summary judgment of the remaining defendants followed. Docket No. 75.

**II. Discussion**

Baez asserts three causes of action in his amended complaint. The first alleges that defendant Selsky failed to correct behavior that violated Baez's Eighth and Fourteenth Amendment rights. The second alleges that defendants Harris and Selsky deprived him of his due process rights in connection with a prison disciplinary hearing. The third alleges that defendant Quartarone was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.FN7 Am. Compl. at ¶¶ 50-53. Defendants seek judgment on all claims.

FN7. Any claims against Dr. Forte have been dismissed and are not being considered on this motion. See note 2 supra.

**A. Standard**

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

*5 A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the nonmovant special solicitude.[FN8] *Id.; Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 2006 WL 3499975, at *5 (2d Cir. Dec. 5, 2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

FN8. Baez has, however, filed at least seven other actions in the federal courts of New York since 1990. *U.S. Party/Case Index* (visited Jan. 8, 2007) <http://pacer.uspci. uscourts.gov/cgi-bin/dquery.pl>.

**B. Eighth Amendment**

**1. Defendant Quartarone**

In his third cause of action, Baez contends that "less than forty (40) hours after the [hernia] surgery, defendant Quartarone ... removed the bandages and padding from the incision area of [his] operation," thereby acting with deliberate indifference to his medical needs. Am. Compl. at ¶ 33. Defendants contend that Baez has failed to exhaust his administrative remedies on this claim and, in the alternative, the claim is without merit.

**a. Failure to Exhaust**

Defendants contend that Baez has not exhausted his administrative remedies with regard to the claim that his Eighth Amendment rights were violated by defendant Quartarone. This assertion is based on the fact that Baez did not raise the issue of his surgery dressings being removed prematurely in his Grievance No. UST-2681-00. Defs. Mem. of Law at 10; *see also* Moran Aff., Ex. E.

Issues that have previously been determined become the law of the case. *In re Lynch,* 430 F.3d 600, 604 (2d Cir.2005) (citing *Quern v. Jordan,* 440 U.S. 332, 348 n. 18 (1979)). A district court may reconsider its own decision if the law has since changed, new evidence becomes available, to correct an error, or if a "manifest injustice would otherwise ensue." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber,* 407 F.3d 34, 44 (2d Cir.2005).

*6 Here, this Court has already decided that Baez did not exhaust his claim regarding removal of the bandages because he never filed a grievance regarding it. Docket No. 27. The Report-Recommendation and Order containing that finding was adopted in full by the district court on September 29, 2003. Docket No. 29. In response to this Court's decisions, Baez filed a grievance on October 3, 2003 where he raised the issue of the early bandage removal. Am. Compl., Ex. A. That grievance was rejected as untimely in the absence of any reason provided for the delay. *Id.* Baez appealed the decision to reject his late grievance, but that decision was affirmed. *Id.* Although Baez attempted to remedy his failure to exhaust, filing an untimely grievance does not amount to an exhaustion of remedies. *Williams v. Comstock,* 425 F.3d 175, 176 (2d Cir.2005). Further, since this Court finds no reason to reconsider its previous decisions, Baez has not exhausted his claim for removal of the bandages.

**b. Medical Treatment**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

A serious medical need is " 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.' " *Cameros v. Branstad,* 73 F.3d 174, 176 (8th Cir.1995) (quoting *Johnson v. Busby,* 953 F.2d 349, 351 (8th Cir.1991)). An impairment that a reasonable doctor or patient would find important and worthy to treat, a medical condition that affects the daily activities of an individual, or the existence of chronic and substantial pain are all factors that are relevant in the consideration of whether a medical condition was serious. *Chance,* 143 F.3d at 702-03.

Deliberate indifference requires the prisoner to prove that the prison official knew of and disregarded the prisoner's serious medical needs. *Id.* at 702. Mere disagreement over proper treatment does not create a constitutional claim as long as the treatment is adequate. *Id.* at 703. Allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

**\*7** Even assuming that hernia repair surgery is a serious medical need, Baez failed to raise a question of material fact with regard to the alleged deliberate indifference of Quartarone in removing his bandages. The

bandages were removed on the second post-operative day, which was within the instructed time period recommended by Baez's surgeon. Davidson Decl. at ¶¶ 3-4. Therefore, it is recommended in the alternative that defendants' motion for summary judgment on this ground be granted.

**2. Defendant Selsky**

Baez alleges that Selsky "contributed to and proximately caused the ... violation of [his] Eighth and Fourteenth Amendment Rights." Am. Compl. at ¶ 50. Summary judgment in favor of all defendants, including Selsky, with regard to Baez's Eighth Amendment claim resulting from his disciplinary hearing has already been granted. Docket No. 27 at 16. As such, Baez's claim against Selsky for a violation of his Fourteenth Amendment due process rights in connection with his prison disciplinary hearing is dismissed. Baez's claim against Selsky for his alleged involvement in Baez's Eighth Amendment claims relative to his medical care remain at issue.

**a. Personal Involvement**

Defendants contend that Baez cannot demonstrate the personal involvement of Selsky in any Eighth Amendment violation.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). The doctrine of respondeat superior is not a substitute for personal involvement. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Supervisory personnel may be considered "personally involved," however, if they participated in the conspiracy, learned of the violation but failed to remedy the wrong, created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue, or were grossly negligent in managing subordinates who caused the violation. *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (citations omitted).

In his amended complaint, Baez's only allegation as to the personal involvement of Selsky is that he and his

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

father wrote Selsky a letter documenting the violations of Baez's rights. Am. Compl. at ¶ 42. However, "receiving a letter from an inmate does not constitute sufficient personal involvement to generate supervisory liability." *Petty v. Goord,* No. Civ. 00-803(MBM), 2002 WL 31458240, at *8 (S.D.N.Y. Nov. 4, 2002). Further, there is no evidence that Selsky participated here in the alleged violations or created a policy which allowed constitutional violations to continue.

Therefore, it is recommended that defendants' motion for summary judgment as to Selsky be granted on this ground.

### C. Fourteenth Amendment

**\*8** Defendants Harris and Selsky contend that Baez's due process claim should be dismissed and that qualified immunity bars Baez's claim.

#### 1. Liberty Interest

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. See *Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995). This standard requires a prisoner to establish that the confinement was atypical and significant in relation to ordinary prison life. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Here, this Court has already decided that Baez has raised a question of fact as to whether twelve months spent in SHU establishes a protected liberty interest. Docket Nos. 27, 29, & 47; *see also Colon v. Howard,* 215 F.3d 227 (2d Cir.2000) (holding that 305 days spent in normal SHU conditions was sufficient to raise a question of significant hardship). Defendants' motion on this ground should, therefore, be denied.

#### 2. Process Provided

At a prison disciplinary proceeding, an inmate is entitled to (1) advance written notice of the charges, (2) an opportunity to call witnesses if it conforms with prison security, (3) a statement of evidence and reasons for the

disposition, and (4) a fair and impartial hearing officer. *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999) (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-64 (1974)). Additionally, the finding of guilt must be supported by some evidence in the record to comport with due process. *Massachusetts Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985); *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001).

Again, this Court has already determined that there is a question of fact as to the fourth prong of Wolff. Docket No. 27 at *12;.see also In re Lynch,* 430 F.3d at 604 (quoting *Quern,* 440 U.S. at 348 n. 18)). As such, it is recommended that defendants' motion for summary judgment on this ground be denied.

### C. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y .2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the issue of defendants entitlement to qualified immunity has already been decided in Baez's favor. Docket Nos. 27, 29, & 47.

**\*9** Therefore, it is recommended that defendants' motion for summary judgment on this ground be denied.

### III. Conclusion

For the reasons stated above, it is hereby
**RECOMMENDED** that defendants' motion for summary judgment (Docket No. 75)

1. **GRANTED** as to Quartarone and Selsky in all respects; and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

2. **DENIED** as to Harris as to the due process claim.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2007.

Baez v. Harris
Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

(Cite as: 2005 WL 3531464 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Roberto CIAPRAZI, Plaintiff,
v.
Glenn S. GOORD; et al. Defendants.
No. Civ.9:02CV00915(GLS/.

Dec. 22, 2005.

Roberto Ciaprazi, Clinton Correctional Facility, Dannemora, New York, Plaintiff pro se.

Hon. Eliot Spitzer, Attorney General, State of New York, The Capitol, Albany, New York, for the Defendants.

Patrick F. MacRae, Assistant Attorney General, of counsel.

*MEMORANDUM-DECISION AND ORDER*

SHARPE, J.

### I. *Introduction*

**\*1** Plaintiff *pro se* Roberto Ciaprazi brings this action pursuant to 42 U.S.C. § 1983. Ciaprazi alleges that the defendants violated his First, Eighth, and Fourteenth Amendment rights. Pending are Ciaprazi's objections to Magistrate Judge David E. Peebles' Report-Recommendation. Upon careful consideration of the arguments, the relevant parts of the record, and the applicable law, the court adopts the Report-Recommendation in its entirety. FN1

> FN1. The Clerk is hereby directed to attach the Report-Recommendation to constitute a complete record of the court's decision in this matter.

### II. *Procedural History*

Ciaprazi commenced this action on July 15, 2002. *Dkt. No. 1.* On February 27, 2003, the defendants moved for summary judgment. *Dkt. No. 39.* On March 14, 2004, Judge Peebles issued a Report-Recommendation which recommended that the defendants' motion for summary judgment be granted in part, and denied in part. *Dkt. No. 47.* Ciaprazi objected. *Dkt. No. 48.* His objections are now before this court.

### III. *Discussion* FN2

> FN2. The court adopts the factual summary in Magistrate Judge Peebles' Report-Recommendation and assumes familiarity with the facts alleged in Ciaprazi's Complaint. *Dkt. Nos. 47,1.*

A. *Standard of Review*

When objections to a magistrate judge's Report-Recommendation are lodged, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the court may "accept, reject, or modify, in whole or in part, the findings or the recommendations made by the magistrate judge." *Id.* Having reviewed the unobjected to portions of the Report-Recommendation, the court adopts them in their entirety because they are not clearly erroneous.

B. *Report-Recommendation*

Although Judge Peebles examined the merits of the case and found that many of Ciaprazi's claims were meritless, this court only conducts *de novo* review of the objected to portions of the Report-Recommendation. Specifically, Judge Peebles found no evidence tending to establish that the adverse actions taken against Ciaprazi were motivated by disciplinary animus, and thereby recommended dismissing Ciaprazi's First Amendment retaliation claim. *Report and Recommendation, pp. 13-23, 45, Dkt. No. 47.* He further found that Ciaprazi lacked standing to bring a cause of action challenging the Tier III disciplinary system under the Eighth Amendment. *Id. at 27.* Lastly, Judge Peebles dismissed both of Ciaprazi's claims under international law and his personal

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

(Cite as: 2005 WL 3531464 (N.D.N.Y.))

involvement claim against defendant Goord. *Id. at 41, 43-4.* [FN3]

> **FN3.** Ciaprazi also makes several procedural objections. For instance, he asserts that defendants' motion is procedurally defective since none of the moving papers are signed, as required by FRCP 11. Second, Ciaprazi objects to the defendants' alteration of the case caption. Third, Ciaprazi objects to the defendants' use of a name that did not appear in the original complaint. These arguments are without merit and this court adopts Judge Peebles articulated reasons for the their denial. *See Report Recommendation p. 10-11 n. 5, Dkt. No. 47.*

C. *Objections*

1. *First Amendment Claim*

First, Ciaprazi contends that his retaliation claim under the First Amendment should not have been dismissed because the defendants did not satisfy their initial evidentiary burden. *Pl. Objs. pp. 1-7, Dkt. No. 48.* Specifically, he argues that Judge Peebles did not properly consider the falsity of a misbehavior report as evidence of retaliation by the defendants.

The court rejects Ciaprazi's argument because as Judge Peebles noted, a prisoner does not have a right to be free from false misbehavior reports. *Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir.1986).* As Judge Peebles further noted, the defendants have shown sufficient evidence to establish that there is no specific link between Ciaprazi's grievances and the defendants' actions. Accordingly, Ciaprazi's retaliation claim is dismissed.

2. *Eighth Amendment*

**\*2** Next, Ciaprazi objects to Judge Peebles' finding that he did not have standing to challenge the disciplinary authority of the Tier III system. *Pl. Objs. p. 7, Dkt. No. 48.* This objection is without merit. As Judge Peebles noted, since the length of Ciaprazi's disciplinary confinement was within the bounds of constitutionally acceptable levels, he has no standing to sue. Second, as Judge Peebles further noted, any generalized complaints Ciaprazi has against the

Tier III system are more appropriately addressed as part of his due process claims. Accordingly, Ciaprazi's claims against the Tier III system are dismissed.

3. *Human Rights Claims*

Ciaprazi also objects to Judge Peebles' finding that he did not have claims under the Universal Declaration of Human Rights (UDHR) and the International Covenant on Civil and Political Rights (ICCPR). Ciaprazi's contention is without merit. As Judge Peebles noted, Ciaprazi has failed to establish that these treaties provide private causes of action. *See Report Recommendation p. 41, Dkt. No. 47.* Accordingly, Ciaprazi's claims under international law are dismissed.

4. *Personal Involvement*

Ciaprazi also objects to Judge Peebles' dismissal of his personal involvement claim against defendant Goord. As Judge Peebles noted, Ciaprazi merely made allegations against Goord in his supervisory capacity. Accordingly, the personal involvement claim against Goord was properly dismissed.

IV. *Conclusion*

Having reviewed the objected-to portions of the Report and Recommendation *de novo,* the remainder under a clearly erroneous standard, and Ciaprazi's objections, this court accepts and adopts the recommendation of Judge Peebles for the reasons stated in the March 14, 2004 Report-Recommendation.

WHEREFORE, for the foregoing reasons, it is hereby

ORDERED that defendants' summary judgment motion (Dkt. No. 39) be GRANTED in part, and that all of plaintiff's claims against defendant Goord, and all of plaintiff's claims against the remaining defendants except his procedural due process and Eighth Amendment conditions of confinement causes of action, be DISMISSED, but that to the extent of those claims, with respect to which triable issues of fact exist, the defendants' motion be DENIED.

IT IS SO ORDERED.

REPORT AND RECOMMENDATION

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

(Cite as: 2005 WL 3531464 (N.D.N.Y.))

PEEBLES, Magistrate J.

Plaintiff Roberto Ciaprazi, a New York State prison inmate who by his own account has frequently lodged complaints against prison officials and been openly critical of their practices, has commenced this proceeding against the Commissioner of the New York State Department of Correctional Services ("DOCS") and several of that agency's employees pursuant to 42 U.S.C. § 1983, complaining of constitutional violations occurring during the course of his confinement. In his complaint, Ciaprazi alleges that 1) a misbehavior report was filed against him in retaliation for his having previously engaged in protected activity; 2) he was deprived of procedural due process during the course of the hearing and resulting adverse finding associated with that misbehavior report; and 3) the conditions which he faced while in disciplinary confinement, following that hearing, were cruel and unusual. Plaintiff asserts claims pursuant to the First, Eighth and Fourteenth Amendments to the United States Constitution, as well as under certain international human rights accords.

*3 Currently pending before the court is a motion by the defendants seeking summary judgment dismissing plaintiff's complaint in its entirety. Having carefully reviewed the record in light of Ciaprazi's claims and defendants' arguments, I find that many of plaintiff's causes of action are devoid of merit, as a matter of law, and thus subject to dismissal. Because I find the existence of genuinely disputed issues of material fact surrounding certain of plaintiff's claims, however, including notably his due process claim against defendants Melino, Kohl, Graham, Fitzpatrick, and Rogers, I recommend denial of defendants' motion seeking dismissal of plaintiff's claims against them.

I. *BACKGROUND*

At the times relevant to his complaint, Ciaprazi was a prisoner entrusted to the custody of the DOCS. Plaintiff alleges that after having been confined within the Clinton Correctional Facility since February, 1997, he was transferred into the Coxsackie Correctional Facility in April of 1998. Complaint (Dkt. No. 1) ¶ 3. Ciaprazi asserts that while at Coxsackie he was administered more than a dozen allegedly false misbehavior reports, resulting in disciplinary cell confinement of over 200 days as well

as other "deprivations" of an unspecified nature. *Id.* ¶ 3. Plaintiff contends that the issuance of those misbehavior reports was motivated by his having filed multiple complaints involving conduct of corrections workers and staff at Coxsackie.

At the heart of plaintiff's claims in this action is an incident which occurred at Coxsackie on July 31, 1999. On that date, Ciaprazi and various other prisoners were taken to an enclosed holding area to provide specimens for use in conducting drug screening urinalysis testing. As a result of an interaction occurring during the course of that testing between the plaintiff and defendant Fitzpatrick, a corrections lieutenant at the facility, plaintiff was placed in keeplock confinement and issued a misbehavior report on the following day, charging him with creating a disturbance (Rule 104.13), interference with a prison employee (Rule 107.10), harassment (Rule 107.11), refusal to obey a direct order (Rule 106.10), and making threats (Rule 102.10). FN1 Defendants' Motion (Dkt. No. 39) Exh. A.

FN1. Keeplock confinement is defined by regulation to include restriction to one's prison room or cell. *See, e.g.,* 7 N.Y.C.R.R. 251-2.2.

On July 31, 1999, following the underlying events and the imposition of keeplock confinement but prior to receiving the misbehavior report, plaintiff filed a grievance regarding the incident; plaintiff followed the filing of that grievance with a request on August 3, 1999 for prehearing release from confinement. Complaint (Dkt. No. 1) ¶ 19. Plaintiff received no response to that grievance. *Id.*

A Tier III disciplinary hearing in connection with the charges stemming from the July 31, 1999 incident was conducted by defendant Melino, a corrections counselor at Coxsackie, beginning on August 4, 1999, and concluding on August 10, 1999. Defendants' Motion (Dkt. No. 39) Exh. A at 2; *id.* Exh. B at 17, 152. FN2 Defendant Cole, who according to the plaintiff is a civilian employee working at Coxsackie, was assigned as plaintiff's inmate assistant in connection with that hearing. The evidence adduced at that hearing included the misbehavior report, as well as testimony from the plaintiff, Corrections Lieutenant Fitzpatrick, Corrections Officer Marshal,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

(Cite as: 2005 WL 3531464 (N.D.N.Y.))

Corrections Counselor Cole, Corrections Officer Rogers, Corrections Officer Simonik, Corrections Lieutenant McDermott, and Corrections Officer Phillips. Defendants' Motion (Dkt. No. 39) Exh. B.

> **FN2.** The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

**\*4** At the conclusion of the hearing, plaintiff was found guilty on all five counts, and a penalty of ten months of disciplinary confinement within the Coxsackie Special Housing Unit ("SHU"), with a corresponding loss of commissary, telephone and package privileges, was imposed.[FN3] Defendants' Motion (Dkt. No. 39) Exh. A at 00. Ciaprazi was not present when Hearing Officer Melino read her decision into the record, having previously been removed from the proceeding for engaging in what the hearing officer regarded as disruptive behavior. *See* Defendants' Motion (Dkt. No. 39) Exh. B at 152. Plaintiff appealed the hearing officer's decision to Donald Selsky, the DOCS Director of Special Housing/Inmate Disciplinary Program, who on September 27, 1999 affirmed the determination. Complaint (Dkt. No. 1) ¶ 51.

> **FN3.** Of those sanctions, five months were suspended and deferred for a to tal of one hundred eighty days. Defendants' Motion (Dkt. No. 39) Exh. A at 00. The record is unclear regarding the amount of disciplinary confinement actually served by the plaintiff as a result of the hearing determination.

On August 20, 1999, plaintiff was transferred into the Upstate Correctional Facility, where he was apparently placed in SHU confinement to serve his disciplinary

sentence. Complaint (Dkt. No. 1) ¶ 52. Plaintiff asserts that during that period, as well as while in keeplock confinement at Coxsackie, he was subjected to significant deprivations, which are described in summary fashion in his complaint, until September 16, 1999 when he was transferred into Clinton and exposed to similarly unpleasant conditions. *Id.* ¶¶ 53-55; Ciaprazi Aff. (Dkt. No. 46) ¶¶ 54-57. Plaintiff describes the keeplock confinement conditions at Coxsackie as even more unpleasant than those experienced in SHU, having included the deprivation of certain personal items such as food and snacks, toiletries, musical instruments, and other similar amenities. Ciaprazi Aff. (Dkt. No. 46) ¶ 54. The deprivations experienced by the plaintiff while in keeplock confinement at Coxsackie also entailed being subjected to "loud and non-stop noise from other frustrated prisoners yelling and banging on the doors," as well as the denial of access to the law library, books and other reading materials, and various programs available to those in general population. *Id.* ¶ 55. While at Upstate, plaintiff contends that he was exposed to cell lighting between 6:00 am and 1:00 am; he was denied reading materials; his medical requests "were ignored"; and he experienced cold conditions and the inability to participate in available recreation due to the lack of warm clothing. *Id.* ¶ 57; Complaint (Dkt. No. 1) ¶ 53. Similar conditions were experienced by the plaintiff while at Clinton, including exposure to cold and lack of warm clothing and blankets, together with the deprivation of medical and mental health services. Ciaprazi Aff. (Dkt. No. 46) ¶ 57; Complaint (Dkt. No. 1) ¶ 54..

## II. *PROCEDURAL HISTORY*

The plaintiff, who is proceeding *pro se* and *in forma pauperis,* commenced this action on July 15, 2002. Dkt No. 1. Named as defendants in plaintiff's complaint are New York DOCS Commissioner Glenn S. Goord; Ellen J. Croche, Chair of the New York State Commission of Correction; Fred Lamey, a member of the New York Commission of Correction; Donald Selsky, the DOCS Director of Special Housing/Inmate Disciplinary Program; Corrections Counselor Melino, whose first name is unknown; Cole, another DOCS employee whose complete name is unknown to the plaintiff; H.D. Graham, Deputy Superintendent for Security at Coxsackie; Corrections

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

(Cite as: 2005 WL 3531464 (N.D.N.Y.))

Lieutenant Fitzpatrick; and Corrections Officer Rogers. *Id.* In his complaint, plaintiff asserts nine separate causes of action, including claims 1) against defendants Rogers and Fitzpatrick, for infringement of his First Amendment right to free speech, and due process and equal protection violations under the United States Constitution, as well as under the Universal Declaration of Human Rights ("UDHR") and the International Covenant on Civil and Political Rights ("ICCPR"); 2) against defendant Graham, for failure to investigate plaintiff's grievance and to take actions to prevent infringement of his constitutional rights; 3) against defendant Cole, for failing to properly perform his duties as Ciaprazi's inmate assistant; 4) against defendant Melino, for deprivation of due process, based upon her conduct and bias during the disciplinary hearing; 5) of retaliation against defendant Melino, asserting that her actions were taken in response to the filing of complaints and grievances by the plaintiff; 6) against defendants Goord and Selsky, based upon their failure to overturn plaintiff's disciplinary conviction and remediate the constitutional deprivations suffered by him; 7) against defendants Goord and Selsky for retaliation, based on plaintiff's prior filing of complaints and grievances; 8) against defendants Croche, Lamey and Goord, in their supervisory capacities, for failure to properly oversee DOCS employees and enact policies to prevent such abuses; and 9) against defendants Goord, Croche and Lamey, for maintaining and fostering a policy of widespread and disportionate disciplinary punishments within the state's prison system. Complaint (Dkt. No. 1) at 14-16. Plaintiff's complaint seeks both injunctive and monetary relief. *Id.*

**\*5** Following the filing of an answer on behalf of the eight defendants who have been served in the action on December 3, 2002, generally denying plaintiff's allegations and setting forth various affirmative defenses, Dkt. No. 13, and pretrial discovery, on February 27, 2004 those defendants moved seeking entry of summary judgment on various bases.[FN4] Dkt. No. 39. Aided only by plaintiff's complaint, the record related to the relevant internal disciplinary proceedings against the plaintiffs, and answers by plaintiff to defendants' interrogatories, and without the benefit of either a transcript of plaintiff's deposition or any affidavits, other than from their counsel, defendants have moved for summary judgment seeking dismissal of plaintiff's claims on various grounds. *Id.* In

their motion, defendants argue that 1) plaintiff has failed to offer proof from which a reasonable factfinder could conclude that cognizable constitutional violations have occurred; 2) defendants Goord and Selsky lack the requisite personal involvement in the constitutional violations alleged; and 3) plaintiff should be denied the injunctive relief which he seeks. *Id.* Plaintiff has since submitted papers in opposition to defendants' summary judgment motion.[FN5] Dkt. No. 46. Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

> **FN4.** There is no indication on the docket sheet that defendant Fitzpatrick has been served in the action. While plaintiff requested and obtained the entry of that defendant's default on June 20, 2003, *see* Dkt. Nos. 20, 21, his default was subsequently vacated by order issued by District Judge David N. Hurd on January 13, 2004, based upon plaintiff's failure to prove that defendant Fitzpatrick had in fact been served. *See* Dkt. No. 35.

> **FN5.** In his papers in opposition to defendants' summary judgment motion, plaintiff has raised several procedural objections to defendants' motion papers. In addressing those objections I am mindful of the preference that matters before the court, whenever possible, be decided on their merits rather than on the basis of technical procedural shortcomings. *See, e.g., Upper Hudson Planned Parenthood, Inc. v. Doe,* 836 F.Supp. 939, 943 n. 9 (N.D.N.Y.1993) (McCurn, S.J.). In any event, plaintiff's procedural objections are not well-founded.

> In his opposition papers, plaintiff asserts that defendants' motion is procedurally defective since none of the moving papers are signed, as required under Rule 11 of the Federal Rules of Civil Procedure. *See* Plaintiff's Memorandum (Dkt. No. 46) at 1. While not bearing signatures in the traditional sense, all of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

(Cite as: 2005 WL 3531464 (N.D.N.Y.))

defendants' original moving papers, which were filed electronically with the court in accordance with this court's case management and electronic case filing requirements (*see* Northern District of New York Local Rule 5.1.2 and General Order No. 22), were properly signed.

Plaintiff also complains of alterations by the defendants to the caption of the case as set forth in his complaint. Specifically, Ciaprazi challenges defendants' addition of the word "unknown" in relation to defendants Melino and Cole, who are identified in plaintiff's complaint only by last names. Since it is well established that the caption of a pleading is not substantive in nature, and therefore does not control, the addition of that word does not provide a basis to reject defendants' motion papers. *See* 5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure Civil § 1321 (3d ed. 2004) ("Although helpful to the district court ... the caption is not determinative as to the identity of the parties to the action"); *see also Prisco v. State of New York,* 804 F.Supp. 518, 521 (S.D.N.Y.1992) (citing an earlier edition of Wright & Miller).

As plaintiff notes, defendants' Local Rule 7.1(a)(3) statement of uncontested, material facts, submitted along with the various other papers in support of their motion, indicates that it is submitted on behalf of a defendant Landry, even though there is no person by that name identified as a defendant in plaintiff's complaint. *See* Dkt. No. 39. Because this is an obvious typographical error, and the contents of the statement obviously relate to the facts of this case, I decline plaintiff's invitation to reject and treat the statement as a nullity on this basis.

I note that Ciaprazi, who appears to be well versed in the applicable requirements of the federal and local rules, himself has overlooked the important requirement that legal

memoranda submitted in connection with motions to not exceed twenty-five pages in length. Northern District of New York Local Rule 7.1(a)(1). Plaintiff's memorandum, which is thirty-four pages in length, has been accepted by the court, without objection by the defendants, despite his failure to obtain prior permission to file an oversized brief. Plaintiff is admonished that in the future, just as he seeks to hold defendants to the requirements of the governing rules, he too must conform to those requirements.

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Insurance Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Insurance,* 391 F.3d at 83.

In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. [FN6] Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. When deciding a summary judgment motion, the court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

(Cite as: 2005 WL 3531464 (N.D.N.Y.))

fact to find in the [nonmovant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

> FN6. A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

B. *Plaintiff's First Amendment Retaliation Claim*

**\*6** Plaintiff's complaint asserts several claims of unlawful retaliation. In his first cause of action, plaintiff asserts that the actions of defendants Rogers and Fitzpatrick in confining him to a cell and issuing, or directing the issuance of, misbehavior reports were taken in retaliation for his having filed prior grievances and complaints regarding DOCS officials, including those working at Coxsackie. Complaint (Dkt. No. 1) First Cause of Action. Plaintiff's second claim alleges that defendant Rogers' failure to investigate plaintiff's complaint regarding the allegedly false misbehavior report, and to order his release from confinement pending a disciplinary hearing, were similarly retaliatory. *Id.* Second Cause of Action. Plaintiff further alleges in his fifth cause of action that the actions of Hearing Officer Melino, including in finding him guilty on all five counts, were motivated by Ciaprazi's filing of prior grievances and complaints. *Id.* Fifth Cause of Action. Plaintiff's seventh claim similarly attributes the failure of defendants Goord and Selsky to reverse the hearing officer's determination, on appeal, to retaliation for his having engaged in protected activity. *Id.* Seventh Cause of Action. Defendants maintain that these

retaliation claims are legally deficient, and that the record contains no evidence upon which a factfinder could conclude that unlawful retaliation occurred.

Claims of retaliation like those asserted by the plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See id.* at 81-83. Because of the relative ease with which claims of retaliation can be incanted, however, as exemplified by plaintiff's claims in this action, the courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

> *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002).

In order to state a *prima facie* claim under section 1983 for unlawful retaliation in a case such as this, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct or speech at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

(Cite as: 2005 WL 3531464 (N.D.N.Y.))

at 492). If the plaintiff carries this burden, the defendants must then show, by a preponderance of the evidence, that they would have taken action against the plaintiff "even in the absence of the protected conduct ." *Mount Healthy, 429 U.S. at 287, 97 S.Ct. at 576.* Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996)* (citations omitted).

**\*7** As can be seen, evaluation of claims of retaliation is a particularly fact-laden exercise, since such claims revolve around both the engaging in protected conduct and establishment of a nexus between that conduct and the adverse action ultimately taken. In making the required analysis in this case, however, the court is somewhat disadvantaged by virtue of the fact that defendants' summary judgment motion is not particularly enlightening as to the basis for their claim that the court is positioned to find, as a matter of law, that plaintiff's retaliation claims are lacking in merit.

In their motion the defendants, in the context of the now-familiar standard governing analysis of First Amendment retaliation claims, acknowledge that the plaintiff, who has lodged formal complaints of prison conditions and treatment of inmates, has engaged in protected activity. That plaintiff has filed an unusually large number of grievances and lawsuits, and taken other steps to complain publicly about matters associated with his confinement by the DOCS, is both apparent from the record before the court, and not controverted by the defendants. Indeed, in his response to defendants' summary judgment motion, plaintiff proudly states that he has "systematically exposed, vehemently criticized, and even ridiculed the inappropriate and arbitrary policies and actions of the staff at Coxsackie, including the actions of defendant Goord and of the Superintendent and Deputy Superintendents of Coxsackie." [FN7] Plaintiff's Affidavit (Dkt. No. 46) ¶ 32. Plaintiff has therefore established, at least for purposes of the instant motion, that he was engaged in protected activity sufficient to trigger First Amendment rights against acts taken in retribution for having voiced those types of complaints. *Graham,* 89 F.3d at 80; *Morello v. James,* 810 F.2d 344, 346-47 (2d Cir.1987).

> [FN7]. Plaintiff has referred to his efforts in this regard as a "blitz of grievances and complaints[.]" Plaintiff's Aff. (Dkt. No. 46) ¶ 52.

Defendants argue, however, that the record is lacking in evidence to establish the requisite connection between that protected activity and the adverse actions taken against Ciaprazi by prison officials. Defendants' legal position is advanced, in part, in an affidavit from their counsel, Patrick F. MacRae, Esq., outlining the evidence relied upon by the defendants in making their motions. [FN8] Defendants also note, in further support of their motion, the requirement that retaliation claims rest upon more than mere conclusory allegations regarding the state of mind of prison officials. *See* Dkt. No. 39 at 8-9; *e.g., Flaherty,* 713 F.2d at 13.

> [FN8]. The attorney's affirmation in and of itself is, of course, of no evidentiary value in determining the motion for summary judgment since none of the facts upon which such a finding would ostensibly be based are within his personal knowledge. *Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011-12 (2d Cir.1986).*

As plaintiff correctly notes, the applicable pleading requirements, including Rule 8 of the Federal Rules of Civil Procedure, provide for mere "notice" pleading, and do not require that complaints contain every detail associated with a plaintiff's claims except in categories not applicable to this case. *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 167-69, 113 S.Ct. 1160, 1162-63 (1993).* Accordingly, the mere fact that the plaintiff's retaliation claims are pleaded in non-specific, conclusory terms does not alone entitle defendants to summary dismissal of those claims.

**\*8** In this case the defendants have satisfied their initial, modest threshold burden of establishing the lack of evidentiary support for plaintiff's retaliation claims. Though conventional wisdom might dictate the submission of affidavits from the primary actors, including notably defendants Rogers and Fitzpatrick, disavowing any retaliatory motives associated with their actions,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

(Cite as: 2005 WL 3531464 (N.D.N.Y.))

defendants' decision to rely instead upon the lack of evidentiary support for plaintiff's retaliation claims, including through plaintiff's responses to defendants' interrogatories as well as the proceedings associated with the underlying disciplinary matter, is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact for trial with regard to those claims. *Celotex,* 477 U.S. at 323-34, 106 S.Ct. at 2553; *see also Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. There is no requirement under Rule 56 of the Federal Rules of Civil Procedure or otherwise that a party affidavit be submitted to support such a motion, which instead can be based upon any admissible evidence. *Id.*

To demonstrate that a reasonable factfinder could discern a nexus between plaintiff's filing of grievances and the disciplinary matters associated with the incident at issue, Ciaprazi essentially makes two arguments. First, he contends that the manifest falsity of the misbehavior report as well as testimony proffered during the disciplinary hearing give rise to an inference that the disciplinary matters were motivated toward retaliatory animus. Secondly, plaintiff argues that the sheer number of grievances and formal complaints lodged by him, including some close in temporal proximity to the underlying incident, similarly gives rise to a legitimate inference of retaliatory motivation. *See* Ciaprazi Memorandum (Dkt. No. 46) at 14.

Plaintiff's argument in this regard is significantly diluted by the sheer number of complaints lodged by him over time. By his own admission, plaintiff has regularly and openly complained of prison policies and practices and during the relevant time period prior to the July 31, 1999 incident, and indeed had filed many formal complaints regarding his treatment while at Coxsackie. Yet, plaintiff has submitted no evidence that any of those complaints related to defendants Rogers or Fitzpatrick, the two principal actors in this case, nor has he pointed to any collaboration between those named in his prior complaints and Fitzpatrick and Rogers. At best, plaintiff has argued that prior to July 31, 1999 he "filed complaints and/or grievances against Lieutenants Sweeney, Armstrong, Skrocky and McDermott, all colleagues of defendant Fitzpatrick of the same rang [sic] with defendant

Fitzpatrick." *Id.* ¶ 32.

In an equally tenuous attempt to link his protected activity with the issuance of a misbehavior report, plaintiff notes that on May 26, 1999 he filed a grievance for harassment against an employee named Fitzpatrick, who was assigned to assist him in connection with another Tier III disciplinary hearing, stating his naked belief, lacking in evidentiary support, that the employee named in that complaint "may be and apparently is a relative of defendant Fitzpatrick." *Id.* ¶ 33, Exh. 39. Plaintiff also notes that on July 21, 1999 he filed a grievance accusing defendant Goord of "gross abuse of power", requesting an investigation of defendant Goord by the New York State Police and federal authorities, and that five days later, on July 26, 1999, he filed a complaint with various agencies including the United States Department of Prisons complaining of mistreatment. *Id.* ¶¶ 34, 35.

**\*9** While there is some appeal to finding the requisite fact issue to avoid the entry of summary judgment on plaintiff's retaliation claims based upon the timing of these events, that factor is undermined by the steady stream of grievances filed by him on a regular and continuing basis. Were the plaintiff someone who had rarely if ever complained about prison conditions, but shortly before being issued a misbehavior report had lodged a formal complaint against or implicating the conduct of the officer who issued the disciplinary citation, a very different set of circumstances would be presented, and summary judgment would not be warranted. In this case, however, plaintiff can point to no complaints lodged by him against or implicating the conduct of defendant Fitzpatrick, who issued the disputed misbehavior report. Accordingly, I find that the defendants have established that they are entitled to summary dismissal of plaintiff's retaliation claims based upon plaintiff's failure to establish a basis on which a reasonable factfinder could find the requisite connection between plaintiff's grievance activities and the issuance of the misbehavior report and subsequent disciplinary hearing.[FN9] *E.g., Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 389 (W.D.N.Y.1998).

FN9. Prior to the Second Circuit's recent decision in *Gill,* defendants perhaps could have

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

(Cite as: 2005 WL 3531464 (N.D.N.Y.))

effectively argued that defendants' actions were not likely to deter, and in fact have not chilled, plaintiff's exercise of his First Amendment rights, and therefore do not give rise to a retaliation claim. *E.g., Colombo v. O'Connell,* 310 F.3d 115, 117 (2d Cir.2002); *Curley v. Village of Suffern,* 268 F.3d 65, 72-73 (2d Cir.2001); *Spear v. Town of West Hartford,* 954 F.2d 63, 68 (2d Cir.1992).* In its recent decision in *Gill,* however, the Second Circuit clarified that such a finding does not end the inquiry, since the critical focus is not upon the subjective element, but is instead objective, examining whether the retaliatory conduct alleged "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), superseded by 2003 U.S.App. LEXIS 13030 (2d Cir. Feb. 10, 2003)).

C. *Plaintiff's Eighth Amendment Cruel And Unusual Punishment Claim*

In his complaint Ciaprazi, in somewhat indiscriminate fashion, asserts that the actions taken against him by the various defendants resulted in his exposure to cruel and unusual punishment, in violation of the Eighth Amendment.[FN10] Plaintiff's cruel and unusual punishment claims appear to center upon the conditions which he faced as a result of the disciplinary proceedings against him and resulting in SHU confinement initially at Coxsackie, and later at Upstate and at Clinton. In their motion, defendants assert that these claims are similarly deficient as a matter of law.

> FN10. That amendment provides, in pertinent part, that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). The Eighth Amendment does not mandate comfortable prisons, but yet it does not tolerate inhumane ones either; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J .) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

**\*10** Plaintiff's cruel and unusual punishment claim challenges the fact that 1) he was placed in a double bunk cell at Upstate; 2) was placed in isolation and exposed to light except for five hours each night; 3) was deprived of such amenities such as writing paper and envelopes, proper access to the law library, medical care, access to newspapers, magazines and books, access to the courts, and legal papers; 4) was exposed to loud and boisterous behavior on the part of other inmates; 5) was denied essential clothing and bedding as well as personal hygiene materials, radios or headphones, books, newspapers and magazines; and 6) was exposed to cold conditions, leading him to suffer at least one case of the flu. Complaint (Dkt. No. 1) ¶¶ 52-56; *see also* Plaintiff's Affidavit (Dkt. No. 46) ¶¶ 53-57. To counter these allegations, defendants have submitted nothing to reflect the lack of a basis upon

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

(Cite as: 2005 WL 3531464 (N.D.N.Y.))

which a reasonable factfinder could conclude that plaintiff was exposed to cruel and unusual punishment while in disciplinary isolation as a result of the Tier III determination now at issue. Instead, defendants' motion focuses upon a narrow aspect of plaintiff's Eighth Amendment claim, in which they assert that the lack of policies guaranteed to result in uniformity throughout the DOCS system of punishments to result in a Eighth Amendment violation.

As skeptical as perhaps one may be regarding plaintiff's ability to ultimately persuade a factfinder that the admittedly unpleasant conditions to which he was apparently exposed and the deprivations suffered while in disciplinary confinement rise to a constitutionally significant level, I am unable to state, based upon the record as currently constituted, that no reasonable factfinder could so conclude. I therefore recommend denial of defendants' motion to dismiss plaintiff's Eighth Amendment cruel and unusual punishment claim relating to the conditions of his confinement.[FN11]

> FN11. In their motion, defendants have not argued lack of personal involvement with regard to their Eighth Amendment claims. It therefore remains to be seen whether plaintiff can establish the defendants' participation in the Eighth Amendment violations alleged.

Included within his Eighth Amendment claim, though more appropriately grouped with his due process cause of action, is plaintiff's contention that because the Tier III hearing officer was provided the unfettered discretion, in the event of finding of guilt, to impose a penalty of whatever magnitude seen fit, the disciplinary scheme in place at the DOCS is constitutionally infirm. In plaintiff's case, however, the imposed penalty of ten months of disciplinary confinement, 180 days of which were deferred, fell comfortably within the bounds of acceptable levels under the Eighth Amendment. Consequently, whatever may be said about plaintiff's arguments regarding the discretion affording to hearing officers, he lacks standing to raise such a claim. *See Trammell v. Mantello,* No. 90-CV-382, 1996 WL 863518, at *8-*9 (W.D.N.Y. June 10, 1996)* (Tier III regulations pass constitutional muster).

D. *Plaintiff's Procedural Due Process Claim*

In their motion, defendants also challenge plaintiff's contention that he was denied procedural due process during the course of the disciplinary hearing which resulted in his disciplinary confinement for a period of five months. In support of their motion, defendants argue both that plaintiff was not deprived of a constitutionally cognizable liberty interest, and that even assuming he was, he was afforded the requisite process due under the Fourteenth Amendment in connection with that deprivation.

**\*11** To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 260 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996).

1. *Liberty Interest*

Addressing the first of these required showings, in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483-84, 115 S.Ct. at 2300; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658.

Defendants challenge the applicability of both of these factors. Initially, defendants question whether New York has, by statute or otherwise, created a protected liberty interest in prisoners remaining free from segregation, including for disciplinary reasons, arguing that it has not. Defendants' Memorandum (Dkt. No. 39) at 14. The cases cited in support of that proposition, however, which relate to whether there is a constitutional or liberty interest in being assigned to a particular program, job assignment, or facility, are inapposite. *See, e.g., Klos v. Haskell,* 48 F.3d 81, 87-88 (2d Cir.1995) (involving revocation of assignment to "shock

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

(Cite as: 2005 WL 3531464 (N.D.N.Y.))

incarceration" program); *Hall v. Unknown Named Agents of N.Y. State Dept. for Corr. Servs. for APPU Unit at Clinton Prison,* 825 F.2d 642, 645-46 (2d Cir.1987) (involving assignment to Assessment Program and Preparation Unit); *see also Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 2547 (1976) (no constitutional right of inmate to be placed in any particular facility); *Frazer v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996) ("no protected liberty interest in a particular job assignment"). Despite defendants' assertion to the contrary, it is now firmly established that through its regulatory scheme, New York State has created a liberty interest in prisoners remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004) (citing *Welch v. Bartlett,* 196 F.3d 389, 394 n. 4 (2d Cir.1999); *see also LaBounty v. Coombe,* No. 95 CIV 2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.).

Having rejected defendants' contention that the State has not created such an interest, I next turn to examination of whether the conditions of plaintiff's disciplinary confinement, as alleged by him, rise to the level of an atypical and significant hardship under *Sandin.* Atypicality in a *Sandin* inquiry normally presents a question of law.[FN12] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999). When determining whether a plaintiff possesses a cognizable liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary.[FN13] *Hynes,* 143 F.3d at 658; *Arce,* 139 F.3d at 336.

FN12. In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v.. Giltner,* 197 F.3d 578, 585 (2d Cir.1999).

FN13. While not the only factor to be considered, the duration of a disciplinary keeplock confinement remains significant under *Sandin. Colon,* 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (see *id.* at 232 n .5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure). In fact, in *Colon v. Howard* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See id.* at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

**\*12** Given that plaintiff has shown that he was subjected to disciplinary confinement for a period of five months, and has alleged his exposure to conditions beyond those normally associated with such SHU confinement, as described in the applicable regulations, at this juncture I am unable to conclude, as a matter of law, that he was not deprived of a constitutionally significant liberty interest as a result of the disciplinary proceeding at issue. I therefore recommend against summary dismissal of plaintiff's due process claims on this basis.

2. *Due Process*

The procedural protections to which a prison inmate is entitled before being deprived of a recognized liberty interest are well established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

(Cite as: 2005 WL 3531464 (N.D.N.Y.))

present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988).

Plaintiff's procedural due process claim is multi-faceted. In that claim, Ciaprazi maintains that 1) he was denied meaningful assistance by defendant Cole, who refused his request to interview potential witnesses identified by the plaintiff; 2) Hearing Officer Melino effectively denied the plaintiff access to witnesses since witness waiver forms, not to plaintiff's liking in form, were allegedly presented by an unknowledgeable corrections officer to those inmates whose testimony was requested by Ciaprazi, following which those inmates apparently refused to sign the waiver forms and appear to testify on his behalf; 3) the hearing officer was biased and partial, and demonstrated open hostility toward the plaintiff; 4) the hearing officer's disciplinary determination was not supported by the evidence; and 5) the hearing officer refused plaintiff's suggestion to administer polygraph tests to defendants Rogers and Fitzpatrick, as well as to Ciaprazi. Also implicit in plaintiff's due process claim is his contention that his constitutional rights were violated through the issuance of a false misbehavior report.[FN14]

> **FN14.** Among the due process violations alleged in plaintiff's complaint is the claim that by taking into account his prior disciplinary record when determining the appropriate punishment to be imposed based upon the finding of guilt, hearing officer Melino violated the constitutional guaranty against double jeopardy. Since it is well established that the double jeopardy clause does not apply in the prison disciplinary setting, this claim lacks merit. *Bolanos v. Coughlin,* No. 91 Civ. 5330, 1993 WL 762112, at *13 (S .D.N.Y. Oct. 15, 1993).* Plaintiff's contention that the hearing officer's actions in this regard also violated an unspecified New York regulation fares no better, since such an allegation does not automatically support a claim of civil rights violations under 42 U.S.C. § 1983. *Alnutt v.*

*Cleary,* 913 F.Supp. 160, 168 (W.D.N.Y.1996).

Plaintiff's arguments relating to the sufficiency of evidence supporting the hearing officer's finding of guilt can be swiftly discounted. The Constitution, including its Due Process Clause, requires only that there be some evidence of guilt supporting a prison disciplinary determination. *Superintendent, Massachusetts Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455-56, 105 S.Ct. 2768, 2774 (1985). Having reviewed the record of plaintiff's disciplinary proceeding in light of his submissions, I find that this standard has been met.

**\*13** Plaintiff's claims regarding the allegedly false misbehavior report also lack merit. It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report.[FN15] *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273 (1988). The rationale supporting this general rule is that an inmate's procedural due process rights are adequately safeguarded by the opportunity to challenge and present evidence to rebut the false accusations at a disciplinary hearing. *Freeman,* 808 F.2d at 953.

> **FN15.** Unquestionably, a prisoner does enjoy a substantive due process right against the issuance of a false misbehavior report as retribution for having engaged in protected activity. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995). In light of my finding of no connection between plaintiff's complaints and the issuance by defendant Fitzpatrick of the misbehavior report, however, such a claim does not lie in this action.

As for plaintiff's contention that his due process rights were violated when polygraph tests were not administered to key corrections officials, as requested by him, plaintiff has cited no cases-nor is the court aware of any-which require the administering of polygraph tests in connection with parties and witnesses in the context of an inmate disciplinary determination. *See Hinebaugh v. Wiley,* 137 F.Supp.2d 69, 79 (N.D.N.Y.2001) ("some evidence" does not require independent examination of credibility and therefore "certainly does not require" court to order

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

(Cite as: 2005 WL 3531464 (N.D.N.Y.))

personnel to submit to polygraph to ascertain if hearing testimony was truthful). This issue, then, provides no basis for finding the existence of a procedural due process violation.

Plaintiff's allegations regarding the ineffectiveness of his assigned assistant provide a greater basis for pause. While the requirements associated with the provision of such assistance are modest, they are not non-existent. Under *Wolff,* an inmate facing a Tier III disciplinary hearing is entitled to meaningful assistance in preparing his or her defense. *Eng,* 858 F.2d at 897-98. In this case, plaintiff asserts that while he was assigned an assistant, he was denied meaningful assistance from that individual. In support of this contention, plaintiff alleges that he identified certain witnesses critical to his defense, but that his assistant refused to interview those witnesses with an eye toward requesting their testimony during the hearing. Complaint (Dkt. No. 1) ¶¶ 20-21; Ciaprazi Aff. (Dkt. No. 46) ¶ 40. This, if true, could establish a due process violation based on the inadequacy of the inmate assistance provided to the plaintiff. *See Avers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998).

In light of my inability to find, as a matter of law, that plaintiff did not suffer the deprivation of a liberty interest as a result of his five month period of disciplinary confinement, and additionally to conclude that no reasonable factfinder could find the existence of a due process violation associated with that disciplinary confinement, I recommend denial of the portion of defendants' summary judgment motion which seeks dismissal of plaintiff's due process claims.

F. *Equal Protection*

In his complaint plaintiff also complains of the alleged deprivation of equal protection. Defendants contend that this claim is also subject to dismissal as a matter of law.

**\*14** "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tx. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985) (citation omitted). The general rule is that a policy is presumed to be valid and will be sustained if the classification drawn by that policy is rationally related to a legitimate state interest. *Id.* at 440, 105 S.Ct. at 3254. One exception to that rule, however, is when a policy classifies by race, alienage, or national origin-"[t]hese factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy-a view that those in the burdened class are not as worthy or deserving as others." *Id.* For this reason, these policies are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest. *Id.* The essence of a cognizable equal protection claim includes a showing of "clear and intentional discrimination." *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401 (1944) (internal quotation and citations omitted).

The apparent basis for plaintiff's equal protection claim is his contention that in light of his national origin, he was treated differently than United States citizen counterparts.[FN16] In the face of defendants' summary judgment motion, it was incumbent upon the plaintiff to come forward with evidence which could support a claim that he was treated differently than other inmates, and that the difference in treatment could properly be attributed to his status as a Romanian. As such evidence, plaintiff offers only a statement made to him by defendant Fitzpatrick at one point, in substance, that plaintiff had "now ... learned to speak English." *See* Plaintiff's Memorandum (Dkt. No. 46) at 29. Beyond this slender reed, plaintiff offers no evidence to support his claim that he was treated differently than inmates not of his national origin, and indeed acknowledges mere speculation on his part as to this premise, arguing that "discrimination based on national origin *may* ... have placed [sic] a role in defendants' unlawful actions[.]" Plaintiff's Memorandum (Dkt. No. 46) at 29 (emphasis added). Instead, plaintiff's equal protection claims consist of mere surmise and speculation, and are subject to dismissal on this basis. *See, e.g., Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) ( "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning").

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

(Cite as: 2005 WL 3531464 (N.D.N.Y.))

FN16. Plaintiff is a Romanian citizen. Complaint (Dkt. No. 1) at 3.

Despite being obligated to do so at this juncture, plaintiff has failed to adduce any evidence to show either that he was treated differently than his non-Romanian counterparts, and that the difference in treatment was based upon his national origin. I therefore recommend dismissal of plaintiff's equal protection claims as a matter of law.

G. *United Nations Resolutions*

**\*15** Each of plaintiff's eight causes of action is based, in part, upon two international agreements, including the Universal Declaration of Human Rights ("UDHR") and the International Covenant on Civil and Political Rights ("ICCPR"). Defendants maintain that as a matter of law, those provisions do not support claims under section 1983.

Section 1983 provides, in pertinent part, for a right of action on behalf of any person deprived of "any rights, privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. § 1983. Plaintiff argues that because the United States is a signatory to these two treaty-like provisions, they have the force of law and can be implemented, and individual treaty violations can give rise to recourse, under section 1983.

It is true that violation of a treaty entered into by the United States can serve as a basis for a claim for damages under section 1983, provided that the treaty allows for a private right of action to redress any alleged violations of its provisions. *Standt v. City of New York,* 153 F.Supp.2d 417, 422-30 (S.D.N.Y.2001) (finding private right of action under section 1983 for violation of the Vienna Convention on Consular Relations, 21 U.S.T. 77, 101 T.I.A .S. No. 6820, 596 U.N.T.S. 261 (April 24, 1963)). To the extent the defendants argue otherwise, and contend that treaties-as distinct from constitutional and other types of federal statutory provisions-cannot support a claim for section 1983 liability, *see* Defendants' Memorandum (Dkt. No. 39) at 17-18, that position therefore lacks support.

As can be seen, analysis of the sufficiency of

plaintiff's claims under the cited treaty provisions turns upon whether those international agreements confer individual rights of action. In order to be found deserving of enforcement under section 1983 as a "law", a treaty ratified by the Senate must either be found to be self-executing or, alternatively, must have been the subject of implementing legislation by Congress. *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287, 1298 (3d Cir.1979).

Since plaintiff has pointed to no applicable implementing legislation, nor is the court aware of any, the availability of the ICCPR to support plaintiff's section 1983 claim depends upon whether it is self-executing. The majority of the courts addressing this issue, however, including within the Second Circuit, have concluded that it is not.[FN17] *See, e.g., Poindexter v. Nash,* 333 F.3d 372, 379 (2d Cir.2003); *Murray v. Warden, FCI Raybrook,* No. 9:01-CV-255, 2002 WL 31741247, at *11 n. 10 (N.D.N.Y. Dec. 5, 2002) (Sharpe, M.J.) (citing *U.S. ex rel. Perez v. Warden, FMC Rochester,* 286 F.3d 1059, 1063 (8th Cir.2002) and *Reaves v. Warden,* No. Civ. A3:01-CV-1149, 2002 WL 535398, at *9 (M.D.Pa. Mar. 22, 2002). Similarly, the UDHR has been characterized by the Second Circuit as "non-binding." *Flores v. Southern Peru Copper Corp.,* 343 F.3d 140, 167-68 (2d Cir.2003).

FN17. Even in one of the cases relied heavily upon by the plaintiff, *Maria v. McElroy,* 68 F.Supp.2d 206, 231 (E.D.N.Y.1999)-a case which has since been effectively overruled on other grounds, *see Restrepo v. McElroy,* 369 F.3d 627 (2d Cir.2004)-the court recognized that the ICCPR was not "self-executing". 68 F.Supp.2d at 231.

**\*16** Based upon the foregoing, and without deciding whether the evidence in the record demonstrates a genuine issue of material fact as to whether those provisions were violated by defendants' alleged actions toward the plaintiff, I find that Ciaprazi's claims under the ICCPR and UDHR are legally deficient as a matter of law. I therefore recommend dismissal of plaintiff's claims which are dependent on those two international agreements.

H. *Personal Involvement*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

(Cite as: 2005 WL 3531464 (N.D.N.Y.))

Defendants claim that plaintiff's claims against defendants Goord and Selsky are legally deficient, in that the record fails to establish their requisite personal involvement in the constitutional violations alleged.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

The basis for asserting liability against defendant Selsky arises exclusively from plaintiff's appeal from his disciplinary determination. That appeal was addressed by defendant Selsky, whose review of that appeal sufficiently establishes his personal involvement in any alleged due process violations based upon his being positioned to discern and remedy the ongoing effects of any such violations. *See, e.g., Gilbert v. Selsky,* 867 F.Supp. 159, 166 (S.D.N.Y.1994).

Plaintiff's claim against defendant Goord is far more tenuous. Plaintiff asserts that because his appeal was mailed directly to defendant Goord who, consistent with his established practice, then referred it to defendant Selsky for review, the Commissioner "presumably read [its] contents." *See* Plaintiff's Memorandum (Dkt. No. 46) at 32. This, coupled with his contention that as the ultimate supervisor of the DOCS defendant Goord was positioned to remedy the violations which he suffered, forms the sole basis for his claims against defendant Goord. These are merely claims against defendant Goord in his supervisory capacity; to sanction them would be to allow for *respondeat superior* liability. Since it is well established that such liability does not lie under section 1983, and there is no other discernible basis to conclude defendant Goord's awareness of or involvement in the matters alleged in plaintiff's complaint, I recommend that defendants' motion be granted and plaintiff's claims against defendant Goord be dismissed based upon lack of personal involvement. *Richardson,* 347 F.3d at 435 (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985);* "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim"); *Scott v. Coughlin,* 78 F.Supp.2d 299, 312 (S.D.N.Y.2000) (Commissioner's act of forwarding appeals addressed to him to Selsky insufficient to establish personal involvement; citing, *inter alia, Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1991)).

IV. *SUMMARY AND RECOMMENDATION*

**\*17** The plaintiff, an experienced and well-versed *pro se* litigant, has commenced this action asserting various claims arising out of the issuance of a disciplinary misbehavior report and the process which followed, including the punishment received. Upon examination of the record, I find no evidence tending to demonstrate that the adverse actions taken against the plaintiff were motivated by disciplinary animus, and thereby recommend the entry of summary judgment dismissing his retaliation claim. I do, however, find the existence of triable issues of fact regarding whether or not Ciaprazi was deprived of a constitutionally significant liberty interest, and whether the assistance provided to the plaintiff in anticipation of his

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

(Cite as: 2005 WL 3531464 (N.D.N.Y.))

hearing was constitutionally adequate, and therefore recommend against summary dismissal of plaintiff's procedural due process claims.

Addressing plaintiff's Eighth Amendment claims I find, particularly in view of the lack of any evidence to the contrary, that the conditions described by the plaintiff could lead a reasonable factfinder to conclude that they amounted to cruel and unusual punishment, and therefore recommend against the entry of summary judgment dismissing plaintiff's Eighth Amendment claim. I further find, however, no basis to conclude that a reasonable factfinder could find an Eighth amendment violation based on the Tier III regulatory scheme, a violation of the Equal Protection Clause of the Fourteenth Amendment, or that the international treaty provisions cited give rise to a private right of action. Accordingly, I recommend dismissal of those claims.

Finally, I recommend dismissal of plaintiff's claims against defendant Goord based upon the lack of his personal involvement, but against dismissal of plaintiff's claims against defendant Selsky on this basis. It is therefore hereby

RECOMMENDED that defendants' summary judgment motion (Dkt. No. 39) be GRANTED in part, and that all of plaintiff's claims against defendant Goord, and all of plaintiff's claims against the remaining defendants except his procedural due process and Eighth Amendment conditions of confinement causes of action, be DISMISSED, but that to the extent of those claims, with respect to which triable issues of fact exist, I recommend that defendants' motion be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have TEN days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. Fed.R.Civ.P. 6(a), 6(e), 72; 28 U.S.C. § 636(b)(1); *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citations omitted); and it is further hereby

ORDERED that the Clerk of the Court serve a copy of this Report and Recommendation upon the parties by regular mail.

N.D.N.Y.,2005.

Ciaprazi v. Goord
Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

END OF DOCUMENT

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)

(Cite as: 2008 WL 2735868 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Jonathan ODOM, Plaintiff,
v.
Ana E. CALERO, et al., Defendants.
No. 06 Civ. 15527(LAK)(GWG).

July 10, 2008.
*REPORT AND RECOMMENDATION*

GABRIEL W. GORENSTEIN, United States Magistrate Judge.

**\*1** Jonathan Odom, currently an inmate at the Auburn Correctional Facility, brings this suit *pro se* under 42 U.S.C. §§ 1983 and 1985 against employees of the New York State Department of Correctional Services ("DOCS"). After the defendants filed a motion to dismiss, the undersigned issued a Report and Recommendation recommending that the motion be granted. Following objections by plaintiff, the district judge granted the defendants' motion to dismiss some of the claims but sustained Odom's objection to dismissing two of the claims on statute of limitations grounds. Thus, the instant Report and Recommendation addresses the alternative grounds raised in the motion to dismiss with respect to the remaining two claims.

In the remaining causes of action, Odom alleges that, in retaliation for testifying in 2001 regarding the assault of a fellow inmate at the Sing Sing Correctional Facility ("Sing Sing"), Correction Officers W. Perez and Brian McCoy filed false misbehavior reports against him, and that Hearing Officer Ana E. Calero violated his right to due process through her conduct at his disciplinary hearings. Following the hearings, Odom was sentenced to various amounts of time in the Special Housing Unit ("SHU") at Sing Sing. Odom further alleges that Brian Fischer, the Superintendent of Sing Sing, and Donald Selsky, the Director of the Special Housing/Inmate Disciplinary Program, violated his right to due process by

affirming the decisions made at those hearings.

Defendants Perez and McCoy have never been served. Defendants Calero, Fischer, and Selsky move to dismiss Odom's claims for failure to state a claim and on qualified immunity and Eleventh Amendment immunity grounds. For the reasons stated below, the defendants' motion should be granted in part and denied in part.

*I. BACKGROUND*

*A. Facts*

On this motion to dismiss, the Court assumes that the facts alleged in Odom's complaint, amended complaint, and affirmation in opposition to the motion are true. *See, e.g., Burgess v. Goord, 1999 WL 33458, at \*1 n.1 (S.D.N.Y. Jan. 26, 1999)* (" 'the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum' " (quoting *Gadson v. Goord, 1997 WL 714878, at \*1 n.2 (S.D.N.Y. Nov. 17, 1997)*)); *accord Torrico v. IBM Corp., 213 F.Supp.2d 390, 400 n.4 (S.D.N.Y.2002)*. In addition, "[d]ocuments that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." *Roth v. Jennings, 489 F.3d 499, 509 (2d Cir.2007)*.

Odom's allegations stem from an incident on May 27, 2001, in which he alleges that he witnessed Perez and "other[ ] prison officials" assault another inmate. *See* Amended Complaint, filed May 24, 2007 (Docket # 10) ("Am.Compl."), ¶ 12. Odom was issued approximately ten misbehavior reports both before and after he testified at the other inmate's disciplinary hearing. *Id.* ¶ 16; *see id.* ¶ ¶ 24-25, 43-44. All of the charges against Odom were dismissed at disciplinary hearings or on appeal before Selsky, except for the charges considered at disciplinary hearings held on June 7, 2001 and July 16, 2001. *Id.* ¶ 17. Those charges resulted in Odom being sentenced to 455 days in the SHU. *Id.* ¶ 18. The charges considered at these hearings were ultimately dismissed on June 17, 2005, and December 30, 2005. *Id.* ¶ 17; *see* Exs. A, F to Am. Compl.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)

(Cite as: 2008 WL 2735868 (S.D.N.Y.))

**\*2** In his first and second causes of action, Odom alleges violations of his due process rights. *Id.* ¶ 27; *see id.* ¶¶ 38; 56. Two Correction Officers, Perez and McCoy, filed misbehavior reports in retaliation for Odom's testifying about the assault of a fellow inmate in 2001. *See id.* ¶¶ 24-25, 44-45. Fischer caused Odom to be subjected to misbehavior reports and unfair disciplinary hearings, and he also assigned Calero as the hearing officer in order to violate Odom's due process rights. *Id.* ¶¶ 14, 28, 43, 46. Calero undertook "to act as [his] inmate assistant, and then did nothing to help assist [him]," *id.* ¶ 29; *see id.* ¶ 47; asked prison officials leading questions and "then provided most of their answers," *id.* ¶ 30; *see id.* ¶ 48; and "refused to allow [Odom] to call witnesses and precluded [him] from presenting a defense, resulting in him being found guilty with no evidence to support the charges," *id.* ¶ 31; *see id.* ¶ 49; Affirmation in Opposition to Defendants' Motion to Dismiss, filed Sept. 7, 2007 (Docket # 25) ("Pl.Aff."), ¶ 9 (Calero failed "to obtain the testimony of the witnesses requested by the plaintiff during his June 7, 2001 and July 16, 2001 disciplinary hearings"). Following one of the hearings, Calero told plaintiff to "mind his business next time." Am. Compl. ¶ 14.

Odom filed appeals with Fischer and Selsky after the disciplinary hearings. *Id.* ¶ 15. While neither Fischer nor Selsky "commit[ted] the due process violations," *id.* ¶ 32, 50, Fischer and Selsky "both became responsible for them[ ] when they ... failed to correct them in the course of their supervisory responsibilities," *id.* ¶ 32; *see id.* ¶ 50. They "refus[ed] to overturn [his] disciplinary conviction and expunge it, despite their knowledge of the ... due process violations." *Id.* ¶ 34; *accord id.* ¶¶ 50-52.

### B. *Procedural History*

The original complaint was received by the Pro Se Office on June 27, 2006, and was filed on December 29, 2006. (Docket # 1). After submitting a "Supplemental Complaint" (filed May 4, 2007 (Docket # 7)), Odom filed the Amended Complaint on May 24, 2007, *see* Am. Compl.

Defendants Calero, Fischer, and Selsky filed their motion to dismiss and supporting papers on August 22,

2007. *See* Notice of Motion, filed Aug. 22, 2007 (Docket # 20) ("Def.Not."); Memorandum of Law in Support of Defendants' Motion to Dismiss, filed Aug. 22, 2007 (Docket # 21) ("Def.Mem."); Declaration of Jeb Harben, filed Aug. 22, 2007 (Docket # 22). Odom responded with an affirmation, *see* Pl. Aff., and the defendants filed a reply brief, *see* Reply Memorandum of Law in Support of Defendants' Motion to Dismiss, filed Sept. 21, 2007 (Docket # 28) ("Def.Reply").

On February 19, 2008, the undersigned issued a Report and Recommendation recommending that all claims be dismissed. *Odom v. Calero,* 2008 WL 449677 (S.D.N.Y. Feb. 19, 2008). The district judge granted the defendants motion to dismiss claims three, four, five and six in the Amended Complaint, sustained Odom's objection to the dismissal of claims one and two on statute of limitations grounds, and referred the motion back to the undersigned to address the alternative grounds in defendants' motion to dismiss. *See* Order, filed Mar. 25, 2008 (Docket # 40). Odom responded to this order, *see* Affirmation in Reply to Judge Lewis A. Kaplan's March 27, 2008 Court Order, dated April 14, 2008 (Docket # 51), and defendants filed a motion for reconsideration, *see* Motion for Reconsideration, filed Apr. 9, 2008 (Docket # 42), which was denied, *see* Order, filed Apr. 15, 2008 (Docket # 45).

**\*3** Shortly before the denial of the motion for reconsideration, Odom submitted a motion for summary judgment. *See* Notice of Motion for Summary Judgment, dated April 14, 2008 (Docket # 48) ("S.J.Motion"); Plaintiff's Affirmation in Opposition to Defendants' Motion for Reconsideration and in Support of the Plaintiff's Motion for Summary Judgment, dated April 14, 2008 (Docket # 49); Brief in Support of Plaintiff's Motion for Summary Judgment, dated April 14, 2008 (Docket # 50); Statement of Undisputed Facts, dated April 14, 2008 (Docket # 52). As discussed below, the summary judgment motion should be denied for procedural reasons. Nonetheless, we have considered Odom's submissions in support of the summary judgment motion to the extent they are relevant to his opposition to the defendants' motion to dismiss.

In addition to arguing for dismissal on statute of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)

(Cite as: 2008 WL 2735868 (S.D.N.Y.))

limitations grounds, Calero, Fischer, and Selsky moved to dismiss the complaint for failure to state a claim or "insufficient pleadings," qualified immunity, failure to allege a conspiracy, and Eleventh Amendment immunity. Def. Mem. at 5-17.

## II. *DISCUSSION*

### A. *Law Governing a Motion to Dismiss for Failure to State a Claim*

Under Fed.R.Civ.P. 8(a)(2), a pleading is required to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Thus, a complaint "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir.2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)) (some internal quotation marks and citation omitted). On a motion to dismiss for failure to state a claim, all factual allegations in the complaint are accepted as true. *See Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508 n.1 (2002).

Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do .... Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1964-65 (2007) (internal quotation marks, citations, and brackets omitted); *see also id.* at 1966 (pleading must "possess enough heft to show that the pleader is entitled to relief") (internal quotation marks, citation, and brackets omitted). Thus, "a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion." *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007).

For purposes of deciding a motion to dismiss, "[a] document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 127 S.Ct. 2197, 2200

(2007) (per curiam) (internal quotation marks and citations omitted); *accord* Boykin v. KeyCorp, 521 F.3d 202, 213-14 (2d Cir.2008).

**\*4** Calero, Fischer, and Selsky argue that Odom has failed to "allege sufficient specific facts to support the stated causes of action," Def. Mem. at 7, by which they apparently mean to argue that he has failed to state a claim under Fed.R.Civ.P. 12(b)(6), *see* Def. Mem. at 4-5, 7 (citing *Bell Atl. Corp.*), 9-11; Def. Not. We now consider whether Odom's Amended Complaint states a claim against any of these defendants.

### B. *Section 1983* Claims

To assert a claim under 42 U.S.C. § 1983, a plaintiff must show that he has been deprived of a right secured by the Constitution or federal law by a defendant acting under the color of state law. 42 U.S.C. § 1983; *see West v. Atkins,* 487 U.S. 42, 48 (1988). Section 1983 does not grant any substantive rights, but rather "provides only a procedure for redress for the deprivation of rights established elsewhere," *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999) (citations omitted), namely in the Constitution or federal statutes. Here it is undisputed that the defendants were acting under color of law. The only question is whether plaintiff has shown that they committed a violation of plaintiff's federal rights. In this case, the only violations that the complaint may be fairly read to assert are violations of the Due Process clause of the Fourteenth Amendment.

A party asserting a due process claim " 'must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process.' " *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)), *cert. denied,* 543 U.S. 1187 (2005). Prisoners subject to disciplinary proceedings can show a liberty interest only if "disciplinary punishment 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)

(Cite as: 2008 WL 2735868 (S.D.N.Y.))

disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (quoting *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)).

"Segregation of longer than 305 days in standard SHU conditions is sufficiently atypical to require procedural due process protection under *Sandin." Iqbal v. Hasty,* 490 F.3d 143, 161 (2d Cir.2007). Odom alleges that he was sentenced to 455 days in the SHU as a result of the disciplinary hearings on June 7, 2001 and July 16, 2001, Am. Compl. ¶ 18, and defendants do not contest that Odom's confinement implicates a liberty interest. Thus, for the purposes of this motion we assume that Odom's sentence of confinement in the SHU implicates a liberty interest.

**\*5** We next address each defendant's arguments regarding whether Odom was deprived of his liberty through insufficient process.

1. *Calero*

As previously noted, Odom alleges that Calero violated his due process rights by the manner in which she conducted disciplinary hearings with respect to misbehavior reports on June 7, 2001 and July 16, 2001. *See* Am. Compl. ¶¶ 4, 17, 27-31, 46-49. Specifically, he alleges that "Calero ... violated the plaintiff's due process rights by failing (without rational explanation) to obtain the testimony of the witnesses requested by the plaintiff during his June 7, 2001 and July 16, 2001 disciplinary hearings." Pl. Aff. ¶ 9; *see* Am. Compl. ¶ 31 (Calero "refused to allow plaintiff to call witnesses and precluded the plaintiff from presenting a defense"); *accord id.* ¶ 49. Odom asserts that in one of the hearings he requested that Calero call "several inmates as witnesses" for him and "provided their cell locations," Declaration in Support of Plaintiff's Motion for Summary Judgment, dated Apr. 14, 2008 (attached to S.J. Motion), ¶ 3, but that she refused to call them on the ground that "staff reports gave a 'full picture' of the incident," *id.* ¶ 4. "The evidence at the hearing consisted solely of the written report of defendant Perez, inmate Hurt's and my neighbor W16 cell and my

testimony" [sic]. *Id.* ¶ 5.

In addition, Odom alleges that he was not afforded "the right to a fair and impartial hearing officer" in his disciplinary hearings. Am. Compl. ¶ 27; *accord id.* ¶ 48. Specifically, he alleges that Calero asked prison officials leading questions and provided "most of their answers." *Id.* ¶ 30; *accord id.* ¶ 48.

According to the Second Circuit:

The due process protections afforded a prison inmate do not equate to "the full panoply of rights" due to a defendant in a criminal prosecution. *Wolff v. McDonnell,* 418 U.S. at 556, 94 S.Ct. 2963. Notably, there is no right to counsel or to confrontation at prison disciplinary hearings. *See id.* at 567-70, 94 S.Ct. 2963. Nevertheless, an inmate is entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken. *See id.* at 563-67, 94 S.Ct. 2963; *accord Luna v. Pico,* 356 F.3d at 487; *Kalwasinski v. Morse,* 201 F.3d at 108.

*Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004).

Construing the complaint in the manner most favorable to plaintiff, Odom's allegations that he was not given a reasonable opportunity to call witnesses and that Calero "provided answers" to questions asked at the hearings are sufficient to state a claim for violation of his due process rights. The defendants' argue that the allegations are infirm because Odom does not give sufficient factual details such as the names of witnesses that he would have called or the evidence he would have presented. Def. Mem. at 7. At this stage of the litigation, however, when only a "short and plain statement" of a claim is required by Fed.R.Civ.P. 8(a)(2), and where the plaintiff is proceeding *pro se,* such factual detail is not required in the complaint.

**\*6** The defendants also argue that Odom has failed to state a claim because there was some evidence on which Calero could have reasonably relied in making her

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)

(Cite as: 2008 WL 2735868 (S.D.N.Y.))

decisions at the disciplinary hearings. Def. Mem. at 10; Def. Reply at 4. Certainly, a hearing decision will be upheld if there is "any evidence" in the record to support it. *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000) (emphasis omitted). But this argument fails for two reasons. First, it requires the Court to look outside the record on a motion to dismiss. Second, it does not address the question of whether Calero committed a due process violation. By asking the Court to judge the decision based on the record that Calero allowed to be created, the defendants ignore the allegations that Odom was not given a reasonable opportunity to call witnesses in order to create a proper record in the first place.

2. *Fischer and Selsky*

The defendants argue that Odom has failed to allege the personal involvement of Fischer and Selsky in any constitutional violation. Def. Mem. at 9. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (internal quotation marks and citation omitted). In addition, personal liability under section 1983 cannot be imposed upon a state official based on a theory of *respondeat superior. See, e.g., Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ( "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior"* ), *cert. denied,* 543 U.S. 1093 (2005); *accord Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). According to the Second Circuit:

The personal involvement of a supervisor may be established by showing that he (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.

*Iqbal,* 490 F.3d at 152-53 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)).

Odom's central allegation is that Fischer and Selsky violated his rights by not overturning Calero's decisions when he appealed the disciplinary hearing decisions to them. Odom argues that Fischer and Selsky "both became responsible" for the due process violations committed at the hearings "when they ... failed to correct [the violations] in the course of their supervisory responsibilities." Am. Compl. ¶¶ 32, 50. He alleges that they "refus[ed] to overturn [his] disciplinary conviction and expunge it, despite their knowledge of the ... due process violations." *Id.* ¶ 34; *accord id.* ¶¶ 50-52. While the source of that knowledge is not identified, the context of allegations make clear that it could only have been derived from their review of Odom's assertions as part of the appeal process itself. Indeed, in another submission, Odom asserts that he "identified the due process violations in his discretionary appeal and direct appeal letters," and that as a result "Fischer and Selsky both knew just what to look for." Pl. Aff. ¶ 12.

**\*7** These allegations are insufficient to show personal involvement in the due process violation alleged to have been committed by Calero. Odom concedes that neither Fischer nor Selsky "commit[ted] the due process violations" themselves. Am. Compl. ¶¶ 32, 50. Rather, Calero is alleged to have committed the alleged due process violation. Once the hearing was over and her decision was issued, the due process violation was completed. The only opportunity that Fischer or Selsky had to rectify this violation was through the appeal process itself.

The only method outlined by the Second Circuit by which personal involvement may be shown potentially relevant here is that Fischer and Selsky, "after being informed of the violation through [the appeals], failed to remedy the wrong." *Colon,* 58 F.3d at 873. This method does not apply here, however, because-as has been noted in a related context-"affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983." *Manley v. Mazzuca,* 2007 WL 162476, at *10 (S.D.N.Y. Jan. 19, 2007) (citing, *inter alia, Foreman v. Goord,* 2004 WL 1886928, at *7 (S.D.N.Y. Aug. 23, 2004) ("The fact that [the prison superintendent] affirmed the denial of plaintiff's grievances is insufficient to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)

(Cite as: 2008 WL 2735868 (S.D.N.Y.))

establish personal involvement.")). As was noted in *Thompson v. New York,* 2001 WL 636432 (S.D.N.Y. Mar. 15, 2001), "[w]ere it otherwise, virtually every prison inmate who sues for constitutional torts by prison guards could name the Superintendent as a defendant since the plaintiff must pursue his prison remedies and invariably the plaintiff's grievance will have been passed upon by the Superintendent." *Id.* at *7 (internal citations omitted). The reference in case law to an official who "fails to remedy" a violation logically applies only to ongoing and therefore correctable, constitutional violations-not to a specific event that is later subject to formal review by designated officials once the constitutional violation has already concluded. As was held in *Harnett v. Barr,* 538 F.Supp.2d 511 (N.D.N.Y.2008), "[i]f the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation." *Id.* at 524; *accord Thompson,* 2001 WL 636432, at *7 ("The Second Circuit's reference to the failure by a supervisor to remedy a known wrong seems to have a different focus. As worded, it appears to address cases involving continuing unconstitutional prison conditions that the warden may be proven or assumed to know about, and a refusal by the warden to correct those conditions."). In this case, any constitutional violation allegedly committed by Calero was concluded by the time Fischer and Selsky were called upon to review it. Accordingly, they were not "personally involved" in committing the alleged due process violations.[FN1]

> **FN1.** Odom has made other allegations against Fischer that are too vague and conclusory to state a claim for a due process violation, such as the assertion that Fischer "subjected" Odom to four of the misbehavior reports after Odom testified at the other inmate's disciplinary hearing. Am. Compl. ¶ 43. Another assertion-that Fischer intentionally assigned Calero as the hearing officer at both hearings in order to violate Odom's due process rights, *id.* ¶¶ 14, 28, 46-is insufficient to show personal involvement inasmuch as it was Calero's responsibility to act as an impartial hearing officer. To fault Fischer, as a supervisory official, for giving her this assignment is tantamount to arguing that he

failed in his supervisory responsibilities. *See Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (per curiam) (a mere "linkage in the prison chain of command" is not sufficient to demonstrate personal involvement for purposes of section 1983).

### C. *Qualified Immunity*

**\*8** The defendants assert that they are entitled to qualified immunity. Def. Mem. at 11. The doctrine of qualified immunity precludes civil liability where prison officials performing discretionary functions " 'did not violate clearly established rights or if it would have been objectively reasonable for the official[s] to believe [their] conduct did not violate plaintiff's rights.' " *Reuland v. Hynes,* 460 F.3d 409, 419 (2d Cir.2006) (quoting *Mandell v. County of Suffolk,* 316 F.3d 368, 385 (2d Cir.2003)), *cert. denied,* 128 S.Ct. 119 (2007); *accord Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see also Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (qualified immunity ensures that defendants have "fair notice" that their conduct is unlawful before being exposed to liability, and "[f]or a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right' " (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987))). A qualified immunity defense may be asserted as part of a motion under Fed.R.Civ.P. 12(b)(6) if it is based on facts appearing on the face of the complaint, though defendants asserting the defense at this stage face a "formidable hurdle." *McKenna v. Wright,* 386 F.3d 432, 434-35 (2d Cir.2004).

With respect to Calero, the defendants' brief makes no argument that the rights of a prisoner to due process at a disciplinary hearing under the standard set forth in *Wolff v. McDonnell,* 418 U.S. 539 (1974), were not clearly established at the time of Odom's hearings. *See* Def. Mem. at 11-12. Instead, they seem to argue that Calero's actions were objectively reasonable. *Id.* But their only support for this argument is material outside the record, *see id.* at 11, and their claim that the decision on the disciplinary hearings must have been justified by the evidence presented at the hearing. As noted previously, however, the issue is whether the complaint alleges that Calero

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)

(Cite as: 2008 WL 2735868 (S.D.N.Y.))

committed a due process violation-not whether the decision was justified by record.

"In analyzing whether the defense of qualified immunity may be successfully invoked on a motion to dismiss, the court need look no further than the complaint's allegations regarding the specific procedural protections allegedly denied the plaintiff. If the entitlement to those protections was 'clearly established' at the time of the administrative hearing ... then the defense is unavailable." *Wright v. Dee,* 54 F.Supp.2d 199, 207 (S.D.N.Y.1999). Calero does not contest that it was clearly established at the time of Odom's hearings that he was entitled to call witnesses on his behalf, *see, e. g., Sira,* 380 F.3d at 69, and that he was entitled to an impartial hearing officer, *see, e.g., Allen v. Cuomo,* 100 F.3d 253, 259 (1996). Odom alleges that these procedural protections were denied him. Thus, Calero has not shown that the complaint establishes that she is entitled to qualified immunity for Odom's due process claims.[FN2]

> [FN2.] While it is clear in the Amended Complaint that Odom is alleging that Perez and McCoy filed the misbehavior reports in retaliation for Odom's testifying at another inmate's disciplinary hearing, Am. Compl. ¶¶ 24-25, 44-45, no retaliation claim has been asserted against Calero. To the extent the complaint could be construed as making such a claim against Calero, it would have to be dismissed because it is not clearly established in this Circuit that a prisoner has a constitutional right to testify in a disciplinary hearing of another inmate. *See Pettus v. McGinnis,* 533 F.Supp.2d 337, 340 (W.D.N.Y.2008) ("This Court has found no authority ... that even today clearly establishes within this circuit whether an inmate's testimony on behalf of another inmate at the other inmate's disciplinary hearing is constitutionally protected.") (dismissing claim of retaliation) (emphasis omitted).

D. *Claims Under* 42 U.S.C. § 1985

**\*9** Odom also purports to assert conspiracy claims under 42 U.S.C. § 1985. *See* Am. Compl. at 1. "To state

a conspiracy claim under 42 U.S.C. § 1985, plaintiff must allege (1) some racial or other class-based discriminatory animus underlying the defendants' actions, and (2) that the conspiracy was aimed at interfering with the plaintiff's protected rights." *Porter v. Selsky,* 287 F.Supp.2d 180, 187 (W.D.N.Y.2003) (citing *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 268 (1993); *Gagliardi v. Village of Pawling,* 18 F.3d 188, 194 (2d Cir.1994)), *aff'd on other grounds,* 421 F.3d 141 (2d Cir.2005). There are no explicit allegations of conspiracy in the Amended Complaint, however. When this issue was raised by defendants in their motion, Odom's response, *see* Pl. Aff. ¶ 46, pointed to scattered allegations in the Amended Complaint that particular defendants "acted alone and/or in conjunction with another named defendant." *See, e.g.,* Am. Compl. ¶¶ 28, 31, 32, 46, 50. Nothing in Odom's allegations, however, shows that the elements of a section 1985 claim, quoted above, have been met.

E. *Eleventh Amendment*

The defendants argue that "[i]f claims are being made against defendants in their positions of authority within DOCS, those claims are essentially claims against DOCS or the State of New York and are barred." Def. Mem. at 17. Odom does not address this argument.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. While the language of the Eleventh Amendment is not literally applicable to suits brought by citizens of the state being sued, the Supreme Court has long held that it bars such suits as well. *See, e.g., Employees of Dep't of Pub. Health and Welfare v. Dep't of Pub. Health and Welfare,* 411 U .S. 279, 280 (1973). Thus, "[i]t is clear ... that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984) (citations omitted). The Supreme Court has also explicitly held that 42 U.S.C. § 1983 is not a statute that abrogates the States' sovereign immunity. *See Quern v. Jordan,* 440 U.S. 332, 340-45 (1979).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)

(Cite as: 2008 WL 2735868 (S.D.N.Y.))

The bar imposed by the Eleventh Amendment "remains in effect when State officials are sued for damages in their official capacity ." *Kentucky v. Graham,* 473 U.S. 159, 169 (1985). Thus, the Eleventh Amendment bars suits against individual employees of the State who are named as defendants in their official capacities. *See, e.g., Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003); *Eng v. Coughlin,* 858 F.2d 889, 894 (2d Cir.1988). Accordingly, to the extent that Odom intends to state claims for money damages against Calero or any other defendant in their official capacities, such claims must be dismissed.

E. *Odom's April 14, 2008 Motion for Summary Judgment*

**\*10** Odom recently filed a motion for summary judgment (Docket # 48). This motion should be denied for two reasons. First, its statement of material facts (Docket # 52) violates Local Civil Rule 56.1(d) inasmuch as none of the statements are "followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." Second, discovery has not yet begun in this case. Thus, a motion for summary judgment is premature and would merely result in a denial pursuant to Fed.R.Civ.P. 56(f). Odom previously filed a motion for summary judgment and it was denied for precisely this reason. *See* Order, filed Nov. 30, 2007 (Docket # 36) (available at: *Odom v. Calero,* 2007 WL 4191752 (S.D.N.Y. Nov. 28, 2007)).

*Conclusion*

For the foregoing reasons, the defendants' motion to dismiss the first and second causes of action (Docket # 20) should be granted in part and denied in part, with the only claim to proceed being the due process claim against Calero. Odom's motion for summary judgment (Docket # 48) should be denied.

### PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Lewis A. Kaplan, and

to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Kaplan. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985).

S.D.N.Y.,2008.

Odom v. Calero
Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)

(Cite as: 2005 WL 2000144 (W.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

W.D. New York.
Michael F. RAMSEY, Plaintiff,
v.
Glenn S. GOORD, Donald Selsky, Mr. Ryerson,
Thomas G. Eagen, John H. Nuttall, Michael McGinnis,
Paul Chapius, A. Bartlett, M. Sheahan, J. Irizarry, J.
Hale, J. Cieslak, Sgt. Litwilder, J. Ames, C.O. Clark,
C.O. Held, and P. Klatt, Defendants.
No. 05-CV-47A.

Aug. 13, 2005.
Michael F. Ramsey, Clinton Correctional Facility,
Dannemora, NY, pro se.

DECISION and ORDER

SKRETNY, J.

*INTRODUCTION*

**\*1** Plaintiff, an inmate formerly incarcerated at the
Elmira and Southport Correctional Facilities (hereinafter
"Elmira" and "Southport"), has brought this action
pursuant to 42 U.S.C. § 1983, and seeks permission to
proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915.
Plaintiff's complaint sets forth five claims alleging
violations of his constitutional and statutory rights. The
first and second claims set forth in the complaint relate to
a July, 2002 administrative hearing that was conducted on
disciplinary charges brought against him during his
sojourn at Elmira, and principally allege a violation of
plaintiff's due process rights. Plaintiff's third and fourth
claims allege violations of his right to practice his
religious beliefs by correctional employees and
supervisory personnel at Southport between February,
2004 and January, 2005. Plaintiff's fifth claim asserts that
prison officials at Southport interfered with his First and
Fourteenth Amendment rights when they deprived him of
paper and other materials necessary to his prosecution of
legal actions that he had previously filed. Plaintiff seeks

declaratory and injunctive relief as well as compensatory
and punitive damages with respect to each claim.

Plaintiff's application to proceed *in forma pauperis* is
granted. For the reasons set forth below, several of
plaintiff's claims are now dismissed pursuant to 28 U.S.C.
§§ (e)(2)(B) and 1915(A), and service by the U.S. Marshal
is directed with respect to the remaining claims.

*DISCUSSION*

Section 1915(e)(2)(B) of 28 U.S.C. provides that the
Court shall dismiss a case in which *in forma pauperis*
status has been granted if the Court determines that the
action: (I) is frivolous or malicious; (ii) fails to state a
claim upon which relief may be granted; or (iii) seeks
monetary relief against a defendant who is immune from
such relief. In addition, 28 U.S.C. § 1915A(a) requires the
Court to conduct an initial screening of "a complaint in a
civil action in which a prisoner seeks redress from a
governmental entity or officer or employee of a
governmental entity," *id.,* regardless of whether or not the
inmate has sought *in forma pauperis* status under 28
U.S.C. § 1915.

In evaluating the complaint, the Court must accept as
true all factual allegations and must draw all inferences in
plaintiff's favor. *See King v. Simpson,* 189 F.3d 284, 287
(2d Cir.1999). Dismissal is not appropriate "unless it
appears beyond doubt that the plaintiff can prove no set of
facts in support of his claim which would entitle him to
relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99,
2 L.Ed.2d 80 (1957). "This rule applies with particular
force where the plaintiff alleges civil rights violations or
where the complaint is submitted *pro se." Chance v.
Armstrong,* 143 F.3d 698, 701 (2d Cir.1998). Based on its
evaluation of the amended complaint, the Court finds that
several of plaintiff's claims must be dismissed pursuant to
28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b) because
they fail to state a claim upon which relief may be granted.

**\*2** Plaintiff brings this action pursuant to 42 U.S.C. §
1983. "To state a valid claim under 42 U.S.C. §§ 1983, the
plaintiff must allege that the challenged conduct (1) was
attributable to a person acting under color of state law, and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)

(Cite as: 2005 WL 2000144 (W.D.N.Y.))

(2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton,* 126 F.3d 400, 405 (2d. Cir.1997) (citing *Eagleston v. Guido,* 41 F.3d 865, 875-76 (2d Cir.1994)). In addition, a prerequisite for liability under § 1983 is "personal involvement" by the defendants in the alleged constitutional deprivation. *Spencer v. Doe,* 139 F.3d 107, 112 (2d Cir.1998).

*1. Claims Relating to July, 2002 Disciplinary Hearing (First and Second Claims)*

*(a) Due Process*

The first claim of plaintiff's complaint alleges that he was deprived of his procedural due process rights during a disciplinary hearing conducted before defendant Ryerson, a hearing officer at Elmira, which resulted on July 24, 2002 in the determination of guilt with respect to the charges brought against plaintiff, and the imposition of six moths punitive confinement with six months loss of good time and privileges. (Compl. pp. 4-5). Specifically, plaintiff claims that he was denied the following due process rights at the hearing: the right to call witnesses; the right to employee assistance; the right to hear and respond to the evidence against him; and the right to have the hearing electronically recorded. (Compl. p. 5). He asserts that defendants Selsky and Goord further violated his due process rights when they denied his appeal of Ryerson's determination.

Plaintiff's second claim also relates to the July, 2002 disciplinary hearing, and alleges that defendant Goord, Commissioner of the New York State Department of Correctional Services ("DOCS") ordered defendant Selsky, Director of the Special Housing Program for DOCS, to deny plaintiff's appeal of the July 24, 2002 disciplinary determination in retaliation for a complaint plaintiff had sent to Goord with respect to Goord's treatment of him. The complaint further alleges that following the denial of plaintiff's appeal of the July 24, 2002 determination by defendant Selsky, he sent a complaint to defendant Goord repeating the "blatant due process violations" that had allegedly been committed by defendant Ryerson during the disciplinary hearing, and alleging that Goord and Selsky's refusal to reverse

Ryerson's determination was done for the purpose of retaliating against him for the complaint he had filed against Goord. Following plaintiff's receipt of a letter from defendant Selsky informing him that no further action would be taken with respect to plaintiff's appeal of the disciplinary determination, plaintiff states that he filed an Article 78 petition in New York State Supreme Court challenging defendant Ryerson's determination. He alleges that after unnecessarily delaying the Article 78 proceeding for the purpose of prolonging plaintiff's stay in punitive confinement, defendant Ryerson administratively reversed defendant Ryerson's determination and then moved successfully to dismiss plaintiff's petition as moot. (Compl. pp. 3, 6-7).

**\*3** It is well settled that when a litigant makes a constitutional challenge to a determination which affects the overall length of his imprisonment, the "sole federal remedy is a writ of habeas corpus." *Preiser v. Rodriguez,* 411 U.S. 475, 500, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). Moreover, an inmate cannot use § 1983 to recover damages where "establishing the basis for the damages claim necessarily demonstrates the invalidity of the conviction," *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), and a § 1983 cannot lie "unless ... the conviction or sentence has already been invalidated" on direct appeal or by a habeas corpus petition. *Id.* at 487. The Supreme Court further held in *Edwards v. Balisok,* 520 U.S. 641, 646, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997), that habeas was the sole mechanism for an inmate's constitutional challenge to a prison disciplinary hearing which led to a revocation of the inmate's accrued good-time credits because the "principal procedural defect complained of," namely deceit and bias on the part of the disciplinary hearing officer, "would, if established, necessarily imply the invalidity of the deprivation [the inmate's] good-time credits."

While the determination that forms the gravamen of plaintiff's complaint in the instant matter did affect the overall length of his imprisonment to the extent that it imposed a loss of six months good time, his complaint is not barred under *Preiser* and *Heck* because plaintiff demonstrates that it was administratively reversed following his commencement of an Article 78 proceeding

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)

(Cite as: 2005 WL 2000144 (W.D.N.Y.))

in New York State Supreme Court.[FN1] *See, e.g., Odom v. Pataki,* 00 Civ. 3727, 2001 U.S. Dist. LEXIS 2790, at *7-8 (S.D.N.Y.2001) ("[A]n inmate may not assert a damages claim under § 1983 that attacks the fact or length of the inmate's confinement without first showing that the conviction has been reversed or otherwise invalidated.").

> FN1. Plaintiff attaches to his complaint documentation from the New York State Department of Correctional Services and the New York State Attorney General's Office which supports his claim that the July 24, 2002 disciplinary hearing determination was reversed, with all references to that determination expunged from plaintiff's record.

In determining whether plaintiff's first and second claims can go forward, the Court must also examine whether plaintiff has alleged the deprivation of a liberty interest that is entitled to constitutional protection. The administrative reversal of the July 24, 2002 disciplinary determination, and the expungement of that determination from plaintiff record, does not render plaintiff's due process claim non-justiciable, for plaintiff alleges that he served 121 days in "punitive confinement" prior to such reversal, during which he was handcuffed, chained and shackled whenever permitted to leave his cell.[FN2] (Compl. p. 5).

> FN2. The Court's determination that plaintiff served 121 days in punitive confinement is based upon the plaintiff's allegation that he was sentenced to six months of such confinement on July 24, 2002, and that his sentence was administratively reversed on November 22, 2002, pursuant to a Memorandum issued on the latter date by the Director of Special Housing/Inmate Discipline of the New York State DOCS, a copy of which is attached to the complaint.

In *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court ruled that the Constitution did not require that restrictive confinement within a prison be preceded by procedural due process protections unless the confinement subjected

the prisoner to "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484, 115 S.Ct. at 2300.[FN3] "Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence impose by a court of law," 515 U.S. at 485, 115 S.Ct. at 2301, and it is only where the prisoner's conditions of disciplinary confinement become an atypical and significant hardship based on a liberty interest created by state law that federal due process standards must be met. *See Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997) (holding that, while *Sandin* did not create a per se rule that disciplinary confinement may never implicate a liberty interest, where a prisoner fails to show the conditions to which he was subjected were "atypical and significant," summary judgment may nevertheless be granted).

> FN3. *Sandin* compared inmates in the SHU for disciplinary purposes to inmates in both the general inmate population and those in administrative segregation and protective custody. 515 U.S. at 485-86, 115 S.Ct. at 2301. Based on that comparison, the Court held that the plaintiff's 30-day SHU punishment did not "work a major disruption in his environment," *id.* at 486, 115 S.Ct. at 2301, and was "within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life." *Id.* at 487, 115 S.Ct. at 2302.

**\*4** Thus, in order to allege a cognizable due process claim, a § 1983 plaintiff must show that the "conditions of his [disciplinary] confinement ... were dramatically different from the basic conditions of [his] indeterminate sentence." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). In determining whether a prisoner has a liberty interest in remaining free from segregated confinement, district courts must make factual findings with respect to the alleged conditions of the confinement and the issue of its atypicality. *See, e.g., Welch v. Bartlett,* 196 F.3d 389, 393-95 (2d Cir.1997); *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997); *Miller,* 111 F.3d at 8-9; *Sealey v. Giltner,* 116 F.3d 47, 52 (2d Cir.1997). Several factors should be considered when assessing whether the particular restrictions imposed on the prisoner are atypical and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)

(Cite as: 2005 WL 2000144 (W.D.N.Y.))

significant, including: (1) the effect of the segregation on the length of the plaintiff's prison confinement; (2) the extent to which the conditions at issue differ from other routine prison conditions; and (3) the duration of the prisoner's disciplinary confinement compared to the potential duration a prisoner may experience while in discretionary confinement. _Wright_, 132 F.3d at 136.

In terms of the period of the number of days of punitive or other special confinement that will be regarded as sufficient implicate a prisoner's liberty interest, our Court of Appeals has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." _Palmer v. Richards,_ 364 F.3d 60, 64 (2d Cir.2004). Instead, the Court of Appeals have established guidelines to be used by district courts in determining whether a prisoner's liberty interest has been infringed. _Id._ Pursuant to these guidelines, the Court has ruled that where a prisoner has been confined for what it has termed an "intermediate duration," defined as between 101 and 305 days, the district court is required to develop a " 'detailed record' of the conditions of confinement relative to ordinary prison conditions." _Id._ at 65 (quoting _Colon v. Howard,_ 215 F.3d 227, 232 (2d Cir.2000)). The Court in _Palmer_ further instructed that in a case involving an intermediate term of confinement, the district court must examine the "actual circumstances" of SHU confinement "without relying on its familiarity with SHU conditions in previous cases." _Id._ (citing _Kalwasinski v. Morse,_ 201 F.3d 103, 106 (2d Cir.1999)).

In the instant case, plaintiff alleges that he was maintained in keeplock for 121 days, during which time he further alleges that he was subject to restraint by handcuffs, chains and shackles whenever he was allowed to leave his cell. It is not possible, based upon the allegations set forth in the complaint, for the Court to determine whether the conditions under which plaintiff was maintained were atypical within the meaning of _Sandin._ In light of the Second Circuit's directive that the district court must develop a detailed record concerning the nature of confinement conditions "where special confinement exceeds 101 days or there is any other indication of atypicality," _Harris v. McGinnis,_ No. 02 Civ. 6481, 2004 U.S. Dist. Lexis 19500, at *14 (S.D.N.Y.2004), the Court concludes that the complaint

sufficiently alleges that plaintiff was deprived of a liberty interest.

**\*5** To state a due process claim, plaintiff must also allege that the defendants "deprived him of [a liberty] interest as a result of insufficient process." _Ortiz v. McBride,_ 380 F.3d 649, 654. Under the Fourteenth Amendment, the procedural protections required when the length or conditions of confinement implicate due process protections: "advance notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." _Luna v. Pico,_ 356 F.3d 481, 487 (2d Cir.2004) (citing _Kalwasinski v. Morse,_ 201 F.3d 103, 108 (2d Cir.1999)). In light of the plaintiff's allegations, noted above, concerning how his due process rights were infringed at the July 24, 2002 hearing, and given the Court's duty to construe liberally the pleadings of _pro se_ plaintiffs, the Court determines that the plaintiff's first and second claims sufficiently allege that his liberty interest was deprived as a result of insufficient process.[FN4]

> **FN4.** The Court notes that while plaintiff does specify in his complaint the precise nature of the alleged deprivation of due process that occurred at the July 24, 2002 hearing, the complaint is pretty thin in terms of allegations of specific facts showing precisely how plaintiff's due process rights were interfered with. The Court's decision to allow plaintiff's due process claims to proceed despite the sparseness of his factual allegations stems from the fact that the administrative reversal of the hearing determination is stated to have been based upon error by the hearing officer. (DOCS Memorandum 11/22/02 attached to complaint).

There remains, however, the question of whether plaintiff has alleged sufficient involvement by defendants Ryerson, Goord and Selsky in the claimed deprivation of his due process rights. A prerequisite for liability under a § 1983 claim is "personal involvement" by the defendants in the alleged constitutional deprivation. _Spencer v. Doe,_ 139 F.3d 107, 112 (2d Cir.1998). Under this requirement, there may be liability if:

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)

(Cite as: 2005 WL 2000144 (W.D.N.Y.))

(1) the defendant participated directly in the alleged constitutional violation; or (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which the unconstitutional practices occurred or allowed the continuance of such policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). A claim which fails to demonstrate a defendant's personal involvement in the alleged constitutional deprivation is subject to *sua sponte* dismissal. *Montero v. Travis,* 171 F.3d 757, 761-62 (2d. Cir.1999) (citing *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)); *see Neitzke v. Williams,* 490 U.S. 319, 323 n. 2, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

Plaintiff's due process claim against defendant Ryerson stems from Ryerson's role as the hearing officer at the hearing which concluded on July 22, 2002, and the Court finds that Ryerson's alleged role in presiding over the hearing is sufficient to allege personal involvement. Accordingly, plaintiff's first claim, alleging deprivation of due process, will be allowed to go forward against defendant Ryerson.

The Court's determination is different, however, with respect to plaintiff's due process claims against defendants Selsky and Goord. Plaintiff alleges in his first claim that he appealed Ryerson's disciplinary determination to Goord, and that defendant Selsky responded on Goord's behalf, advising him that his appeal was denied. In his second claim he further alleges that he sent two letters to defendant Goord complaining about the treatment to which he had been subjected at the disciplinary hearing. Once again responding on behalf of Commissioner Goord, defendant Selsky advised plaintiff that no further action would be taken by Selsky or Goord with respect to plaintiff's complaint about his treatment at the hearing. (Compl. pp. 6-7). Plaintiff's allegations are not sufficient to allege personal involvement by defendants Selsky and

Goord with respect to plaintiff's due process claims.[FN5]

FN5. While plaintiff alleges that defendant Goord ordered defendant Selsky to deny plaintiff's appeal as a means of punishing and retaliating against plaintiff for having complained to Goord, plaintiff alleges no facts that would support this allegation and it is not self-evident how plaintiff would have been in a position to know that Goord "ordered" Selsky to punish and retaliate against plaintiff. Plaintiff similarly alleges no facts to support his claim that Goord requested "lengthy delays and unnecessary extensions" in responding to plaintiff's Article 78 complaint.

*6 It is well-established that "mere linkage in the prison chain of command" is not sufficient to support a claim of personal involvement. *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1995); *see also Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) ("The bare fact that [the defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [plaintiff's] claim."). Moreover, the fact that Commissioner Goord and SHU Director Selsky, as officials in the DOCS "chain of command," affirmed defendant Ryerson's determination on appeal is not enough to establish personal involvement of their part. *Page v. Breslin,* 02-CV-6030, 2004 U.S. Dist. LEXIS 25056, at *21-22 (E.D.N.Y.2004); *Foreman v. Goord,* 02 Civ. 7089, 2004 U.S. Dist. LEXIS, at *21-22 (S.D.N.Y.2004). In addition, the fact that defendant Goord apparently referred plaintiff's appeal and letter-complaints to defendant Selsky for resolution is not enough to establish personal involvement on the part of Goord. *See Lunney v. Brureton,* 04 Civ. 2438, 2005 U.S. Dist. LEXIS 770, at *45-46 (S.D.N.Y.2005) (citing *Sealy v. Giltner,* 116 F.3d 47, 51 (2d cir.1997)") ("[S]ubmitting an appeal or complaint to a subordinate for disposition is not sufficient to find personal involvement."). The Court therefore determines that plaintiff's due process claims against defendants Selsky and Goord must be dismissed.

*(b) Malicious Prosecution, First Amendment, Equal Protection*

In addition to his due process arguments, plaintiff's

Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)

(Cite as: 2005 WL 2000144 (W.D.N.Y.))

first and second claims set forth additional bases for his challenges to the disciplinary proceeding concluded on July 24, 2002. He alleges that he was the victim of malicious prosecution, and that defendants Selsky and Goord's initial refusal to reverse the disciplinary determination stemmed from their decision to retaliate against plaintiff for complaining about their treatment of him, thereby violating his First Amendment rights. Plaintiff also invokes the equal protection clause.

Plaintiff fails to specifically indicate which actions of the defendants are alleged to constitute "malicious prosecution." However, based upon the factual recitals set forth in his statement of his first and second claims, it would appear that plaintiff is contending that the refusal of defendants Selsky and Goord to reverse defendant Ryerson's determination on appeal until after plaintiff had commenced an Article 78 proceeding with respect to that determination constituted "malicious prosecution."

"To prevail on a malicious prosecution claim under either New York law or § 1983, a plaintiff must show that the defendant maliciously commenced or continued against the plaintiff a criminal proceeding that ended in the plaintiff's favor, and that there was no probable cause for the proceeding." Marshall v. Sullivan, 105 F.3d 47, 50 (2d Cir.1996) (citing Posr v. Doherty, 944 F.2d 91, 100 (2d Cir.1991)). Further, only those claims of malicious prosecution that implicate Fourth Amendment rights can be appropriate bases for malicious prosecution claims brought under § 1983. Washington v. County of Rockland, 373 F.3d 310, 316 (2d Cir.2004) (citing Albright v. Oliver, 510 U.S. 266, 274-75, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). A claim for malicious prosecution under § 1983 may not be premised on an administrative disciplinary proceeding, at least in the absence of a claim of a violation of Fourth Amendment rights. Id. at 315.

*7 The disciplinary proceeding challenged by plaintiff in the instant matter was not a criminal prosecution, see Wolff v. McDonnell, 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) ("Prison disciplinary proceedings are not part of a criminal prosecution ...."), and plaintiff alleges no violation of Fourth Amendment rights. Accordingly, to the extent the first and second claims in the complaint are based upon the defendants' alleged

malicious prosecution of him, they must be dismissed.

Plaintiff's invocation of his First Amendment rights to free speech and to petition the government as another basis for his second claim is understood to relate to his allegation that defendant Selksy denied plaintiff's appeal from the July 24, 2002 disciplinary determination in retaliation for his sending a letter to defendant Goord criticizing certain statements Goord had made in a DOCS newsletter. (Compl.P. 6).

It is well established that prison officials may not retaliate against inmates for exercising their constitutional rights. See, e .g., Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir.1995); Franco v. Kelly, 854 F.2d 584, 589 (2d Cir.1988). To state a retaliation claim under § 1983, "a plaintiff must show that: (1) his actions were protected by the Constitution or federal law; and (2) the defendant's conduct complained of was in response to that protected activity." Friedl v. City of New York, 210 F.3d 79, 85 (2d Cir.2000) (internal quotation and citation omitted). As to the second prong, a prisoner alleging retaliation must show that the protected conduct was "a substantial or motivating factor" behind the alleged retaliatory conduct. See Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996). Evidence that can lead to an inference of improper motive includes: (1) the temporal proximity of the filing of a grievance and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining plaintiff. See Colon, 58 F.3d at 872-73.

Because claims of retaliation are easily fabricated, the courts must "examine prisoners' claims of retaliation with skepticism and particular care," Colon, 58 F.3d at 872, requiring " 'detailed fact pleading ... to withstand a motion to dismiss." ' Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983) (quoting Angola v. Civiletti, 666 F.2d 1, 4 (2d Cir.1981)). To survive a motion to dismiss, such claims must be " 'supported by specific and detailed factual allegations," ' and should not be stated " 'in wholly conclusory terms." ' Friedl, 210 F.3d at 85-86 (quoting Flaherty, 713 F.2d at 13); see also Graham, 89 F.3d at 79 (wholly conclusory claims of retaliation "can be dismissed on the pleadings alone"); Gill v. Mooney, 824 F.2d 192,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)

(Cite as: 2005 WL 2000144 (W.D.N.Y.))

194 (2d Cir.1987) (same).

Moreover, only those retaliatory acts that are likely to "chill a person of ordinary firmness from continuing to engage" in activity protected by the First Amendment are actionable under § 1983; in other words, allegations of *de minimis* acts of retaliation do not state a claim under § 1983. *Thaddeus-X v. Blatter,* 175 F.3d 378, 397 (6th Cir.1999) (cited with approval in *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)). See *Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999) (on remand, district court must consider the "serious question" of "whether the alleged acts of retaliation ... were more than *de minimis"* in deciding summary judgment motion). A *de minimis* retaliatory act is outside the ambit of constitutional protection. *Dawes,* 239 F.3d at 492.

**\*8** There is nothing in plaintiff's complaint to support his claim that his appeal from July 24, 2002 was denied in retaliation for his having sent a complaint to defendant Goord beyond: (1) the temporal proximity between his filing of his complaint and the denial of his appeal and (2) his recital of an accusation of retaliation that he leveled against Goord and Selsky in a second letter that he sent to Goord following the denial of his appeal. Plaintiff fails, however, to point to anything said or otherwise communicated to him by Goord or Selsky or by any other prison official or employee that supports his claim that defendants' denial of his appeal was intended to retaliate against him for exercising his First Amendment rights. The Court therefore finds that plaintiff's claim of retaliation is wholly conclusory and therefore that his First Amendment claims (free speech, right to petition) should be dismissed. Further, the Court finds nothing in plaintiff's statement of his first and second claims that would support his allegation that defendants Goord and Selsky violated his equal protection rights, and those claims must likewise be dismissed.

*2. Claims Alleging Deprivation of Religious Freedom (Third and Fourth Claims)*

Plaintiff's third and fourth claims principally allege that prison officials took actions that had the effect of depriving him of his right to freely exercise his religious beliefs.

Plaintiff's third claim alleges that Jewish inmates like himself were subjected at Southport to certain delays and restrictions on their right to be fed food prepared in accordance with the prescribed kosher rules. Specifically, he asserts that only Jewish inmates were forced to wait ten to twenty days after their arrival at Southport before being provided with a kosher diet, disciplined for giving away food they do not eat or want and denied meat alternatives for meat items on the kosher menu. (Compl. p. 8). Curiously, plaintiff's complaint does not identify the officials or employees at Southport who were responsible for such alleged discriminatory treatment of Jewish inmates. Instead, his third claim focuses on the alleged failure of supervisory personnel to take favorable action in response to the grievances and letters plaintiff submitted to them in which he complained about the facility's "discriminatory policies and practices." He alleges that in February, 2004 he filed a grievance complaining about religious discrimination, but that acting Superintendent Chappius and Superintendent McGinnis upheld the denial of the grievance, as did defendant Eagan, the director of the DOCS Inmate Grievance Program, to whom plaintiff subsequently appealed.[FN6]

> **FN6.** Plaintiff attaches to his complaint copies of the relevant decisions denying his grievances, which the Court has reviewed.

As previously noted in connection with the Court's assessment of plaintiff's disciplinary hearing claims, personal involvement of a defendant in an alleged Constitutional violation is a prerequisite for liability under § 1983. Here, plaintiff does not allege that defendants Goord, Eagan, McGinnis and Chappius were personally involved in the alleged deprivations of plaintiff's free exercise rights. Instead, plaintiff seeks to sue them because of their refusal to reverse the denial of his grievance. As previously noted, the fact that a prison official in the prison "chain of command" affirms the denial of an inmate's grievance is not enough to establish the requisite personal involvement of that official. *Page v. Breslin,* 02-CV-6030, 2004 U.S. Dist. LEXIS 25056, at \*21-22 (E.D.N.Y.2004); *Foreman v. Goord,* 02 Civ. 7089, 2004 U.S. Dist. LEXIS, at \*21-22 (S.D.N.Y.2004); *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002); *Villante v. N.Y. State Dep't of Corr. Servs.,* 96-CV-1484,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)

(Cite as: 2005 WL 2000144 (W.D.N.Y.))

2001 U.S. Dist. LEXIS 25208, at *17 (N.D.N.Y.2001). This point was well-stated in *Joyner v. Greiner,* in which the Court dismissed a former inmate's Eighth Amendment claim against the Superintendent of the Sing Sing Correctional Facility which was premised upon the Superintendent's denial of a grievance the inmate had filed with respect to the medical treatment he had received:

**\*9** The fact that Superintendent Greiner affirmed the denial of plaintiff's grievance-which is all that is alleged against him-is insufficient to establish personal involvement or to shed any light on the critical issue of supervisory liability, and more particularly, knowledge on the part of the defendant.

195 F.Supp.2d at 506 (internal quotation marks and citation omitted).

This principle applies to superintendents, commissioners, and other prison officials who are in the chain of command with respect to the grievance review process. *See, e.g., Breslin,* 2004 U.S. Dist. LEXIS at *21-22 (dismissing claim against superintendent based upon "mere affirmation of grievance denial"); *Foreman,* 2004 U.S. Dist. LEXIS at *21-22 (dismissing claims against Commissioner and prison superintendent).

Accordingly, the Court determines that plaintiff's claims against defendants Goord, Eagen, McGinnis, and Chappius alleging violations of his freedom of religion, due process and equal protection rights, as set forth in the "third claim" of his complaint, must be dismissed in their entirety for failure to allege the requisite personal involvement by the defendants.

Plaintiff's fourth claim also relates to the alleged deprivation by prison officials of kosher food, but other things are added to a create convoluted assortment of allegations. Specifically, plaintiff asserts that his rights to free speech and to petition were interfered with, and that he was subjected to malicious prosecution and discrimination.

Plaintiff's fourth claim alleges that in retaliation for having provided a statement supporting a fellow Jewish inmate who had been involved in a dispute with defendant C.O. Clark, Clark advised plaintiff that he was being removed from the kosher meal program. Plaintiff asserts that this retaliatory denial of kosher food, which began on July 29, 2004, continued for about a month thereafter, ending (on September 4, 2004) after plaintiff had filed grievances with respect to the defendants' actions in connection with plaintiff's exclusion from kosher meals, and related retaliatory actions allegedly undertaken by several of the defendants.[FN7] Plaintiff claims that defendant Held initially ordered him removed from the kosher meal program, and that defendant Irizarry subsequently sent plaintiff a letter advising him that he was being removed from the kosher meal "for allegedly violating a facility rule."

FN7. Several of the memoranda and grievance decisions by DOCS officials attached to the complaint indicate that plaintiff had been removed from the "Cold Alternative Meal Program" as a result of "program violations" by the plaintiff (specifically, that plaintiff was giving away or trading his food) and not in retaliation for something plaintiff had done.

Plaintiff then chronicles his attempts to appeal defendant Irizarry's determination, initially to defendant McGinnis. He alleges that McGinnis was advised by the facility Rabbi that Irizarry's actions violated plaintiff's religious dietary laws, and that he should immediately be returned to the kosher meal program, but McGinnis disregarded the Rabbi's advice and upheld Irizarry's determination. Thereafter plaintiff appealed McGinnis's affirmation of Irizarry's decision to defendant Goord. However, following the resumption of plaintiff's kosher meals on September 4, 2004, defendant DOCS deputy Commissioner Nuttal, responding on behalf of Goord, informed plaintiff that the issue was "closed," and that no actions would be taken in response to the issues raised in plaintiff's complaints and appeals. Two additional grievances subsequently filed by plaintiff were, he claims, likewise ignored.

**\*10** The Court finds that plaintiff's allegations are sufficient to allow his fourth claim asserting violations of his free exercise, right to petition, due process, and equal protection rights to proceed against defendants Klatt,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)

(Cite as: 2005 WL 2000144 (W.D.N.Y.))

Clark, Held, Irizarry, McGinnis, and Sheahan.[FN8]

> [FN8.] While the allegations in plaintiff's fourth claim against defendants McGinnis and Sheahan would appear to be essentially based upon their denial of plaintiff's appeal of defendant Irizarry's decision to remove plaintiff from the kosher food program, and might therefore be dismissed for failure to allege those defendant's personal involvement in the violation of plaintiff's constitutional rights (see discussion set forth in the Court's dismissal of plaintiff's third claim *supra* ), the Court finds that plaintiff's allegation that the facility Rabbi spoke to defendant McGinnis, but McGinnis disregarded his advice sufficiently alleges personal involvement against defendant McGinnis (and by extension, defendant Sheahan, who plaintiff alleges acted in concert with McGinnis) to allow plaintiff's fourth claim against McGinnis and Sheahan to go forward.

The Court further finds, however, that plaintiff's fourth claim must be dismissed with respect to defendants Goord, Nuttal, Cieslak and Eagan. Plaintiff's allegations against these defendants with respect to his fourth claim are based upon the fact that they refused to reverse the denial of several grievances filed by plaintiff with respect to his claims of religious discrimination and denial of due process. As explained by the Court in addressing plaintiff's third claim, *supra,* the mere fact that a prison official in the prison "chain of command" has occasion to pass upon a prisoner's grievance is not sufficient to establish personal involvement in an alleged denial of a plaintiff's constitutional rights. *See, e.g., Joyner v. Greiner,* 195 F.Supp. at 506. Similarly, the fact that plaintiff also sent letters to defendant Goord "pleading for him to take corrective actions," but that Commissioner Goord and Deputy Commissioner Nuttall took no corrective action in response to his missives is not sufficient to hold Goord or Nuttal liable under § 1983. *See Sealey,* 116 F.3d at 51.

Plaintiff also asserts in his fourth claim that he was the victim of malicious prosecution and failure to protect, but the complaint does not allege the predicate facts necessary to support these allegations, and they are accordingly dismissed against all defendants.

*3. Claim of Denial of Access to Court and Right to Petition (Fifth Claim)*

Plaintiff's fifth claim asserts that his rights to petition for redress of grievances and for access to the Courts were interfered with when defendants Ames and Litwilder, in February/March 2004, confiscated all of his writing paper and carbon paper, denied him law library materials, would not allow him to use a stapler, and refused to allow him to have his briefs and affidavits in a state court case to be bound in accordance with the rules of the New York State Supreme Court, Second Judicial Department, causing his papers to be rejected. Plaintiff filed grievances with respect to these alleged interferences with his rights, but his grievances were denied or ignored by defendants Bartlett, Hale, and Cieslak, as were his ensuing appeals to defendants McGinnis, Chapius and Eagan.

Plaintiff's allegations that the denial of his access to materials necessary to prepare or perfect his grievances and lawsuits materially prejudiced his ability to pursue such grievances and legal actions are sufficient to state a claim that his right of access to the courts was unconstitutionally hindered. *Ramsey v. Coughlin,* No. 94-CV-9S( F), 1 F.Supp.2d 198, 204-205 (W.D.N.Y.1998) (Magistrate's Report and Recommendation). Plaintiff's fifth claim will therefore be allowed to proceed against defendants Ames and Litwilder.

**\*11** However, plaintiff's fifth claim must be dismissed with respect to defendants Bartlett, Hale, Cieslak, McGinnis, Chapius and Eagan. With respect to these defendants, plaintiff's allegations fail to allege the requisite personal involvement. As previously noted, the fact that defendants failed to respond to plaintiff's letters or, as links in the prison system "chain of command," affirmed the denial or dismissal of plaintiff's grievances, is not sufficient to establish their liability under Section 1983. *See, e.g., Page v. Breslin,* 2004 U.S. Dist. LEXIS at *21-22; *Foreman v. Goord,* 2004 U.S. Dist. LEXIS, at 19-22; *Joyner v. Greiner,* 195 F.Supp.2d at 15.

*CONCLUSION*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)

(Cite as: 2005 WL 2000144 (W.D.N.Y.))

In accordance with the foregoing, the Court determines that:

Plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and filed an Authorization with respect to the filing fee. Accordingly, plaintiff's request to proceed *in forma pauperis* is granted.

All claims against defendants Goord, Selsky, Eagan, Chappius, Nuttal, Cieslak, Bartlett, and Hale are dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A.

Plaintiff's malicious prosecution claim as set forth in the "first claim" of his complaint is dismissed as to all defendants enumerated therein.

Plaintiff's free exercise of religion, due process, equal protection/discrimination claims set forth in the "third claim" of his complaint are dismissed as to all defendants enumerated therein.

Plaintiff's malicious prosecution and failure to protect claims set forth in the "fourth claim" of his complaint are dismissed as to all defendants enumerated therein.

Plaintiff's due process claim set forth in the "first claim" of his complaint survives as to defendant Ryerson.

Plaintiff's free exercise of religion, right to petition, due process, and equal protection claims set forth in the "fourth claim" of his complaint survive as to defendants Klatt, Clark, Held, Irizarry, McGinnis and Sheahan.

Plaintiff's access to court, right to petition, and due process claims set forth in the "fifth claim" of his complaint survive as to defendants Ames and Litwilder.

The U.S. Marshal is directed to serve the summons, complaint and this Order on defendants Ryerson, Klatt, Clark, Held, Irizarry, McGinnis, Sheahan, Ames and Litwilder regarding the claims against those defendants which survive, as enumerated above.

*ORDER*

IT HEREBY IS ORDERED that plaintiff's claims against defendants Selsky, Goord, Eagan, Chappius, Nuttal, Cieslak, Bartlett and Hale are dismissed with prejudice;

FURTHER, that the Clerk of the Court is directed to terminate as parties to this action defendants Selsky, Goord, Eagan, Chappius, Nuttal, Cieslak, Bartlett and Hale;

FURTHER, that the Clerk of the Court is directed to file plaintiff's papers, and to cause the United States Marshal to serve copies of the summons, complaint and this Order upon defendants Ryerson, Klatt, Clark, Held, Irizarry, McGinnis, Sheahan, Ames and Litwilder without plaintiff's payment therefore, unpaid fees to be recoverable if this action terminates by monetary award in plaintiff's favor;

**\*12** FURTHER, that pursuant to 42 U.S.C. § 1997e(g)(2), the defendants are directed to answer the complaint.

SO ORDERED.

W.D.N.Y.,2005.

Ramsey v. Goord
Not Reported in F.Supp.2d, 2005 WL 2000144 (W.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
No. 97-CV-1385 LEK DRH.

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments. [FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

## I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

## II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

## III. Discussion

### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989);* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6965105 (N.D.N.Y.)

(Cite as: 2012 WL 6965105 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Lerome HILSON, Plaintiff,
v.
M. MALTESE, et al., Defendants.
No. 9:09–CV–1373 (NAM/ATB).

Dec. 14, 2012.

Lerome Hilson, pro se.

Megan M. Brown, Asst. Attorney General for Defendant.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.
*1 This matter was referred for Report and Recommendation on March 22, 2012 by U.S. District Judge Norman A. Mordue, pursuant to 28 U.S .C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In his amended civil rights complaint, plaintiff alleges that Corrections Officers Maltese, Ryder, and Dinkins physically and sexually assaulted him, and/or failed to intervene to protect him, during a "strip frisk" at Five Points Correctional Facility ("Five Points") on June 12, 2008. (Amended Complaint ("AC"), Dkt. No. 37). Plaintiff seeks substantial monetary damages and injunctive relief. (*Id.*).[FN1]

> FN1. The amended complaint also included claims against several John or Jane Doe defendants; but plaintiff subsequently moved to withdraw his claims against the unidentified defendants, which motion Judge Mordue granted. (Dkt.Nos.47, 48).

Presently before the court is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt.Nos.51, 52). Plaintiff opposes defendants' motion. (Dkt. No. 54).[FN2] Defendants argue that (1) defendants did

not violate plaintiff's Eight Amendment rights because their use of force against him was de minimis and was applied in a good faith effort to maintain or restore discipline, not maliciously and sadistically; (2) plaintiff's misconduct was the proximate cause of the minor injuries that he suffered; and (3) the defendants are entitled to qualified immunity. (Def.s' Memo. of Law at 1, Dkt. No. 51–10). Based on the record, including a videotape of the entire incident, this court concludes that no rational fact finder could conclude that plaintiff has established an Eighth Amendment claim for excessive force or sexual assault. Accordingly, this court recommends that defendants' motion for summary judgment be granted and that plaintiff's amended complaint be dismissed in its entirety.

> FN2. Plaintiff also filed a letter which the Clerk construed as a motion for a temporary restraining order/preliminary injunction. (Dkt. No. 57). After the defendants filed opposition to that motion (Dkt. No. 58), plaintiff advised the court that he did not intend to move for injunctive relief and withdrew the motion (Dkt. No. 59).

**DISCUSSION**

**I. FACTS**

Plaintiff alleges that, on June 12, 2008, he and other inmate mess hall workers were going, as ordered, to pick up food service carts when he encountered defendant Maltese. Plaintiff alleges that C.O. Maltese ordered plaintiff to submit to a pat frisk, using degrading language. (AC, Dkt. No. 37 at 6).[FN3] Defendant Maltese and a correction sergeant (identified in the amended complaint only as "John Doe") then escorted plaintiff to a separate room to conduct a strip frisk. (*Id.*). Plaintiff alleges that C.O. Maltese continued to act unprofessionally, and that a female correction officer kept coming into the room, making plaintiff "very uncomfortable." However, Sgt. Doe refused plaintiff's request that another correction officer take over the strip frisk. (AC at 6–7).

> FN3. Because plaintiff organized his amended complaint without consecutive paragraph or page

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6965105 (N.D.N.Y.)

(Cite as: 2012 WL 6965105 (N.D.N.Y.))

numbers, the court will reference the page numbers assigned by the court's Case Management/Electronic Filing system.

Plaintiff alleges that, although he complied with the officer's directions in connection with the ensuing strip frisk, C.O. Maltese and Sgt. Doe pushed plaintiff against the wall and began to assault him by, *inter alia,* hitting him in the face. (AC at 7). Plaintiff was forced to the floor and placed in handcuffs and leg restraints. C.O. Maltese then allegedly sat on plaintiff's back "and used his hands to spread open my buttcheeks attempting to stick his finger in my anus then fondling my scrotum by holding it and squeezing it while smacking my ass; resulting in sexual assault...." (*Id.*). Plaintiff alleges that C.O. Ryder and C .O. Dinkins were present during the strip frisk and used excessive force against the plaintiff and/or failed to intervene to protect him from the physical and sexual assault. (AC at 7, 9).

**\*2** The amended complaint alleges that plaintiff suffered nightmares and fear as a result of this incident, causing him to seek psychiatric treatment. (AC at 8). During his deposition, plaintiff described his physical injuries to include swelling on his lips and bruising on his face, back, side, arm, and wrists. (Plf.'s Dep. at 32, 36, 45, Dkt. No. 51–5).

The declarations and reports of C.O. Maltese and other employees of the Department of Corrections and Community Supervision ("DOCCS") describe the incident on June 12, 2008 quite differently. C.O. Maltese conducted a strip frisk of plaintiff, with the approval of Sgt. Elsenheimer, after defendant Maltese observed plaintiff "walking in an unusual manner" and discovered, during a pat frisk, "an unidentifiable bulge in [plaintiff's] groin area." (Unusual Incident Rept., Dkt. No. 52–1 at 11–13; Use of Force Report, Dkt. No. 52–1 at 14; 6/12/2008 Maltese Mem., Dkt. No. 52–1 at 30–32; Maltese Decl., Dkt. No. 51–7).

During the strip frisk, the defendants used force to subdue and restrain plaintiff when he reportedly refused to follow instructions to lift his penis and testicles, became irate, and raised closed fists towards defendant Maltese. (*Id.;* 6/12/08 Elsenheimer Mem., Dkt. No. 52–1 at 36–37;

Dinkins Decl., Dkt. No. 51–8; Ryder Decl., Dkt. No. 51–9). As discussed below, the videotape, while it does not clearly show every detail of this frenetic incident, strongly corroborates the defendants' version of plaintiff's conduct before force was used by the correction officers. After plaintiff was restrained on the floor, C.O. Maltese then completed the strip frisk, using gloved hands to separate plaintiff's buttock cheeks. (6/12/2008 Maltese Mem.; 6/12/08 Elsenheimer Mem.). The DOCCS reports and medical records, including color photographs of plaintiff taken shortly after the incident, document that plaintiff suffered only a 5 cm. raised area on his right eyebrow and a 5 cm. swollen and red open area on his right cheek. (Dkt. No. 52–1 at 15–23).

The strip frisk resulted in the discovery and seizure of 21 concealed contraband cigarettes, which reportedly fell to the floor when plaintiff removed his pants, and a rolled-up brown paper towel found between plaintiff's buttocks. (Maltese Decl. ¶¶ 17–18, 28; 6/12/2008 Maltese Mem.; 6/12/08 Elsenheimer Mem.; photograph logs and photographs of contraband, Dkt. No. 52–1 at 24–26). As a result of the incident, plaintiff was issued a misbehavior report charging him with creating a disturbance, refusing to obey a direct order, harassment, smuggling contraband, violating search and frisk policies, and destruction of state property. (Dkt. No. 54–2 at 125–27).

A transcript of the disciplinary hearing indicates that plaintiff pled guilty to all charges, acknowledging that he "f—ed up" and that the situation "escalated and got out of proportion." (Dkt. No. 54–2 at 131–35). During his deposition, plaintiff denied that he had any contraband on June 12, 2008, denied that he pled guilty to the charges at the hearing, and claimed that what really happened at the hearing was being covered up. (Plf.'s Dep. at 65–70). Plaintiff acknowledged that he did not appeal the guilty disposition on the disciplinary charges, despite his professed innocence. (*Id.;* Dkt. No. 54–2 at 128–29).

## II. *APPLICABLE LAW*

### A. Summary Judgment

**\*3** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6965105 (N.D.N.Y.)

(Cite as: 2012 WL 6965105 (N.D.N.Y.))

as a matter of law. Fed.R.Civ.P. 56; _Salahuddin v. Goord,_ 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." _Anderson v. Liberty Lobby,_ 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. _Gallo v. Prudential Residential Servs.,_ 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. _Celotex Corp. v. Catrett,_ 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. _Salahuddin v. Goord,_ 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." _Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,_ 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. _See United States v. Diebold, Inc .,_ 369 U.S. 654, 655 (1962); _Salahuddin v. Goord,_ 467 F.3d at 272.

**B. Eighth Amendment**

**1. Excessive Force**

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. _Hudson v. McMillian,_ 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." _Gregg v. Georgia,_ 428 U.S. 153, 173 (1976); _Sims v.. Artuz,_ 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. _Blyden v. Mancusi,_ 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " _Whitely v. Albers,_ 475 U.S. 312, 327 (1986) (citation omitted); _Hudson,_ 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se [,]" regardless of the seriousness of the injuries. _Blyden,_ 186 F.3d at 263 (citing _Hudson,_ 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." _Hudson,_ 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " _Sims,_ 230 F.3d at 22 (citation omitted).

**\*4** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." _Id,_ at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " _Id._ (quoting _Hudson,_ 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." _Scott v. Coughlin,_ 344 F.3d 282, 291 (2d Cir.2003).

**2. Sexual Abuse**

While allegations of sexual abuse may, in some circumstances, violate the Eighth Amendment, isolated incidents of harassment, involving verbal harassment and touching are not severe enough to be "objectively, sufficiently serious." _Boddie v. Schnieder,_ 105 F.3d 857, 860, 861 (2d Cir.1997). The court held that the "isolated episodes of harassment and touching alleged by Boddie are despicable and, if true, they may be potentially be the basis of state tort actions. But they do not involve a harm

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6965105 (N.D.N.Y.)

(Cite as: 2012 WL 6965105 (N.D.N.Y.))

of federal constitutional proportions...." *Id.* at 861–62.

**3. Failure to Intervene**

A correction officer who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate. *See, e.g., Tafari v. McCarthy,* 714 F.Supp.2d 317, 342 (N.D.N.Y. May 24, 2010); *Cicio v. Graham,* No. 9:08–CV–534 (NAM/DEP), 2010 WL 980272, at *13 (N.D.N.Y. March 15, 2010). A law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated by other officers in his or her presence. *Id.*[FN4] In order to establish liability under this theory, a plaintiff must prove that the defendant in question (1) possessed actual knowledge of the use by another correction officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Id.; Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted).

> FN4. *See also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be."); *Anderson v. Branen,* 17 F .3d 552, 557 (2d Cir.1994) ("all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence").

**III. *ANALYSIS***

There is no dispute that the defendants applied force to plaintiff during the course of a strip frisk on June 12, 2008. Defendant Maltese contends that, when he ordered plaintiff to lift his penis and testicles as part of the strip frisk procedure, plaintiff grabbed his penis and shook it at the officer, saying "F—you, I'm not doing another thing for you!" (Maltese Decl. ¶ 20; 6/12/2008 Maltese Mem. at 2). C.O. Maltese alleges that plaintiff was yelling and waving his arms and that he raised his right arm and a clenched fist level with the officer's face. (Maltese Decl. ¶¶ 21–22; 6/12/2008 Maltese Mem. at 2–3). Defendant

Maltese states that he began to fear for his safety and determined that he needed to gain control of the plaintiff before the situation escalated further, so he pushed defendant backward and grabbed plaintiff's head and neck to force him to the floor. (Maltese Decl. ¶ 23–24; 6/12/2008 Maltese Mem. at 3). Other officers then began to assist C.O. Maltese in subduing plaintiff and placing him in restraints, after which defendant Maltese completed the strip frisk, by spreading plaintiff's buttocks while he was lying face down on the floor. (Maltese Decl. ¶ 25–28; 6/12/2008 Maltese Mem. at 3).

**\*5** During his deposition, plaintiff conceded that "he never really wanted to comply with the rest of [the strip search]," and that C.O. Maltese directly ordered him to comply "numerous" times. (Plf.'s Dep. at 30–31). Plaintiff claimed that he did not lift his hands up to cause any physical harm to the correction officer. (Plf.'s Dep. at 30). He contends that once the officers had him in a body hold, he did not resist. (Plf.'s Dep. at 39). Plaintiff further alleged that defendant Maltese punched him repeatedly, seven to eight times, in the face and that plaintiff was also kicked. (Plf.'s Dep. at 35, 45). During his October 2011 deposition, plaintiff acknowledged that the video of the June 12, 2008 incident, which he last viewed in 2009, was an "accurate depiction of what happened." (Plf.'s Dep. at 41, 72).[FN5]

> FN5. In his July 24, 2008 Notice of Intention to File Claim, plaintiff claims that he "was assaulted by the officers off camera." (Dkt. No. 54–2 at 27). Plaintiff has consistently alleged that the officers who assaulted him were C.O. Maltese and "Sgt. Doe" (who was presumably Sgt. Elsenheimer). In his deposition, plaintiff acknowledges that he was escorted from the strip frisk room after the incident by officers other than Maltese and the sergeant. (Plf.'s Dep. at 42). The video tape, which has a running time signature by hour, minute, and second, shows the entire incident, from plaintiff's escort into the strip frisk room by C.O. Maltese to his escort out of the same room by other officers, with no apparent gaps during which plaintiff might have been assaulted "off camera."

This court has carefully reviewed the surveillance

Slip Copy, 2012 WL 6965105 (N.D.N.Y.)

(Cite as: 2012 WL 6965105 (N.D.N.Y.))

video of the June 12, 2008 incident at Five Points, which shows the approximately 30 minutes while plaintiff was in the strip frisk room with C.O. Maltese and others, without any audio.[FN6] The plaintiff began to remove his clothes, as directed by C.O. Maltese, at approximately 1:25:30.[FN7] Just prior to taking off his boxer shorts, starting at 1:28:24, the plaintiff waved his arms and turned his head to C.O. Maltese. At about 1:29:15, the plaintiff used his right hand to shake his penis towards the officer, in apparent irritation. The plaintiff, facing C.O. Maltese, again started to wave his arms at the officer, while saying something forcefully to him. (Video, 1:29:22). With C.O. Maltese holding his left hand, palm down, towards the plaintiff, the inmate appeared to shout and continued to wave raised arms and hands, at times with fists clenched. (Video, 1:29:38). Over the next 30 seconds or so, while C.O. Maltese continued to use his hand, palm down, in an apparent effort to calm the plaintiff, the inmate made several more forceful comments to C.O. Maltese, waved his arms several more times in an agitated fashion, and leaned in toward the officer once. (Video, 1:29:53). At approximately 1:30:08, just after plaintiff appeared to say something further to C.O. Maltese while shaking his head from side to side, the officer pushed plaintiff against the wall, grabbed him around the neck, and pulled him to the floor.

> FN6. The video shows the output of four cameras at different points in and around the strip frisk room at Five Points. Most of the relevant portions of the video show plaintiff on camera no. 4 in the strip frisk room, although he is briefly seen on other cameras as he was escorted into and out of the strip frisk room. Defense counsel provided a CD with several video files, some of which consist of only portions of the incident and some of which did not play, at least on the programs available to me. However, the file "VIDEO—TS.IFO" shows the entire incident.

> FN7. As noted, the video image has a running time stamp, which apparently corresponds to the time in the afternoon when the incident took place.

At 1:30:11, three other male correction officers rush into the room and positioned themselves at various positions around plaintiff's body on the floor. From the movement of the four officers over the next minute or so, it is apparent that the plaintiff was still struggling. At 1:30:20, the female officer handed C.O. Maltese something, presumably restraints. At approximately 1:30:44 and 1:30:56, while the plaintiff still appeared to be resisting, a correction officer other than C.O. Maltese punched plaintiff with his right fist a total of five times, but without lifting his arm to a great extent or appearing to use substantial force.[FN8] There is no indication on the video that anyone kicked the plaintiff and, given the small size of the strip frisk room and the positions of the four officers who were kneeling or stooping over the plaintiff, they would not have been in a position to strike plaintiff with their feet with any force. By 1:31:26, two of the officers stood, and the more relaxed posture of the other two officers indicates that the plaintiff had stopped struggling and had presumably been placed in restraints. The officers then moved plaintiff's position on the floor. (Video, 1:32:00).

> FN8. In his declaration, defendant Ryder admits striking plaintiff three times in his right elbow with his closed fist after plaintiff refused orders to put his hands behind his back so that restraints could be applied. (Ryder Decl. ¶¶ 8–10).

**\*6** Over the next few minutes, while plaintiff remained face down on the floor, several officers came in and out of the room, some putting on latex gloves. While it is not entirely clear at what point C.O. Maltese completed the strip frisk, that appeared to happen at some point between 1:35:30 and 1:38:10. The correction officers then put some clothes on or over plaintiff while he was still on the floor (Video, 1:39:00) and then help him back onto his feet (Video, 1:39:58). Shortly thereafter, the officers involved in the strip frisk appeared to be relieved of duty by other officers. For approximately ten minutes, these other officers waited in the strip frisk room with plaintiff-still in restraints and standing against the wall-and then escorted the plaintiff towards the infirmary.

Based on the record presented in connection with the summary judgment motion, this court concludes that no

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6965105 (N.D.N.Y.)

(Cite as: 2012 WL 6965105 (N.D.N.Y.))

reasonable fact finder could conclude that the defendants used force against the plaintiff maliciously and sadistically to cause harm, as required to satisfy the subjective element of the Eighth Amendment standards for excessive force. As plaintiff acknowledged in his deposition, he was serving a sentence for second degree murder, following a prior conviction for robbery and assault, and he outweighed the officer who was conducting the strip search by 70 to 80 pounds. (Plf.'s Dep. at 6–7, 34). Notwithstanding the lack of an audio track, the video of the strip search clearly corroborates the statements of C.O. Maltese and others that plaintiff was agitated and was making aggressive gestures with his arms and hands. [FN9] The deposition testimony of plaintiff, his guilty plea to the various disciplinary charges against him, and the video tape all overwhelmingly corroborate the officers' statements that plaintiff refused to comply with the orders of C.O. Maltese to complete the strip frisk procedure. [FN10] Under those circumstances, no reasonable juror would question that C.O. Maltese, in forcing plaintiff to the floor, applying restraints, and completing the strip frisk once plaintiff was restrained, acted in a good faith effort to maintain and restore discipline with respect to a dangerous inmate who was acting aggressively and refusing direct orders. *See, e.g., Perkins v. Brown,* 285 F.Supp.2d 279, 284–85 (E.D.N.Y.2003) (defendants' use of force to search plaintiff only after he had refused to submit to a search and directed profanity at defendants was clearly not "repugnant to the conscience of mankind," but was a good faith effort to restore discipline and to gain control over a recalcitrant and dangerous inmate); *Johnson v. Woods,* No. 07–CV–1018 (DNH/DRH), 2010 WL 2039164, at *15–16 (N.D.N.Y. Mar. 2, 2010) (given that the officers' declarations and the facility video tapes showed that plaintiff was agitated, combative, and uncooperative, his allegations to the contrary raised no issues of material fact that the use of force to extract plaintiff from his cell was the only option to uphold discipline and was reasonably calculated to ensure the safety of the officers); *Cunningham v. Rodriguez,* 01 Civ. 1123, 2002 WL 31654960, at *5–6 (S.D.N.Y. Nov. 22, 2002) (granting summary judgment and dismissing the excessive force claim of a plaintiff who, after disobeying a direct order of the court and using profanity, refused to comply with a court officer's order to step back and place his hands behind his back; because of his resistance, the officers' use

of force to subdue him and to escort him out of the courtroom was not "repugnant to the conscience of mankind").

FN9. The court may rely on the video of the relevant events in concluding that no reasonable fact finder could credit the plaintiff's inconsistent claims about the incident. *See, e.g., Kalfus v. New York and Presbyterian Hosp.,* 476 F. App'x 877, 880–81 (2d Cir.2012) (the video demonstrated that plaintiff resisted arrest by refusing to stand up or be handcuffed, and that the patrolmen used only reasonable force to overcome his resistance; no reasonable fact finder could conclude that defendants applied excessive force); *Green v. Morse,* 00–CV–6533, 2009 WL 1401642, at *9 (W.D.N.Y. May 18, 2009) (this court may rely on the video evidence clearly showing that some use of force was necessary to grant summary judgment and dismiss plaintiff's excessive force claim) (citations omitted).

FN10. Plaintiff's conclusory assertion that the transcript and other records of his disciplinary hearing were completely fabricated is not sufficient to establish a material issue of fact with respect to his admissions of guilt to charges, including violating stip frisk procedures, particularly in light of his failure to appeal. *See, e.g., Proctor v. Kelly,* 9:05–CV–692 (GTS/GJD), 2008 WL 5243925, at *5 (N.D.N.Y. Dec. 16, 2008) (plaintiff's conclusory and unsupported allegations that a defendant tampered with the tape of a disciplinary hearing is not sufficient to overcome summary judgment dismissing due process claims); *Gill v. Jones,* 95 Civ. 9031, 2001 WL 1346012, at *8–9 (S.D.N.Y. Nov. 1, 2001) (plaintiff's conclusory claim that his appeals of disciplinary hearings must have been tampered with because they were never received is insufficient to avoid summary judgment on an interference-with-mail claim); *Lewis v. Johnson,* 08–CV–0482 (TJM/ATB), 2010 WL 3785771, at *20 (N.D.N.Y. Aug. 5, 2010) (plaintiff's conclusory allegation that multiple medical

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

professionals in two different prisons fabricated plaintiff's medical records to suppress evidence of his alleged injuries is highly suspect and would, in the court's view, be insufficient to sway any rational fact finder) (ReportRecommendation), *adopted,* 2010 WL 3762016 (N.D.N.Y. Sept. 20, 2010). As noted above, plaintiff also denied, during his deposition that he possessed any contraband cigarettes or that he pled guilty to smuggling such contraband. As corroboration of his denial, plaintiff points to the fact that the video tape of the strip frisk does not show the contraband cigarettes falling out of plaintiff's pants. (Plf.'s Dep. at 44). While it is true the video does not show the contraband cigarettes, C.O. Maltese searched plaintiff's pants partly while just out of camera range. (Video, 1:26:45). And, as noted above, there is other documentary corroboration of the seized cigarettes, including photographs of the contraband. (Maltese Decl. ¶¶ 17–18, 28; 6/12/2008 Maltese Mem.; 6/12/08 Elsenheimer Mem.; photograph logs and photographs of contraband, Dkt. No. 52–1 at 24–26). In any event, it is not material to the evaluation of plaintiff's excessive force claims whether or not he was actually found in possession of contraband. His combative refusal to cooperate with a legitimate strip frisk procedure warranted the defendants' forceful response, whether or not the officers eventually found any contraband.

**\*7** Given the video evidence regarding the extent of the force applied to the plaintiff and the medical evidence of the relatively minor nature of his injuries, no reasonable fact finder could conclude that the force applied to plaintiff was more than de minimis, and thus was insufficient to satisfy the objective element of the Eighth Amendment standards for cruel and unusual punishment. In any event, there is no material issue of fact that the force applied was not greater than reasonably necessary to restore discipline and order under the circumstances encountered by the defendants. *See, e.g., Sprau v. Coughlin,* 997 F.Supp. 390, 394–95 (W.D.N.Y.1998) (plaintiff inmate alleged that the officer grabbed him behind the neck and hit him several times across the neck and face and in the eye, but the medical report noted only a small bump under plaintiff's eye; the court found that the amount of force used was de minimis and did not reach constitutional dimensions); *Bove v. New York City,* 98 Civ. 8800, 1999 WL 595620, at \*6 (S.D.N.Y. Aug. 6, 1999) (the plaintiff's alleged injuries that are supported by the objective hospital records-a single bruise to head-lead the court to conclude that the force used by the officers on the night in question was at worst, de minimis); *Johnson v. Woods,* 2010 WL 2039164, at \*12, 15 (a broken pinky finger on plaintiff inmate's left hand, a slight bump on his head, and a mild head and rib pain are not injuries of sufficient severity, nor worthy of Eighth Amendment protection).

Defendant Ryder's controlled punches to plaintiff's arm while the inmate was struggling on the floor, resisting the officers' attempts to apply mechanical restraints, is clearly a de minimis use of force outside of the protection of the Eighth Amendment. *See, e.g., Allaway v. McGinnis,* 473 F.Supp.2d 378, 382–83 (W.D.N.Y.2007) (the four punches delivered to plaintiff (which the officer describes in a sworn declaration as blows administered for the sole purpose of getting plaintiff to comply with the officers) were, as shown on the video, delivered in a deliberate, methodical manner from a relatively short distance, while plaintiff was still struggling and resisting the officers' attempts to place mechanical restraints on him; no rational fact finder could conclude that these punches met either the objective or subjective components of an Eighth Amendment violation). Even if, as plaintiff claims, some of these blows landed on his face, there would be no material issue of fact supporting his claim of excessive force. *See, e.g., Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070, at \*13, n. 46 (S.D.N.Y. May 7, 2001) (plaintiffs allegations that officer hit him two or three times in the face, causing his face to turn red, but resulting in no other injuries are insufficient to state an Eighth Amendment claim) (collecting cases); *Cunningham v. Rodriguez,* 2002 WL 31654960, at \*5 (blows to back and face held to be de minimis).

**\*8** With respect to plaintiff's claims of sexual abuse [FN11] during the strip frisk, such an isolated incident of alleged sexual touching does not involve a harm of federal constitutional proportions. *Boddie v. Schnieder,* 105 F.3d

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6965105 (N.D.N.Y.)

(Cite as: 2012 WL 6965105 (N.D.N.Y.))

at 861.^FN12 Numerous courts in this Circuit have held that allegations of isolated sexual abuse during frisk searches do not implicate the Eighth Amendment. *See Morrison v. Cortright,* 397 F.Supp.2d 424 (W.D.N.Y.2005) (allegation that correctional officer shone light up inmate's anus, ran his middle finger between inmate's buttocks, causing inmate to urinate on himself, and rubbed his penis against inmate's buttocks during strip frisk failed to implicate the Eighth Amendment); *Montero v. Crusie,* 153 F.Supp.2d 368, 373, 375 (S.D.N.Y.2001) (allegation that correctional officer, on several occasions, squeezed inmate's genitalia during pat frisks did not implicate the Eighth Amendment, especially when inmate did not allege physical injury); *Williams v. Keane,* No. 95 Civ. 379, 1997 WL 527677, at *1, 11 (S.D.N.Y. Aug. 25, 1997) (allegation that correctional officer put his hand down inmate's pants and fondled inmate's genitals during frisk search failed to implicate the Eighth Amendment).

FN11. Plaintiff's allegations that C.O. Maltese directed racially or otherwise degrading and abusive or profane language toward him during the incident, does not support an Eighth Amendment claim. Verbal harassment, "unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and, therefore, is not actionable under ... § 1983." *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) (collecting cases). *See also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (the claim that a prison guard called plaintiff names did not allege any appreciable injury and was properly dismissed).

FN12. Plaintiff cites *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 236–38 (S.D.N.Y.2005) for the proposition that "contemporary standards of decency" relating to alleged sexual assault during a prison pat frisk have become more stringent since the Second Circuit's *Boddie* case. However, the court agrees with other district judges in this circuit who have concluded that *Rodriguez* incorrectly concluded that *Boddie* is not controlling precedent. *See, e.g., Samuels v.*

*Strange,* 3:08–CV–1872, 2012 WL 4754683, at *4 (D.Conn. Oct. 4, 2012) (the holding of *Rodriguez* is inconsistent with Second Circuit precedent, as well as the vast majority of relevant circuit and district court cases); *accord, Harry v. Suarez,* 10 Civ. 6756, 2012 WL 2589080 (S.D.N.Y. July 3, 2012).

In sum, based on the conclusive video and medical evidence in the record, plaintiff's inconsistent and/or conclusory allegations regarding the circumstances of the incident during the strip frisk on June 12, 2008; the nature and extent of the force used against him; and the extent of his injuries do not create material issues of fact sufficient to defeat defendants' summary judgment motion. *See Scott v. Harris,* 550 U.S. 372, 379–81 (2007) (when opposing parties tell two different stories, one of which is blatantly contradicted by the record evidence (including surveillance video), so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment); *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account"; *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case"). Accordingly this court recommends that plaintiff's claims of excessive force and sexual abuse under the Eighth Amendment should be dismissed in their entirety. Because of this court's conclusion that no Eighth Amendment violation occurred, this court need not address plaintiff's claim that certain defendants failed to intervene to protect him from such purported violations, or the defendants' claims of qualified immunity.^FN13

FN13. In determining whether qualified immunity applies, the court may first consider

Slip Copy, 2012 WL 6965105 (N.D.N.Y.)

(Cite as: 2012 WL 6965105 (N.D.N.Y.))

whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201 (2001), modified by *Pearson v. Callahan,* 555 U.S. 223, 236 (2009) (holding that, "while the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory" in all cases). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201.

**\*9 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 51) be **GRANTED** and the remaining claims in the Amended Complaint be **DISMISSED IN THEIR ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2012.

Hilson v. Maltese
Slip Copy, 2012 WL 6965105 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Frank G. MOWRY, Plaintiff(s),
v.
Robert F. NOONE, In his Individual and Official
Capacity and Douglas Dickenson, Individually and in
his Official Capacity as an employee/agent of the
County of Seneca, Defendant(s).
**No. 02-CV-6257FE.**

Sept. 30, 2004.

Frank G. Mowry, Gowanda, NY, pro se.

Thomas J. Lynch, Esq., Law Offices of Thomas J. Lynch,
Syracuse, NY, Thomas Desimon, Esq., Harris Beach LLP,
Pittsford, NY, for Defendants.

DECISION AND ORDER

*Preliminary Statement*

FELDMAN, Magistrate J.

**\*1** Plaintiff Frank G. Mowry ("Mowry" or "plaintiff"),
proceeding *pro se,* brings this action pursuant to 42 U.S.C.
§ 1983. Plaintiff alleges that (1) defendant Robert F.
Noone, Jr. ("Noone") used excessive force to effectuate
his arrest, in violation of his rights under the Fourth
Amendment of the Constitution, (2) defendant Douglas
Dickenson ("Dickenson") failed to intervene to prevent
Noone from using excessive force, and (3) both Noone
and Dickenson deliberately denied him medical care in
violation of his rights under the Fourteenth Amendment of
the Constitution. Defendants now move for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure (Docket # 70). In accordance with the
provisions of 28 U.S.C. § 636(c), the parties have
consented to the jurisdiction of this Court for all
dispositive matters, including trial. (Docket # 11). For the
reasons set forth herein, defendants' motion for summary
judgment is granted.

*Factual Background*

Mowry alleges that on July 22, 1999 he was stopped at a
traffic light in the left turn only lane at the Ovid Street
bridge in Seneca Falls, New York. Mowry continued
straight ahead onto Cayuga Street when the light turned
green. Defendant Officer Robert F. Noone, Jr. of the
Seneca Falls Police Department, observed Mowry disobey
the traffic sign, activated the emergency lights on his
vehicle and began following Mowry. (Mowry Dep. Trans.
p. 17, 17-18 FN1). Mowry knew that he was driving
illegally but did not pull over. (Mowry Dep. Trans. p. 18,
12). Noone continued to follow Mowry for several miles.
(Mowry Dep. Trans. p. 20, 8). When Mowry turned onto
Route 318, Deputy Douglas Dickenson of the Seneca
County Sheriff's Department, joined the pursuit and
activated his emergency lights. (Mowry Dep. Trans. p. 22,
5-6, p. 24, 3). Mowry continued driving even though he
knew he was the subject of pursuit. (Mowry Dep. Trans.
p. 25, 7). Mowry lead defendants on a highspeed chase
that reached speeds of over 75 mph and narrowly avoided
several head-on collisions as he attempted to pass vehicles
on the two-lane road. (Mowry Dep. Trans. p. 21, 12-13,
22). Mowry turned onto Birdsey Road and continued
driving until a construction road closure forced him to stop
his car. (Mowry Dep. Trans. p. 28, 9-22).

FN1. Deposition references are to the page and
line number of transcript of the May 27, 2003
deposition of plaintiff Frank. G. Mowry.

Mowry exited his car and when he saw Dickenson,
followed by Noone, turn onto Birdsey Road he began to
flee. (Dep. Trans. p. 38, 9-13; p. 39, 3). Dickenson ran
after Mowry yelling at him to stop. (Mowry Dep. Trans. p.
39, 8). Once Mowry saw that he was about to be overtaken

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

by Dickenson, he stopped and Dickenson brought him to the ground. (Mowry Dep. Trans. p. 34, 20). Mowry landed with his hands and knees on the gravel. (Mowry Dep. Trans. p. 37, 2; p. 40, 20-21). Dickenson asked Mowry if he was alright, and Mowry responded yes. (Mowry Dep. Trans. p. 42, 15-20).

Dickenson gave Mowry 30 seconds to catch his breath on his hands and knees, then pulled Mowry's right arm behind his back to handcuff him. (Mowry Dep. Trans. p. 42, 12-13, p. 39, 21-22). At the same time, Mowry heard a car door slam and saw Noone running towards them. (Mowry Dep. Trans. p. 72, 19-21). Mowry testified that when he saw Noone running towards them he only had time to turn his head away. (Mowry Dep. Trans. p. 46, 6-8). Mowry testified that Noone was running too fast and overran Mowry and Dickenson. (Mowry Dep. Trans. p. 46, 18-19). As Noone jumped over the top of Mowry's head, the toe of Noone's boot hit the side of Mowry's head. (Mowry Dep. Trans. p. 49, 4-5). Noone landed on one foot before regaining his balance. (Mowry Dep. Trans. p. 48, 21-23). Noone and Dickenson pulled Mowry off the ground and placed him in Noone's car. (Mowry Dep. Trans. p. 49, 13-14). Mowry claims to have lost consciousness until he was placed in the back of the patrol car. (Mowry Dep. Trans. 50, 9-14). Mowry denies telling anyone that he was injured until after he got to the police station and was formally "booked in" at the county jail. (Mowry Dep. Trans. 55, 7-13). Mowry concedes that he did not ask for any medical attention at that time. (Mowry Dep. Trans. 55, 17-22, 68, 10-15).

**\*2** Mowry was taken to the Seneca Falls Police Station where he was charged with Driving While Intoxicated, Aggravated Unlicensed Operation of a Motor Vehicle in the First Degree, and Reckless Endangerment.[FN2] Within 24 hours of his arrest, Mowry was examined by medical personnel at the county jail and was treated for neck pain. (Mowry Dep. Trans. p. 68, 19; p. 58, 3-4).

> FN2. Mowry later admitted guilt to all three charges. (Mowry Dep. Trans. p. 63, 8-20).

Mowry alleges that he was later diagnosed with a fractured left cheekbone. (Mowry Dep. Trans. p. 65, 5-9). He also asserts that as a result of this injury he experiences blurred vision and migraine headaches. (Mowry Dep. Trans. p. 65, 6-9). According to Mowry, the results of an MRI taken while he was in prison were "normal." (Mowry Dep. Trans. p. 82, 18-19).

*Discussion*

*Summary Judgment Standard:* Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" only if it has some affect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Catanazaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998).

The burden of showing the absence of any genuine issue of material fact rests on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When a court is confronted with facts that permit different conclusions, all ambiguities and inferences that may reasonably be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996). Rule 56(e), however, also provides that in order to defeat a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial. Such an issue is not created by a mere allegation in the pleadings [citations omitted], nor by surmise or conjecture on the part of the litigants." *United States v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982) (per curium). "Affidavits submitted in opposition to a motion for summary judgment must set forth such facts as would be admissible in evidence." *Franklin v. Krueger Int'l,* 1997 WL 691424 at *3 (S.D.N.Y. November 5, 1997) (citing *Raskin v. The Wyatt Co.,* 125 F.3d 55 (2d Cir.1997) ("only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

In addition, *pro se* submissions, particularly those alleging civil rights violations, are construed liberally and are

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

treated as raising the strongest arguments that they might suggest. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). *See also Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (because plaintiff's "complaint alleges civil rights violations and he proceeded *pro se* in the District Court, we must construe his complaint with particular generosity") (citations omitted).

**\*3** *I. Excessive Force Claim:* The Supreme Court has held that claims against police officers for excessive force must be examined under the Fourth Amendment's reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Determining whether the force used was reasonable requires a balancing of the intrusion on the individual's Fourth Amendment rights against the interests of the government. *Id.* at 396. The reasonableness of a particular use of force must be judged objectively from the perspective of a reasonable officer at the scene of the arrest. *Graham,* 490 U.S. at 397. In evaluating the officer's actions, courts should consider the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396. It is well established that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion. *Id. See Mickle v. Morin,* 297 F.3d 114, 120 (2nd Cir.2002)(in the context of excessive force used during an arrest, "not every push or shove" is excessive.)(internal citations omitted).

In this case, the record is clear that the officers were faced with an extremely dangerous situation as Mowry drove erratically down narrow roads to avoid capture. Indeed, Mowry's actions repeatedly put the lives of other motorists in imminent danger. Applying the *Graham* balancing test to these circumstances, there is no question that the officers acted appropriately in stopping and arresting Mowry. *See Washington v. City of Riverside Illinois,* 2003 WL 1193347, \*5 (N.D.Ill. March 13, 2003) (summary judgment granted when driver's decision to flee justified officer's subsequent use of force to arrest.). Simply put, Mowry has produced no evidence upon which a reasonable jury could find that the defendants used excessive force during his take down and arrest.

As for Mowry's allegation that Noone applied excessive

force by "kicking him in the head," this Court will not credit Mowry's attempt to change his deposition testimony with the affidavit he submits in opposition to defendants' motions. Rather, this Court relies on Mowry's deposition testimony which clearly establishes the accidental nature of any injury caused by Noone. *See Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987)("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."); *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.").

The undisputed facts here are that after Mowry was taken down by Dickenson, Noone exited his vehicle, ran toward Mowry with such speed that he overran Mowry and Dickenson, and tripped over Mowry. In light of the prolonged chase, the officers had a reasonable basis for believing that Mowry posed a serious threat, especially since he continued to run and evade arrest after he exited his vehicle. Under these circumstances, this Court finds that it was objectively reasonable for Noone to approach Mowry at a high rate of speed in his effort to assist Dickenson in subduing Mowry, and that his actions can not constitute excessive force.

**\*4** *II. Failure to Intervene Claim:* Mowry also makes a claim for failure to intervene. It is well established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994); *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988). Failure to intercede results in liability where an officer observes the use of excessive force or has reason to know that it will be used. *Anderson,* 17 F.3d at 557. In order to be held liable, the law enforcement official must have had a realistic opportunity to intervene in order to prevent the harm from occurring. *Id.* at 557.

Here, based on the facts as presented by Mowry, Dickenson did not have the opportunity to intercede before Noone tripped over Mowry, and therefore cannot be held liable. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

(2d Cir.1988) (defendant entitled to judgment where record clear that blows were struck in such a rapid succession that officer "had no realistic opportunity to attempt to prevent them."). At the time the alleged excessive force was used, Dickenson had one hand on Mowry's left arm and was attempting to pull Mowry's right arm behind Mowry's back. Even Mowry stated that when he heard Noone running toward them he only had time to turn his head away before Noone overran them. Moreover, Noone's alleged use of excessive force was a single kick to the head, an event which Mowry concedes happened quickly and without warning. This was not a situation where the alleged excessive force continued for such a period of time that Dickenson, upon realizing what was happening, could have stopped it. *Id.* at 11-12.

Because a reasonable jury could not conclude otherwise, summary judgment should be granted in favor of Dickenson on the failure to intervene claim.

*III. Denial of Medical Treatment:* Mowry's third claim is for denial of medical treatment. The denial of medical treatment for a pre-trial detainee is evaluated under the Due Process Clause of the Fourteenth Amendment. *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). Although not specifically defined by the Supreme Court, the due process rights of a pre-trial detainee are at least as great as the Eighth Amendment rights of a convicted prisoner. *City of Revere,* 463 U.S. at 244; *Weyant v. Okst,* 101 F.3d. at 856.

In *Weyant,* the Second Circuit established a two-part test to determine liability for denial of medical treatment. First, the denial of medical treatment must concern an objectively serious injury. *Weyant,* 101 F.3d at 856. A serious injury has been defined as "one that may produce death, degeneration or extreme pain." *Mills v. Fenger,* 2003 WL 251953, *4 (W.D.N.Y.2003) (citations omitted). Second, the plaintiff is required to show that based on what the defendant knew or should have known, the defendant acted with deliberate indifference to plaintiff's serious medical needs. *Weyant,* 101 F.3d at 856. Deliberate indifference is established if the defendant acted with reckless disregard for the substantial risk posed by the plaintiff's serious medical condition. *Weyant,* 101 F.3d at 856.

**\*5** Here, the undisputed facts establish that the defendants did not deny plaintiff medical treatment. Even assuming arguendo that Mowry's injury rose to the level of an objectively serious medical injury, there is no credible evidence in the record to base a finding that either Noone or Dickenson should have been aware of his need for medical treatment, but were indifferent to him. Indeed, the record demonstrates that Mowry never told the defendants that he needed medical attention and the injuries he now alleges were not apparent to them. Contrary to plaintiff's claims, Dickenson demonstrated his concern for plaintiff's well-being when he asked Mowry if he was alright and gave him time to catch his breath. Mowry did not ask for medical assistance or complain about his alleged injuries immediately following the arrest. At the county jail, Mowry stated that he did not need medical attention. It was not until the following day that Mowry first requested medical attention. Mowry admits that in response to this request, he was then treated by the medical personnel at the county jail and given a prescription for neck pain.

The record is devoid of credible evidence that either defendant acted with reckless disregard for the substantial risk posed by the plaintiff's serious medical needs. *See Thomas v. Nassau County Correctional Center,* 288 F.Supp.2d 333, 338 (E.D.N.Y.2003) (to establish a constitutional violation the facts must give rise to a reasonable inference that defendants *knew* of serious medical needs and intentionally disregarded them.). Based on the record here, summary judgment should be granted in favor of defendants Dickenson and Noone on plaintiff's denial of medical treatment claim.

*Conclusion*

For all the foregoing reasons, defendants' Motions for Summary Judgment (Docket # 67, 70) are granted. Having granted defendants' motion for summary judgment by determining that plaintiff has failed to adduce evidence of a constitutional violation, plaintiff's motions for "dismissal of defendant's (sic) motion" and "cross motion" for summary judgement (Docket # 75) are denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

SO ORDERED.

W.D.N.Y.,2004.
Mowry v. Noone
Not Reported in F.Supp.2d, 2004 WL 2202645
(W.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jonathan HENRY, Plaintiff,
v.
James F. DINELLE, Corrections Officer; Russell E.
Duckett, Corrections Officer; Alfred J. Deluca,
Corrections Officer; Donald L. Broekema, Sergeant;
and Jean Norton, Nurse, Defendants.
No. 9:10–CV–0456 (GTS/DEP).

Nov. 29, 2011.
Sivin & Miller, LLP, Edward Sivin, Esq., of Counsel,
New York, NY, for Plaintiff.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Timothy P. Mulvey, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### MEMORANDUM–DECISION and ORDER

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this prisoner civil
rights action filed by Jonathan Henry ("Plaintiff") against
the five above-captioned employees of the New
York State Department of Corrections and Community
Supervision ("Defendants"), is Defendants' motion for
partial summary judgment. (Dkt. No. 24.) For the reasons
set forth below, Defendants' motion is granted in part and
denied in part.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Generally, liberally construed, Plaintiff's Complaint
alleges that, between approximately January 29, 2009, and
January 31, 2009, at Ulster Correctional Facility in
Napanoch, New York, Defendants violated Plaintiff's
following rights in the following manner: (1) Defendants

Nurse Jean Norton, Corrections Officer James F. Dinelle,
Corrections Officer Russell E. Duckett and Corrections
Officer Alfred J. DeLuca violated Plaintiff's rights under
the First Amendment by filing retaliatory false
misbehavior reports against him, and subsequently
providing false testimony against him at administrative
disciplinary hearings, which resulted in his spending time
in the Special Housing Unit ("SHU"); (2) Defendant
Dinelle violated Plaintiff's rights under the Eighth
Amendment by assaulting him on two occasions, and
Defendants DeLuca and Duckett violated Plaintiff's rights
under the Eighth Amendment by assaulting him once; (3)
Defendant Sergeant Donald L. Broekema violated
Plaintiff's rights under the Eighth Amendment by failing to
intervene to prevent one of these assaults from occurring;
(4) Defendant Norton violated Plaintiff's rights under the
Eighth Amendment by harassing him almost immediately
before he was subjected to the above-described assaults;
and (5) Defendants Norton, Dinelle, Duckett and DeLuca
violated Plaintiff's rights under the Fourteenth Amendment
by performing the aforementioned acts, which constituted
atypical and significant hardships in relation to the
ordinary incidents of prison life. (See generally Dkt. No.
1 [Plf.'s Compl.].) Familiarity with the factual allegations
supporting these claims in Plaintiff's Complaint is assumed
in this Decision and Order, which is intended primarily for
review by the parties. (Id.)

### B. Undisputed Material Facts

At all times relevant to Plaintiff's Complaint, Plaintiff
was an inmate and Defendants were employees of the New
York State Department of Corrections and Community
Supervision at Ulster Correctional Facility. On January 30,
2009, Defendant Dinelle took Plaintiff to the medical
ward, because Plaintiff was experiencing a foul odor and
oozing from a wound on his leg. After Defendant Norton
treated Plaintiff, she filed an inmate misbehavior report
against Plaintiff based on (1) Plaintiff's harassing behavior
toward Defendant Norton and Defendant Dinelle, and (2)
Plaintiff's disobedience of a direct order to be quiet. The
misbehavior report was signed by Defendant Dinelle as an
employee witness.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

At his deposition, Plaintiff testified, while leaving the infirmary, he was punched and kicked by Defendant Dinelle and two unknown prison officials. Plaintiff was then taken to the SHU, where he waited with Defendants Dinelle and Duckett, and up to three more individuals, for a sergeant to arrive. When Defendant Broekema (a sergeant) arrived at the SHU, Plaintiff was taken to a frisk room, where a frisk was conducted. During the frisk, Defendants Dinelle, Duckett and (Plaintiff suspected) DeLuca used force to bring Plaintiff to the ground. Plaintiff testified that, during the use of force, he was simultaneously punched in the nose by two officers while their supervisor watched.

**\*2** After the use of force, Plaintiff stated to Defendants Dinelle, Broekema and Duckette, "I will be contacting my attorney," or "I will be calling a lawyer." [FN1] Plaintiff never used the term "grievance" when addressing Defendants Dinelle, Broekema and Duckette (or Defendant Norton).[FN2] Subsequently, Defendant Duckett filed an inmate misbehavior report against Plaintiff based on his disobedience of frisk procedures and a direct order. Defendant DeLuca signed this report as a witness to the events.

> FN1. (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 100, 102–03 [attaching pages 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo .].)

> FN2. (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 59–60, 100, 102–03 [attaching pages 175, 176, 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo.].)

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which

(again) is intended primarily for review by the parties. (*Id.*)

**C. Defendants' Motion**

Generally, in support of their motion for partial summary judgment, Defendants argue as follows: (1) Plaintiff's claim that Defendants issued false misbehavior reports should be dismissed because Plaintiff has no constitutional right to be free of false misbehavior reports; (2) Plaintiff's First Amendment retaliation claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (a) engaged in protected activity, or (b) suffered adverse action as a result of engaging in protected activity; (3) Plaintiff's Fourteenth Amendment substantive due process claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants deprived Plaintiff of his liberty rights; (4) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she (a) used force against Plaintiff, or (b) was in a position to prevent the use of force from occurring, yet failed to do so; (5) Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"; (6) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Broekema had a realistic opportunity to intervene to prevent or stop the assault, yet failed to do so; and (7) Defendants are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].).[FN3]

> FN3. In their motion, Defendants do not challenge the evidentiary sufficiency of Plaintiff's Eighth Amendment excessive-force claim against Defendants Dinelle or Duckett. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].)

In Plaintiff's response to Defendants' motion for partial summary judgment, he argues as follows: (1) his

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

retaliation claims should not be dismissed because there are triable issues of fact as to whether Defendants retaliated against him for stating that he would be contacting an attorney; (2) his failure-to-intervene claim against Defendant Broekema should not be dismissed because there are triable issues of fact as to whether Defendant Broekema failed to prevent excessive force from being used against him; (3) his excessive-force claim against Defendant DeLuca should not be dismissed because there are triable issues of fact as to whether Defendant DeLuca used excessive force against him; and (4) Defendants are not protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].) [FN4]

> FN4. Plaintiff does not oppose Defendants' arguments that (1) Plaintiff's excessive-force claim against Defendant Norton should be dismissed, and (2) Plaintiff's substantive due process claim should be dismissed. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].)

**\*3** In their reply, Defendants essentially reiterate their previously advanced arguments. (*See generally* Dkt. No. 29, Attach. 1 [Defs .' Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't,* 04–CV–0828, 2009 WL 3165551, at \*2–3 (N.D.N.Y. Sept.29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B. Legal Standards Governing Plaintiff's Claims

### 1. First Amendment Retaliation Claim

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that, in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of his First Amendment rights. *See Gill,* 389 F.3d at 381–383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

> *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that (1) the speech or conduct at issue was "protected", (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights, and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

**\*4** In determining whether an inmate has established a prima facie case of a causal connection between his protected activity and a prison official's adverse action, a number of factors may be considered, including the following: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996); *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002). Even where the inmate has established such a prima facie case, the prison official may be entitled to judgment as a matter of law on the inmate's retaliation claim where the prison official has satisfied his burden of establishing that the adverse action would have been taken on proper grounds alone. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994); *Jordan v. Garvin,* 01–CV–4393, 2004 WL 302361, at *6 (S.D.N.Y. Feb.17, 2004).

### 2. Eighth Amendment Claims of Excessive–Force and Failure–to–Intervene

To establish a claim of excessive-force under the Eighth Amendment, a plaintiff must satisfy two components: "one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009). In consideration of the subjective element, a plaintiff must allege facts which, if true, would establish that the defendant's actions were wanton " 'in light of the particular circumstances surrounding the challenged conduct.' " *Id.* (quoting *Blyden v. Mancusi,* 186 F.3d 252, 262 [2d Cir.1999] ). The objective component asks whether the punishment was sufficiently harmful to establish a violation "in light of 'contemporary standards of decency.' " *Wright,* 554 F.3d at 268 (quoting *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Generally, officers have a duty to intervene and prevent such cruel and unusual punishment from occurring or continuing. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). "It is well-established that a law enforcement official has an affirmative duty to intervene

on behalf of an individual whose constitutional rights are being violated in his presence by other officers." *Cicio v. Lamora,* 08–CV–0431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb.24, 2010) (Peebles, M.J.). A corrections officer who does not participate in, but is present when an assault on an inmate occurs may still be liable for any resulting constitutional deprivation. *Id.* at *8. To establish a claim of failure-to-intervene, the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008). Generally, officers cannot be held liable for failure to intervene in incidents that happen in a "matter of seconds." *Parker v. Fogg,* 85–CV–177, 1994 WL 49696 at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.).

### 3. Fourteenth Amendment Substantive Due Process Claims

**\*5** The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125–126 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91–CV–1196, Memorandum–Decision and

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

Order (N.D.N.Y. filed Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

"An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes 'an atypical and significant hardship on the ordinary incidents of prison life.' " *Whitaker v. Super,* 08–CV–0449, 2009 WL 5033939, at *5 (N.D.N.Y. Dec. 14, 2009) (Kahn, J. adopting Report–Recommendation by Lowe, M.J.) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 [1995] ). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU. *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). When evaluating whether an inmate's confinement in SHU violates his substantive due process rights, the issue, then, is whether his keeplock confinement imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Id.* at 64.

"In the Second Circuit, determining whether a disciplinary confinement constituted an 'atypical and significant hardship' requires examining 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement.' " *Whitaker,* 2009 WL 5033939, at *5 (quoting *Palmer,* 364 F.3d at 64). "Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an 'atypical and significant hardship' only if 'the conditions were more severe than the normal SHU conditions.' " *Id.* (quoting *Palmer,* 364 F.3d at 65).[FN5]

FN5. Generally, " '[n]ormal' SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week." *Whitaker,* 2009 WL 5033939, at *5 n. 27 (citing *Ortiz v. McBride,* 380 F.3d 649, 655 [2d Cir.2004] ).

**4. Qualified Immunity Defenses**

**\*6** The qualified immunity defense is available to only those government officials performing discretionary functions, as opposed to ministerial functions. *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004), *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).[FN6] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007).[FN7] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

*v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).[FN8] As the Supreme Court has explained,

> FN6. *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

> FN7. *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' "); *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

> FN8. *See also Malsh v. Corr. Oficer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity

*Malley,* 475 U.S. at 341.[FN9]

> FN9. *See also Hunter v. Bryant,* 502 U.S. 224, 299, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks omitted].

## III. ANALYSIS

### A. Plaintiff's Retaliation Claim Under the First Amendment

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (1) engaged in protected activity, or (2) suffered adverse action as a result of engaging in protected activity. More specifically, Defendants argue that the claim should be dismissed because (1) the statement of an inmate's intent to contact an attorney is not protected conduct, (2) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Norton knew of Plaintiff's intention to contact an attorney, and (3) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants' actions were retaliatory. (Dkt. No. 24, Attach.10.) [FN10]

> FN10. Defendants also argue that Plaintiff's First Amendment claim should be dismissed to the extent that it is based solely on the fact that misbehavior reports against him were *false* (as opposed to being false *and retaliatory* ). The Court agrees that Plaintiff has no general constitutional right to be free from false misbehavior reports. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997). As a result, to the extent that the Plaintiff's Complaint may be construed as asserting a claim based solely on the issuance of false behavior reports, that claim is dismissed.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

**\*7** After carefully considering the admissible record evidence adduced in this case, and carefully reviewing the relevant case law, the Court has trouble finding that an inmate's one-time making of an oral statement (immediately after the use of force against him) that he would be "contacting [his] attorney," or "calling a lawyer" at some unidentified point in the future constitutes engagement in activity that is protected by the First Amendment—especially where, as here, the inmate did not reference the prison grievance process in his statement.

Representation by a lawyer is certainly not necessary to file an inmate grievance in the New York State Department of Corrections and Community Supervision, nor does such representation necessarily result in the filing of a grievance. Rather, such representation is most typically associated with the filing of a civil rights action in federal court (as is clear from the motions for appointment of counsel typically filed in federal court actions). As a result, the statement in question does not reasonably imply that Plaintiff would be filing a grievance as much as it implies that he was going to consult an attorney as to whether or not to file a civil rights action in federal court.

Here, such a statement is problematic. This is because, generally, the filing of the prisoner civil rights action in federal court in New York State must be preceded by the prisoner's exhaustion of his available administrative remedies (or his acquisition of a valid excuse for failing to exhaust those remedies). Any filing without such prior exhaustion (or acquisition of a valid excuse), under the circumstances, would be so wholly without merit as to be frivolous. Of course, filing a court action that is frivolous is not constitutionally protected activity.[FN11]

> [FN11]. *See* _Wade–Bey v. Fluery,_ 07–CV–117, 2008 WL 2714450 at \*6 (W.D.Mich. July 8, 2010) ("Although it is well established that prisoners have a constitutional right of access to the courts ..., the filing of a frivolous lawsuit would not be protected activity.") [citation omitted].

Moreover, to the extent that Plaintiff's statement could be construed as reasonably implying that he was going to consult an attorney as to whether or not to file a grievance, the Court has trouble finding that such a vague statement is constitutionally protected.[FN12] As one district court has stated, "[h]oping to engage in constitutionally protected activity is not itself constitutionally protected activity."[FN13] The Court notes that a contrary rule would enable a prisoner who has committed conduct giving rise to a misbehavior report to create a genuine issue of material fact (and thus reach a jury) on a retaliation claim (alleging adverse action based on the issuance of that misbehavior report) simply by uttering the words, "I'm calling a lawyer," after he commits the conduct in question but before the misbehavior report is issued.

> [FN12.] The Court notes that numerous cases exist for the point of law that even *expressly threatening* to file a *grievance* does not constitutes protected activity. *See, e.g., Bridges v. Gilbert,* 557 F.3d 541, 554–55 (7th Cir.2009) ("[I]t seems implausible that a *threat* to file a grievance would itself constitute a First Amendment-protected grievance.") [emphasis in original]; _Brown v. Darnold,_ 09–CV–0240, 2011 WL 4336724, at \*4 (S.D.Ill. Sept.14, 2011) ("Plaintiff cannot establish that his threat to file a grievance against Defendant Darnold is a constitutionally protected activity."); _Koster v. Jelinek,_ 10–CV–3003, 2011 WL 3349831, at \*3, n. 2 (C.D.Ill. Aug.3, 2011) ("The plaintiff does not seem to be asserting that he had a First Amendment right to threaten the facilitators with lawsuits and grievances, nor does the Court believe that he has such a right."); _Ingram v. SCI Camp Hill,_ 08–CV–0023, 2010 WL 4973302, at \*15 (M.D.Pa. Dec.1, 2010) ("Stating an intention to file a grievance is not a constitutionally protected activity."), *aff'd,* No. 11–1025, 2011 WL 4907821 (3d Cir. Oct.17, 2011); _Lamon v. Junious,_ 09–CV–0484, 2009 WL 3248173, at \*3 (E.D.Cal. Oct.8, 2009) ("A mere threat to file suit does not rise to the level of a protected activity...."); _Miller v. Blanchard,_ 04–CV–0235, 2004 WL 1354368, at \*6 (W.D.Wis. June 14, 2004) ("Plaintiff alleges that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

defendants retaliated against him after he threatened to file a lawsuit against them. Inmates do not have a First Amendment right to make threats.").

FN13. *McKinnie v. Heisz,* 09–CV–0188, 2009 WL 1455489, at *11 (W.D.Wis. May 7, 2009) ("Hoping to engage in constitutionally protected activity is not itself constitutionally protected activity. At most, petitioner's actions could be construed as a 'threat' to assert his rights but that is not enough.").

In any event, even assuming, for the sake of argument, that Plaintiff's statement was constitutionally protected, the Court finds, based on the current record, that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that his statement to Defendants Dinelle, Duckett, and Broekema that he would be contacting an attorney was a substantial or motivating factor for the issuance of the misbehavior report by Defendant Norton (which was signed by Defendant Dinelle as a witness), and the misbehavior report by Defendant Duckett (which was signed by Defendant DeLuca as a witness). The Court makes this finding for two alternate reasons.

**\*8** First, with regard to the misbehavior report issued by Defendant Norton, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she was aware Plaintiff would be contacting an attorney. In addition, with regard to the report made by Defendant Duckett (which was signed by Defendant DeLuca as a witness), although there is record evidence that Defendant Duckett had knowledge of Plaintiff's statement that he would contact an attorney, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Duckett had reason to believe, at the time the misbehavior report was issued, Plaintiff would actually follow through with his one-time oral statement, made on the heals of a heated incident.

Second, even assuming that Defendant Duckett or Defendant Norton had reason to believe Plaintiff would contact an attorney, Plaintiff has failed to adduce

admissible record evidence from which a rational factfinder could conclude that Defendant Duckett or Defendant Norton would not have issued the misbehavior report anyway, based on Plaintiff's actions. Indeed, at Plaintiff's disciplinary hearings, evidence was adduced that he in fact committed most of the misconduct alleged in the misbehavior reports, which resulted in the hearing officer finding multiple violations and sentencing Plaintiff to SHU. FN14 Furthermore, those convictions were never subsequently reversed on administrative appeal. FN15 As a result, no admissible record evidence exists from which a rational factfinder could conclude that Plaintiff has established the third element of a retaliation claim—the existence of a causal connection between the protected speech and the adverse action.

FN14. *See Hynes v. Squillance,* 143 F.3d 653, 657 (2d Cir.1998) (holding that defendants met their burden of showing that they would have taken disciplinary action on valid basis alone where the evidence demonstrated that plaintiff had committed "the most serious, if not all, of the prohibited conduct"); *Jermosen v. Coughlin,* 86–CV–0208, 2002 WL 73804, at *2 (N.D.N.Y. Jan.11, 2002) (Munson, J.) (concluding, as a matter of law, that defendants showed by a preponderance of the evidence that they would have issued a misbehavior report against plaintiff even in the absence of his complaints against correctional department personnel, because they established that the misbehavior report resulted in a disciplinary conviction, "demonstrat[ing] that plaintiff in fact committed the prohibited conduct charged in the misbehavior report.").

FN15. For these reasons, the Court finds to be inapposite the case that Plaintiff cites for the proposition that the Court must accept as true his sworn denial that he committed any of the violations alleged in the misbehavior reports issued against him. *See Samuels v. Mockry,* 142 F.3d 134, 135–36 (2d Cir.1998) (addressing a situation in which a prisoner was placed in a prison's "Limited Privileges Program," upon a finding rendered by the prison's Program Committee, that he had refused to accept a

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

mandatory work assignment, *"without a hearing or a misbehavior report"* ) [emphasis added]. The Court would add only that, even if it were to accept Plaintiff's sworn denial as true, the Court would still find that he has failed to establish that Defendants Duckett and Norton would not have issued the misbehavior reports against him anyway, based on their subjective belief that he was acting in a disturbing, interfering, harassing and disobedient manner at the time in question (as evident from, *inter alia,* their misbehavior reports, the disciplinary hearing testimony of three of the Defendants, and admissions made by Plaintiff during his deposition regarding the "confusion" and "misunderstanding" that occurred during his examination by Defendant Norton, his persistent assertions about his prescribed frequency of visits, and his unsolicited comments about his proper course of treatment).

For each of these alternative reasons, Plaintiff's retaliation claim under the First Amendment is dismissed.

**B. Plaintiff's Claims Under the Eighth Amendment**

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's Eighth Amendment claims because (1) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Norton used any force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so, (2) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Broekema had a reasonable opportunity to intervene and prevent the alleged assault by Defendants Dinelle, DeLuca and Duckett, yet failed to do so, and (3) Plaintiff's identification of Defendant DeLuca is "very tentative."

As an initial matter, because Plaintiff did not oppose Defendants' argument that his excessive-force claim against Defendant Norton should be dismissed, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou v.*

*S.U.N.Y. Inst. of Tech.,* 08–CV–0444, 2011 WL 4344025, at *11 (N.D.N.Y. Sept.14, 2011)* (Suddaby, J.). After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, the Court can find no record evidence to support the claim that Defendant Norton used force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so. As a result, Plaintiff's Eighth Amendment claim against Defendant Norton is dismissed.

**\*9** Turning to Plaintiff's failure-to-intervene claim against Defendant Broekema, it is undisputed that it was Defendants Duckett, Dinelle and DeLuca who used force against Plaintiff. Plaintiff testified that, while Defendant Broekema was in the room at the time, Defendant Broekema was standing behind Defendant Dinelle on his "immediate right." In addition, Plaintiff testified that Defendant Duckett's threat of physical force against Plaintiff was conditioned on Plaintiff's continued failure to comply with (what Plaintiff perceived to be) conflicting instructions by Defendants Duckett and Dinelle during the frisk. (Dkt. No. 24, Attach. 4, at 97–99.) Furthermore, Plaintiff testified that it was only after he failed to put his hands in his pockets (rather soon after being warned by Defendant Duckett) that either Defendant Duckett or Defendant Dinelle punched him *one time* with a "closed fist" in the side of his nose, causing him to immediately fall to the ground. (*Id.* at 98–99.) Finally, Plaintiff testified that the kicks that he suffered soon after falling to the ground were limited in nature, having occurred only "a couple of times," and indeed having only *possibly* occurred. (*Id.* at 99.)

While the Court in no way condones the conduct alleged in this action, the Court is simply unable to find, based on the current record, that Plaintiff has adduced sufficient admissible record evidence to reach a jury on his Eighth Amendment claim against Defendant Broekema. Rather, based on the evidence presented, a rational factfinder could only conclude that the use of force was simply too uncertain for a reasonable person in Defendant Broekema's position to expect; and it was too brief in nature to give Defendant Broekema a realistic opportunity

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

to intervene in it, so as prevent the one punch and possibly few kicks that Plaintiff presumably experienced.[FN16]

> FN16. *See* *O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988) (noting that "three blows [that occurred] in such rapid succession ... [is] not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator"); *Blake v. Base,* 90–CV–0008, 1998 WL 642621, at *13 (N.D.N.Y. Sept.14, 1998) (McCurn, J.) (dismissing failure-to-intervene claim against police officer based on finding that the punch to the face and few body blows that plaintiff allegedly suffered "transpired so quickly ... that even if defendant ... should have intervened, he simply did not have enough time to prevent plaintiff from being struck"); *Parker v. Fogg,* 85–CV–0177, 1994 WL 49696, at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.) (holding that an officer is not liable for failure-to-intervene if there "was no 'realistic opportunity' to prevent [an] attack [that ends] in a matter of seconds"); *see also* *Murray–Ruhl v. Passinault,* 246 F. App'x 338, 347 (6th Cir.2007) (holding that there was no reasonable opportunity for an officer to intervene when one officer stood by while another fired twelve shots in rapid succession); *Ontha v. Rutherford Cnty., Tennessee,* 222 F. App'x 498, 506 (6th Cir.2007) ("[C]ourts have been unwilling to impose a duty to intervene where ... an entire incident unfolds 'in a matter of seconds.' "); *Miller v. Smith,* 220 F.3d 491, 295 (7th Cir.2000) (noting that a prisoner may only recover for a correction's officer's failure to intervene when that officer "ignored a realistic opportunity to intervene").

Finally, based on the current record, the Court rejects Defendants' third argument (i.e., that Plaintiff's excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"). Defendants argue that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant DeLuca was present during the use of force

against Plaintiff (let alone that Defendant DeLuca used force against Plaintiff). This is because Plaintiff's basis for bringing his excessive-force claim against Defendant DeLuca is that he remembered being assaulted by three individuals, including Defendants Dinelle and Duckett, whose last names began with the letter "D." While this fact is undisputed, it is also undisputed that Defendant DeLuca was interviewed by the Inspector General's Office regarding his involvement in the incidents giving rise to Plaintiff's claims,[FN17] and that both Defendant Broekema's use-of-force report, and Defendant Broekema's Facility Memorandum, state that Defendant DeLuca participated in the use of force against Plaintiff.[FN18] Based on this evidence, a rational factfinder could conclude that Defendant DeLuca violated Plaintiff's Eighth Amendment rights. As a result, Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca survives Defendants' motion for summary judgment. The Court would add only that, although it does not construe Plaintiff's Complaint as alleging that Defendant DeLuca failed to intervene in the use of force against Plaintiff, assuming, (based on Plaintiff's motion papers) that Plaintiff has sufficiently alleged this claim, the claim is dismissed because the entirety of the record evidence as it pertains to Defendant DeLuca establishes that he used force against Plaintiff.

> FN17. (Dkt. No. 27, Attach. 2, at 19–20.)

> FN18. (Dkt. No. 27, Attach. 2, at 10, 14.)

**C. Plaintiff's Claim Under the Fourteenth Amendment**

**\*10** As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Defendants did not deprive Plaintiff of his liberty rights. As stated above in note 2 of this Decision and Order, Plaintiff failed to address Defendants' argument that his substantive due process claim should be dismissed. As a result, as stated above in Part III.B. of this Decision and Order, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou,* 2011 WL 4344025, at *11.

After carefully considering the matter, the Court finds

that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, although the record evidence establishes that Plaintiff was confined in SHU for 150 days as a result of the misbehavior reports issued by Defendants Norton and Duckett, Plaintiff has failed to adduced admissible record evidence from which a rational factfinder could conclude that the conditions of his confinement during this 150–day period were more severe than normal SHU conditions.[FN19] As a result, Plaintiff's substantive due process claim is dismissed.

> FN19. *See* *Spence v. Senkowski,* 91–CV–0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (finding that 180 days that plaintiff spent in SHU, where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217–19 (W.D.N.Y.1998) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353–56 (W.D.N.Y.1997) (161 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96–CV–2003, 1997 WL 137448, at *4–6 (S.D.N.Y.1997) (192 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116–17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94–CV–4094, 1996 WL 487951, at *4–5 (S.D.N.Y. Aug.27, 1996) (210 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103–04 (W.D.N.Y.1995) (270 days in SHU under numerous conditions of confinement that

were more restrictive than those in general population).

**D. Defendants' Defense of Qualified Immunity**

As stated above in Part I.C. of this Decision and Order, Defendants seek dismissal of Plaintiff's claims on the alternative ground that they are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances.

**1. Retaliation**

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 [1982] ). Here, even assuming that Plaintiff's statement that he would contact an attorney regarding the use of force he experienced constitutes engagement in protected activity, and even also assuming that the only reason Defendant Norton and/or Duckett issued Plaintiff a misbehavior report was because he made this statement, these Defendants are, under the circumstances, entitled to qualified immunity. This is because the Court finds that the right to make this statement (without experiencing any resulting adverse action) was not a clearly established during the time in question (January 2009), based on a review of the relevant case law. *See, supra,* notes 12 and 13 of this Decision and Order.

As a result, Plaintiff's retaliation claim is dismissed on the alternate ground of qualified immunity.

**2. Excessive Force**

There is no doubt that the right to be free from the use of excessive force was "clearly established" at the time of the incidents giving rise to Plaintiff's claims. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Moreover, with regard to whether it was objectively reasonable for Defendants to use the alleged amount of force that they used, the Second Circuit has made clear that, "[w]here the circumstances are in dispute, and contrasting accounts present factual issues as to the degree of force actually employed and its

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." *Mickle v. Morin,* 297 F.3d 114, 122 (2d Cir.2002) [internal quotation marks omitted].

**\*11** Here, after carefully reviewing the record, and construing it in the light most favorable to Plaintiff, the Court finds that, even if Defendants Dinelle, DeLuca and Duckett genuinely feared being assaulted by Plaintiff, and even if those three Defendants genuinely perceived Plaintiff's words and movements to constitute an attempt to resist a frisk, admissible record evidence exists from which a rational jury could conclude that those perceptions were not objectively reasonable under the circumstances. As the Second Circuit has observed, it is impossible to "determine whether [Defendants] reasonably believed that [their] force was not excessive when several material facts [are] still in dispute, [and therefore,] summary judgment on the basis of qualified immunity [is] precluded." *Thomas v. Roach,* 165 F.3d 137, 144 (2d Cir.1999).[FN20] For these reasons, the Court rejects Defendants' argument that Plaintiff's excessive-force claim should be dismissed on the ground of qualified immunity as it relates to Defendants Dinelle, DeLuca and Duckett.

> FN20. *See also* Robison v. Via, 821 F.2d 913, 924 (2d Cir.1987) ( "[T]he parties have provided conflicting accounts as to [who] initiated the use of force, how much force was used by each, and whether [the arrestee] was reaching toward [a weapon]. Resolution of credibility conflicts and the choice between these conflicting versions are matters for the jury and [should not be] decided by the district court on summary judgment.").

However, the Court reaches a different conclusion with regard to Plaintiff's failure-to-intervene claim against Defendant Broekema: the Court finds that, at the very least, officers of reasonable competence could disagree on the legality of Defendant Broekema's actions, based on the current record. As a result, Plaintiff's failure-to-intervene claim against Defendant Broekema is dismissed on this alternative ground.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for partial summary judgment (Dkt. No. 24) is ***GRANTED*** in part and ***DENIED*** in part in the following respects:

(1) Defendants' motion for summary judgment on Plaintiff's First Amendment claim is ***GRANTED;***

(2) Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment substantive due process claim is ***GRANTED;***

(3) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton is ***GRANTED;***

(4) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema is ***GRANTED;*** and

(5) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca is ***DENIED;*** and it is further

**ORDERED** that the following claims are ***DISMISSED*** with prejudice from this action:

(1) Plaintiff's First Amendment claim;

(2) Plaintiff's Fourteenth Amendment substantive due process claim;

(3) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton; and

(4) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema; and it is further

**ORDERED** that Defendants Norton and Broekema are ***DISMISSED*** from this action; and it is further

**ORDERED** that, following this Decision and Order, the following claims remain pending in this action: Plaintiff's Eighth Amendment excessive-force claim against Defendants DeLuca, Dinnelle and Duckett; and it is further

**\*12 ORDERED** that counsel are directed to appear

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

on **JANUARY 4, 2012 at 2:00 p.m.** in chambers in Syracuse, N.Y. for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **DECEMBER 16, 2011,** and the parties are directed to engage in meaningful settlement negotiations prior to the 1/4/12 conference.

N.D.N.Y.,2011.

Henry v. Dinelle
Slip Copy, 2011 WL 5975027 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Troy GARRETT, Plaintiff,
v.
Edward REYNOLDS, Superintendent, Mohawk Corr.
Facility; James A. Mance, Deputy Superintendent of
Programs; John O'Reilly,[FN1] Deputy Superintendent; J.
Burge, First Deputy; M. Maher, DSS; R. Centore,
Correctional Officer, Defendants.

> FN1. In this case, the defendants maintain and
> the docket confirms that defendant John O'Reilly
> has never been served. Service must be made
> upon a defendant within 120 days of filing the
> complaint or any claims against that defendant
> will be dismissed. See Fed.R.Civ.P. 4(m). The
> original complaint, which named O'Reilly, was
> filed on November 26, 1999, and the amended
> complaint was filed on July 13, 2001. However,
> O'Reilly was never served. Since this defendant
> has never been served, this court lacks
> jurisdiction over him, and this court recommends
> the dismissal of this defendant.

No. Civ.9:99CV2065NAMGLS.

Oct. 7, 2003.

Troy Garrett, Peekskill, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York,
Syracuse, NY, for the Defendants.

Maria Moran, Asst. Attorney General, of counsel.

*REPORT-RECOMMENDATION*

SHARPE, Magistrate, J.
  I. *Introduction* [FN2]
    FN2. This matter was referred to the undersigned
    for a Report-Recommendation by the Hon.

Norman A. Mordue, United States District
Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and
Local Rule 72.3(c).

**\*1** Plaintiff, *pro se* Troy Garrett filed an action under
42 U.S.C. § 1983 claiming that the defendants violated his
civil rights when they retaliated against him for his
activities as an IGRC representative by subjecting him to
verbal harassment, physical abuse and subsequently, a
transfer. Garrett also claims that the supervisory
defendants failed to properly investigate his complaints
and failed to train/supervise their employees. This court
recommends denying the motion for summary judgment in
part and granting it in part.

  II. *Procedural History*

  On July 13, 2001, Garrett filed an amended complaint
against the defendants claiming that they violated his civil
rights under the First, Sixth Eighth, and Fourteenth
Amendments.[FN3] On September 28, 2001, the defendants
filed a motion for summary judgment. On January 18,
2002, this court issued an order informing Garrett of his
obligation to file a response and extended his time to
respond for thirty days. On April 24, 2002, this court
granted an additional sixty days to respond to the
defendants' motion. Despite having been given multiple
opportunities to respond, Garrett has failed to file a
response.

> FN3. Although Garrett claims to be raising
> violations under the Sixth, Eighth, and
> Fourteenth Amendments, the only viable claim
> based on this court's interpretation of the
> complaint is under the First Amendment for
> retaliation.

  III. *Facts* [FN4]

> FN4. The facts are taken from the defendants'
> statement of undisputed material facts since
> Garrett failed to file a response.

  On June 17, 1999, Garrett filed a grievance against

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Officer Kelley for verbal harassment.[FN5] This grievance was denied by the Central Office Review Committee (CORC) on July 21, 1999. On March 19, 2000, Garrett filed a grievance claiming that defendant Burge used intimidation tactics. Defendant Reynolds investigated the grievance and it was denied based on a finding that no harassment occurred. Garrett appealed to the CORC and they denied the grievance on April 5, 2000. On April 10, 2000, defendant Centore wrote a misbehavior report against Garrett for creating a disturbance and employee harassment. On April 12, 2000, Lieutenant Manell presided over Garrett's Tier 2 disciplinary hearing and he was found guilty of both charges. He was given a 21 day recreation penalty, and loss of packages and commissary. However, his recreation penalty was suspended and deferred. Garrett appealed the determination and it was affirmed on April 19, 2000.

FN5. Not a party in this suit.

On April 17, 2000, Garrett filed a grievance against Centore for harassment. Burge denied his grievance on May 4, 2000, and subsequently, the CORC denied it. On May 12, 2000, Garrett sent a letter to Burge concerning further harassment by Centore. On May 16, 2000, Garrett filed another grievance against Centore for harassment. His grievance was denied on May 26, 2000. After Garrett appealed, his grievance was again denied by the CORC. On June 22, 2000, the Superintendent's Office received a letter from Garrett alleging that Centore threw a piece of paper with a picture of a plunger and the words "always gets the job done" into his cell. He wrote a grievance against Centore for harassment due to the paper that he threw into his cell. Burge forwarded the grievance to the CORC on August 10, 2000. The CORC accepted the grievance on August 30, 2000, in order to investigate.

**\*2** On June 23, 2000, the Inspector General's Office interviewed Garrett at the Mohawk Correctional Facility regarding his complaints of Centore. That same day, Captain Naughton filed an administrative segregation recommendation. On June 29, 2000, an administrative segregation hearing was held. On July 14, 2000, Garrett was transferred [FN6] to the Mid-State Correctional Facility.

FN6. The defendants suggest that Garrett has failed to exhaust his administrative remedies concerning his transfer. They claim that he agreed to the transfer and participated in the administrative hearing which resulted in his transfer. The issue of transfer will not be addressed in this Report-Recommendation because the court has insufficient information to determine whether he exhausted his remedies.

Finally, Garrett filed a claim alleging that his property was lost or damaged on October 8, 1999. However, he was paid $75.00 for this claim and he signed a release on December 13, 1999.

IV. *Discussion*

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994)(alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U .S. 519, 520 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

**\*3** This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at \*2 (N.D.N.Y. March 1, 2002)(interalia citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at \*1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, Garrett did not file a response to the motion for summary judgment. Consequently, this court will accept the properly supported facts contained in the defendants' 7.1 Statement (*Dkt. No. 49* ) as true for purposes of this motion.[FN7] With this standard in mind, the court now turns to the sufficiency of Garrett's claims.

> [FN7.] The court notes that this does not apply to the various conclusions of law contained in the defendants' 7.1 Statement.

B. *Eleventh Amendment*

In Garrett's complaint, he raises claims against the defendants in their official and individual capacities. The Eleventh Amendment provides that: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the Amendment does not specifically prohibit suits against a state by its own citizens, the Supreme Court has consistently applied that immunity to such cases. *See Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999)(citing *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974)). Moreover, it is well established that Eleventh Amendment immunity applies not only when a state is a named defendant, but when liability must be paid from state coffers. *See New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 134 (2d Cir.1995)(citing *Edelman,* 415 U .S. at 665); *Dawkins v. State of New York,* 93-CV-1298, 1996 WL 156764, at \*2 (N.D.N.Y. Mar. 28, 1996).

**\*4** In this case, Garrett raises claims against the defendants in their official and individual capacities. Since the Eleventh Amendment bars official capacity claims against these state officers, this court recommends dismissal of Garrett's claims against the defendants in their official capacity.

C. *Retaliation*

In this case, Garrett claims that during the course of his appointment as an IGRC representative, he has been subjected to repeated acts of harassment, both verbal and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

physical, threatened with physical assaults, placed into disciplinary confinement in the SHU, and transferred.[FN8] The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under § 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983).

> FN8. This case turns on the interpretation of the complaint. Garret's complaint is not a model of clarity and as noted, he has failed to file a response to the motion for summary judgment. Nonetheless, a careful reading of Garrett's opening paragraph under the title "Facts" compels this court to interpret this complaint as one claiming retaliation for his activities and status as an IGRC representative.

In order for a plaintiff to prevail on a First Amendment retaliation claim, a plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal connection between the protected speech and the adverse action. *See Dawes v. Walker,*[FN9] 239 F.3d 489, 492 (2d Cir.2001) (citation omitted) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). If Garrett makes these showings, DOCS may evade liability if it demonstrates that it would have disciplined or transferred him " 'even in the absence of the protected conduct." ' *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted).

> FN9. Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

An inmate has a constitutional right to be protected from retaliation based upon his activities as an IGRC representative. *Alnutt v. Cleary,* 913 F.Supp. 160, 170 (W.D.N.Y.1996). However, a claim brought under "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp.2d 113, 129

(N.D.N.Y.2003)(citing *Alnutt,* 913 F.Supp at 165-66)). Ordinarily, a claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at 474.

In this case, Garrett claims that defendant Centore harassed him for his activities as an IGRC representative. Garrett also claims that he was removed as an IGRC representative when he was transferred. In addition, Garrett claims that defendants Reynolds, Mance, Burger and Maher failed to properly investigate his allegations against Centore. Garrett claims that these defendants failed to properly investigate his claims in retaliation for his activities as an IGRC representative.

**\*5** More specifically, Garrett claims that Reynolds and Mance recalled IGRC passes for one day in order to interfere with an investigation inquiry into a correctional officer's conduct involving inmates who were left in the yard during inclement weather. Finally, Garrett claims that his property was destroyed while he was in the SHU.[FN10] Garrett filed grievances against Centore in April, May, and June of 2000. One of his complaints involved Centore throwing a folded piece of paper into his cell which had a picture of a plunger with the words "always gets the job done" on it. On June 23, 2000, he was placed in administrative segregation in the SHU. Three weeks later he was transferred.[FN11]

> FN10. However, the defendants provide the court with documents which show that he was paid $75.00 in settlement of this claim.

> FN11. The defendants maintain that Garrett failed to exhaust this claim. At this juncture, it is unclear whether or not he exhausted this claim. As such, this court cannot, as a matter of law, recommend dismissal because the court has insufficient information to determine this issue.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Viewing the facts in the light most favorable to Garrett, the non-moving party, this court cannot, as a matter of law, find that Garrett fails to state a claim for which relief can be granted. He claims that he was retaliated against for his activities as an IGRC representative. As noted, verbal harassment alone will not constitute a violation of a prisoner's constitutional rights but in this case, it appears that he was transferred for his activities as an IGRC representative. The defendants rely on numerous grievances which were denied by the CORC to show that their actions were proper. They also claim that Garrett has failed to show injury, however, at this juncture of the litigation with virtually no discovery in this case, this court cannot recommend dismissal as a matter of law.

D. *Personal Involvement*

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted* ). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged deprivation of rights. *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989).* Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 690-695 (2d Cir.1978). However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Garrett contends that defendants Reynolds and Mance allowed staff members under their supervision to violate his rights. More specifically, Mance refused to properly investigate Garrett's complaints. Garrett also claims that defendant Burge refused to grant his request for redress against defendant Centore. Finally, Garrett claims that the defendants collectively failed to properly train and supervise their employees.

**\*6** The defendants contend that the claims against the supervisory defendants should be dismissed for lack of personal involvement. However, this court finds this contention without merit since it appears that all of the defendants were involved in the investigation process of Garrett's complaint and he accuses all of them of continuing the alleged constitutional violation by failing to properly investigate the grievances he filed. Accordingly, this court recommends denying the defendants' motion for summary judgment based on the lack of personal involvement.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Garrett's claims against the defendants in their official capacity under the Eleventh Amendment should be dismissed since these claims are barred; and it is further

RECOMMENDED, that defendant O'Reilly be dismissed since he was never served; and it is further

RECOMMENDED, that the defendants' motion for summary judgment be denied in all other respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

Garrett v. Reynolds
Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 7431068 (N.D.N.Y.)

(Cite as: 2011 WL 7431068 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jeremy SANTIAGO, Plaintiff,
v.
K. HOLDEN, Defendant.
No. 11–CV–567 (GTS/DRH).

Nov. 29, 2011.
Jeremy Santiago, Comstock, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Krista A. Rock, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendant.

**REPORT–RECOMMENDATION AND ORDER**[FN1]

> [FN1.](#) This matter was referred to the undersigned for report and recommendation pursuant to [28 U.S.C. § 636(b)](#) and N.D.N.Y.L.R. 72.3(c).

[DAVID R. HOMER](#), United States Magistrate Judge.

*1 Plaintiff pro se Jeremy Santiago ("Santiago"), an inmate in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to [42 U.S.C. § 1983](#) alleging that defendant K. Holden ("Holden"), a corrections officer employed by DOCCS, violated his constitutional rights under the First, Eighth and Fourteenth Amendments. Compl. (Dkt. No. 1). Presently pending is Holden's motion for summary judgment pursuant to [Fed.R.Civ.P. 56](#). Dkt. No. 9. Santiago opposes the motion. Dkt. No. 12. Also pending is Santiago's motion to amend his complaint. Dkt. No. 14. For the following reasons, it is (1) ordered that Santiago's motion to amend the complaint is denied, and (2) Holden's motion for summary judgment be granted.

**I. Background**

The facts are related in the light most favorable to

Santiago as the non-moving party. *See [Ertman v. United States,](#) 165 F.3d 204, 206 (2d Cir.1999).*

Santiago contends that he has suffered "(1) a violation of [his] constitutional rights, (2) emotional distress, (3) cruel and unusual punishment, (4) pain and suffering [and] (5) den[ial of his] religious practice." Compl. ¶ IV. While the specifics are unclear, it appears that after Santiago went before the Inmate Grievance Committee,[FN2] presumably sometime prior to April 16, 2011 when the current complaint was filed. *Id.* ¶ IV. In retaliation for that grievance, Holden issued Santiago a misbehavior report. *Id.* ¶ IV(A). Santiago contends that he did not engage in any of the proscribed conduct alleged in the misbehavior report. *Id.* ¶ V. Santiago identifies himself as a Muslim. *Id.*

> [FN2.](#) "The IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ...." *[Abney v. McGinnis,](#) 380 F.3d 663, 668 (2d Cir.2004)* (internal citations omitted).

"When an inmate appeals a grievance to CORC, DOCCS Directive[s] .... stipulate [ ] that it is Department policy to maintain grievance files for the current year and the previous four calendar years." Hale Aff. (Dkt. No. 9–2) ¶ 7. Santiago's complaints that he received a false retaliatory misbehavior report and that his right to practice his religion was infringed, are all issues which require review by the IGP. *Id.* ¶¶ 8–9. DOCCS also has an expedited procedure to review grievances, though the ultimate appeal is still to the CORC. *Id.* ¶ ¶ 9–10. Santagio's grievances were denied at the facility level, but were never appealed to, and thus never addressed by, CORC. *Id.* ¶¶ 10–12; *see also* Dkt. No. 9–3.

Santiago's opposition to Holden's motion indicates that the Constitution provides an inmate with various rights, including the free exercise of religion. Dkt. No. 12.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 7431068 (N.D.N.Y.)

(Cite as: 2011 WL 7431068 (N.D.N.Y.))

However, there are no additional factual allegations contained within the opposition. *Id.* Additionally, Santiago filed an amended complaint, which states identical facts and purported causes of action as his initial complaint. Dkt. No. 14. It too lacks any additional factual allegations. *Id.*

## II. Discussion

Santiago contends that his constitutional rights were violated, though the exact reasons why are unclear. Holden moves for dismissal because (1) Santiago has failed to exhaust his administrative remedies, (2) there are no merits to Santiago's constitutional claim, and (3) Holden is entitled to both Eleventh Amendment and qualified immunity.

### A. Legal Standard

**\*2** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Fed.R.Civ.P. 56*; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks summary judgment

against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

### B. Failure to Exhaust

Under *42 U.S.C. § 1997e(a)*, an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases. *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); see also *Woodford v. Ngo,* 548 U.S. 81, 83, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). This exhaustion requirement applies to all prison condition claims. *Porter,* 534 U.S. at 532. "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement." *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999). The exhaustion requirement also applies even if the administrative grievance process does not provide for all the relief requested by the inmate. *Nussle,* 534 U.S. at 524. Exhaustion must be proper, meaning that all agency requirements are timely complied with, as "untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement." *Ruggiero v. County of Orange,* 467 F.3d 170, 176 (2d Cir.2006) (citing *Woodford,* 548 U.S. at 2382, 2385).

**\*3** While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." *Ruggiero,* 467 F.3d at 175 (citing *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)).

A plaintiff's failure to exhaust administrative remedies may be excused if: (1) administrative remedies were not actually available; (2) defendants have forfeited their affirmative defense of non-exhaustion or are estopped from raising such a defense because of their own actions; or (3) special circumstances exist, such as a reasonable misinterpretation of [DOCCS] regulations.

*Torres v. Carry,* 672 F.Supp.2d 338, 344

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 7431068 (N.D.N.Y.)

(Cite as: 2011 WL 7431068 (N.D.N.Y.))

(S.D.N.Y.2009) (citations omitted).

Exhaustion for an inmate in DOCCS custody is generally achieved through the IGP. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1 *et seq.*. Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit. *Torres,* 672 F.Supp.2d at 344; *see also* N.Y. Comp.Codes R. & Regs. tit. 7 § 701.5(d)(2)(ii) ("The CORC shall review each appeal, render a decision on the grievance, and transmit its decision ... within 30 calendar days"); *Collins v. Goord,* 438 F.Supp.2d 399, 408 (S.D.N.Y.2006) ("[I]n order to exhaust remedies, an inmate in a New York State correctional facility must pursue fully his complaint through DOC[C]S's three-step ... IGP...."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) ("Only upon exhaustion of these three levels of review [provided by the IGP] may a prisoner seek relief pursuant to § 1983 in federal court.") (citations omitted).

In this case, Santiago has never appealed any of the denials of his grievances to, or received denials from, CORC. Thus he has not properly completed the exhaustion requirement. Moreover, there are no facts alleged which alleviate this failure since Santiago has not proffered that these remedies were unavailable to him or that special circumstances existed excusing him from exhausting such remedies.

Accordingly, Holden's motion should be granted on this ground.

### C. Eleventh Amendment

Santiago does not specify in which capacities he is suing Holden. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

*\*4* A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Here, Santiago seeks monetary damages against defendant in his official capacities for acts occurring within the scope of his duties with DOCS. Thus, the Eleventh Amendment bar applies and serves to prohibit Santiago's claim for monetary damages against the defendant in his official capacities.

Accordingly, it is recommended that Holden's motion be granted on this ground and that judgment be granted to Holden as to Santiago's claims against him in his official capacity.

### D. Failure to State a Claim

An action commenced pursuant to 42 U.S.C. § 1983 requires proof of the "deprivation of any right[ ], privilege[ ], or immunit[y] secured by the Constitution" or laws of the United States federal government. 42 U.S.C. § 1983. Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right. *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 19, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). Moreover, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusion [thus t]hreadbare recitals of the

Slip Copy, 2011 WL 7431068 (N.D.N.Y.)

(Cite as: 2011 WL 7431068 (N.D.N.Y.))

elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

### 1. Retaliation

Santiago contends that after filing a grievance, a false misbehavior report was issued against him in retaliation for his actions. To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007) (citations omitted).

There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

**\*5** *Burton v. Lynch,* 664 F.Supp.2d 349, 367 (S.D.N.Y.2009) (internal quotation marks and citations omitted). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 214–15 (N.D.N.Y.2008). Conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

In this case, Santiago has not alleged facts sufficient to support a retaliation claim. There is no question that Santiago's conduct in filing grievances and appeals was

conduct protected by the First Amendment. However, Santiago has only stated in conclusory terms that the misbehavior report was false. Such assertions are insufficient. *Jackson,* 549 F.Supp.2d at 214. Moreover, no evidence was offered and Santiago relies solely on his suppositions to establish this element. Such unsupported assertions are insufficient to defeat a motion for summary judgment. *See Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 56 n. 8 (2d Cir.2003) ("[S]upposition ... is too tentative to qualify as evidence ...."); Fed.R.Civ.P. 56(e) ("Supporting affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.").

Accordingly, in the alternative, Holden's motion as to this claim should be granted on the merits.

### 2. False Misbehavior Reports

An inmate enjoys the right not to be deprived of his liberty without due process. However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988)). As discussed *supra,* Santiago has failed to allege facts sufficient to state a plausible retaliation claim. Accordingly, his false misbehavior report claims must also fail. Thus, in the alternative, Holden's motion on this ground should be granted as to this claim.

### 3. Freedom to Exercise Religion

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (*citing Pell v. Procunier,* 417 U.S. 817, 822 (1974)). However, Santiago fails to establish what specific misconduct defendant engaged in which infringed upon his right to free exercise of his religion. Making conclusory allegations about defendant's alleged interference with Santiago's

Slip Copy, 2011 WL 7431068 (N.D.N.Y.)

(Cite as: 2011 WL 7431068 (N.D.N.Y.))

constitutional rights is insufficient to establish a constitutional claim. *See e.g. Colon v. Zydell, 635 F.Supp.2d 264, 266 (W.D.N.Y.2009)* (dismissing case where inmate "alleges, in conclusory fashion, that the defendants generally failed to remedy the alleged [First Amendment] constitutional deprivation ...."). Accordingly, in the alternative, Holden's motion on this ground should be granted as to this claim.

### E. Qualified Immunity

**\*6** Defendant also contends that he is entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Aiken v. Nixon, 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002)* (McAvoy, J.), *aff'd, 80 Fed.Appx. 146 (2d Cir. Nov.10, 2003)*. However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights ... immunity might still be available as a bar to ... suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir.1991)* (citations omitted).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)*. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken, 236 F.Supp.2d at 230*. Here, the second prong of the inquiry need not be reached because, as discussed *supra*, accepting all of Santiago's allegations as true, he has not shown that Holden violated his constitutional rights. Accordingly, it is recommended in the alternative that Holden's motion on this ground be granted.

### III. Motion to Amend Complaint

Santiago filed a motion to amend his complaint after Holden filed his motion for summary judgment. Dkt. No. 14. The proposed amended complaint was substantially the same as the original, asserting identical causes of action and no additional facts.

*Fed.R.Civ.P. 15(a)* provides that a court should grant leave to amend "freely ... when justice so requires." When exercising its discretion, a court must examine whether there has been undue delay, bad faith, or dilatory motive on the part of the moving party. *Evans v. Syracuse City Sch. Dist., 704 F.2d 44, 46 (2d Cir.1983)* (citing *Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)*). A court must also examine whether there will be prejudice to the opposing party. *See, e.g., Ansam Associates Inc. v. Cola Petroleum, Ltd., 760 F.2d 442, 446 (2d Cir.1985)* (permitting proposed amendment would be especially prejudicial once discovery has been completed and a summary judgment motion filed). Finally, where it appears that granting leave to amend is unlikely to be productive or the amendment is futile, it is not an abuse of discretion to deny leave to amend. *Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir.1993)* (citations omitted).

Santiago's amended complaint is substantially the same as his original complaint. Thus the amended complaint will serve no useful purpose for Santiago, the Court, or Holden and its filing would be futile. Accordingly, the motion to amend is denied.

### IV. Conclusion

**\*7** For the reasons stated above, it is hereby:

1. **RECOMMENDED** that Holden's motion for summary judgment (Dkt. No. 9) be **GRANTED** and that judgment be entered for Holden as to all claims; and

2. **ORDERED** that Santiago's motion to amend (Dkt. No. 14) be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir.1989);* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 7431068 (N.D.N.Y.)

(Cite as: 2011 WL 7431068 (N.D.N.Y.))

N.D.N.Y.,2011.

Santiago v. Holden
Slip Copy, 2011 WL 7431068 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.